**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NARESH VISSA RAMMOHAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STANLEY BLACK & DECKER, INC., DONALD ALLAN, JR., JAMES M. LOREE, AND LEE MCCHESNEY,<br><br>Defendants. | **CIVIL CASE NO. 3:23-cv-00369**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>October 13, 2023 |

Lead Plaintiff General Retirement System of the City of Detroit ("Plaintiff"), by its attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Stanley Black & Decker, Inc. ("Stanley" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former Company employees and analysis by consultants. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Stanley common stock between October 28, 2021 and July 28, 2022, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against Stanley and certain of the Company's

executive officers and directors.

2. At the outset of the Class Period, Stanley was undergoing a multi-year simplification of its business units through acquisitions and divestitures to return to the Company's roots of primarily defining itself as a tool manufacturer. Leading into this transformation, Stanley enjoyed what it described as the strongest consumer demand environment in the Company's history to finance the Company's activities.

3. Specifically, Stanley repeatedly informed investors throughout 2021 and into 2022 that the Covid-19 pandemic environment of stay-at-home orders and remote work had led many consumers to spend more time at home, thus spurring increased home remodeling and do-it-yourself ("DIY") projects and consequently creating high consumer demand for Stanley's Tools & Outdoor products, which was by far the biggest segment of its business.

4. Throughout the Class Period, Defendants repeatedly assured the public that demand, which had increased with the Covid-19 pandemic, was continuing to remain strong and robust. Moreover, they stated that demand was strong across all markets.

5. For example, as detailed below, Defendants made the following statements:

- In an October 28, 2021 press release, it was stated that "demand was robust across all markets";
- In an October 28, 2021 earnings call with investors, Defendant Loree stated that "[c]ustomer demand remained at robust levels", called customer demand "extraordinary", and stated that Tools generated growth in the "strongest demand environment in our history";
- During that same call, Defendant Allan stated that "the market demand environment remains very strong and supportive";
- In a February 1, 2022 press release, Defendant Loree was quoted as stating

that "customers [were] experiencing unprecedented demand";

- That press release further stated that "[e]nd-user demand remained strong across all markets";

- During a February 1, 2022 earnings call with investors, Defendant Loree stated that "[w]e benefited from extraordinarily strong customer demand, which continues for our innovative products and portfolio of brands";

- During that same call, Defendant Allan stated that "[e]nd-user demand strength remains persistent across all markets";

- In an April 28, 2022 press release, Defendant Loree was quoted as stating that Stanley "capitalized on the strong demand environment";

- That press release further stated that "U.S. retail point-of-sale demand remained robust";

- During an April 28, 2022 earnings call with investors, Defendant Allan stated that "[t]he headline for the first quarter is that demand for our products remains healthy" and that "we have not seen evidence of broad demand destruction";

- Regarding the Tools & Outdoor segment, during that same call, Defendant Allan stated that "we continue to experience a very solid demand environment"; and

- During that same earnings call, Defendant Loree stated that "customer demand remained strong."

6. Defendants' statements in paragraph 5, as detailed below, were materially false and misleading for the following reasons: (i) contrary to Defendants' statements touting the Company's strong and robust demand, by the beginning of the Class Period, demand was stalling from the Covid-19 fueled levels and would decline throughout the Class Period; (ii) in order to

meet sales targets, and concurrently hide that demand was slowing, in the fourth fiscal quarter of 2021 ("Q4 2021"), Stanley pulled-in a massive amount of orders by inducing one or more customers to take additional product by providing a discount for orders that were otherwise expected to be made in 2022, which not only allowed Stanley to report better results for Q4 2021 and full year 2021 than it otherwise would have reported but also misled investors by claiming, inaccurately, that demand was staying strong going into 2022; and (iii) that the combination of the pulling-in of orders into Q4 2021 and the slowing of demand would result in Stanley's customers accumulating inventory that was slow to sell and would result in lower orders in 2022. Defendants knew that their statements were false and misleading as the Company's top executives approved the pulling-in of orders into 2021 from 2022, were provided reports tracking demand, at least monthly, and the Company admittedly tracked Stanley's point-of-sale results to monitor demand.

7. Additionally, during the Class Period, Defendants repeatedly stated that strong demand would continue and that strong demand would support earnings growth into 2022. For example, as detailed below, Defendants made the following statements about strong demand trends continuing:

- In an October 28, 2021 press release, Defendant Loree stated that Stanley's "multi-year growth story remains compelling given the positive secular demand trends and unique opportunities ahead";

- In an October 28, 2021 earnings call with investors, Defendant Loree stated that "we remain highly confident in our multiyear growth" and that "several positive secular demand trends . . . are benefiting our businesses";

- During that same call, Defendant Allan stated that the Company was positioned for "significant growth in 2022 and beyond";

- During that same call, Defendant McChesney stated that Stanley had "invested in inventory to serve the robust demand environment here in 2021 and in "22 and beyond";

- Defendant Loree further stated during that same call, that Stanley was "enjoying positive secular trends, vibrant markets and a strong array of growth catalysts, and we expect this to continue" and that "we continue to execute on the strong demand trends";

- During a February 1, 2022 earnings call with investors, Defendant Loree stated that "[w]e benefited from extraordinarily strong customer demand" and that such demand would be buoyed by "several positive secular demand trends that are benefiting our businesses;" and

- During an April 28, 2022 earnings call with investors, Defendant Loree stated that "while the boom global conditions of 2020 and 2021 have leveled off, the fundamentals and secular drivers remain healthy and are still very much intact. As we look out over the balance of the year, the combination of repair/remodel, new residential construction and commercial construction have plenty of runway to continue to drive enduring demand in many of our markets around the world."

8. These statements in paragraph 7 were materially false and misleading because Defendants knew or were reckless in not knowing that demand was slowing from the Covid-19 levels and that in Q4 2021, Stanley needed to rely on a massive pull-in of orders from 2022 in order to try to meet sales targets and to hide the decline in demand. Accordingly, because demand was presently not strong and robust, as Defendants' claimed, but was stalling, Defendants' statements about Stanley's strong demand trends were materially false and misleading and there was no reasonable basis for them to state that strong and robust demand would continue.

9. The truth began to be revealed on April 28, 2022 when Defendants issued a set of partial corrective disclosures stating that Stanley's Tools & Outdoor net sales had dropped in the Company's first fiscal quarter of 2022 to $4.4 billion, and that Stanley was accordingly revising its earnings per share guidance down for fiscal year 2022. Defendants also disclosed that Stanley's gross margin dropped "610 basis points from prior year as price realization was more than offset primarily by commodity inflation, higher supply chain costs to serve demand and lower volumes."

10. On this news, Stanley stock fell 8.6% or $12.01 per share, from a close of $139.14 per share on April 27, 2022, to a close of $127.13 on April 28, 2022.

11. However, Defendants continued to make materially false and misleading statements regarding the Company's deteriorating demand. For example, the Company's April 28, 2022 press release stated that "[v]olume was in line with expectations, but constrained by temporary electronic component supply challenges, which have continued to improve." On an earnings call held for investors that morning, Defendant Loree echoed the press release in stating that component supply, rather than falling demand, was the primary headwind for Stanley's sales volume, noting "[t]he volume could have been higher, but for the supply-constrained environment that we continue to make progress on resolving".

12. Defendants repeatedly mislead investors about the Company's core Tools & Outdoor segment, stating that the Tools & Outdoor sales decline was attributable to supply chain issues rather than falling demand. For example, Defendant Loree reassured investors that "while the boom global conditions of 2020 and 2021 have leveled off, the fundamentals and secular drivers remain healthy and are still very much intact", that "the combination of repair/remodel, new residential construction and commercial construction have plenty of runway to continue to drive enduring demand", and that "we will monitor and respond accordingly if and when we

observe any adverse impact from a higher interest rate environment and/or significant elasticity of demand effects following our pricing actions." Defendant Allan also reassured investors that "the headline for the first quarter is that demand for our products remains healthy" and, in response to an analyst question, that there "is not an assumption that there's some significant slowdown related to overall demand." Contrary to these statements, demand had been declining beginning in 2021 and that decline continued into 2022.

13. On July 28, 2022, the truth was fully revealed when Stanley released its Q2 2022 results in a press release before stock markets opened for trading. In the press release, Defendant Allan stated that "significantly slower demand in late May and June [] drove the majority of the challenges we faced this quarter" and that "[a]s the softening of the demand environment accelerated rapidly during the last portion of the quarter … [w]e are now preparing for demand to normalize closer to 2019 levels for the remainder of 2022." Contrary to those statements, demand had been declining throughout 2022 and had started declining in 2021, which was hidden, in part, by the pull-ins into Q4 2021. Defendants also contemporaneously held an earnings call for investors and analysts the morning of July 28, 2022. Defendants revealed on the call that, due to a sharp slowdown in consumer demand for power tools in May through June 2022, sales volumes had in fact shrunk by double digits, the Company's net income for its second quarter had plunged to $87.6M compared to $459.5M in the year-earlier quarter, and that Stanley was cutting its 2022 earnings per share guidance by nearly half.

14. Upon the news that demand had plummeted, that sales volumes had shrunk, and that Stanley was slashing its earnings guidance for 2022 by nearly half, Stanley's common stock, which had closed at $117.45 per share the evening prior, fell to a closing price of $98.58 per share on July 28, 2022 on heavy trading volume, representing over a 16% day-over-day drop.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

17. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Stanley is headquartered in this District, with its principal place of business located at 1000 Stanley Drive, New Britain, CT 06053.

19. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means of and instrumentalities of interstate commerce, including, but not limited to, the mail services, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

20. Plaintiff City of Detroit General Retirement System purchased Stanley common stock during the Class Period as set forth in the certification it previously filed, and has been damaged thereby.

21. Defendant Stanley is a corporation organized and headquartered in the state of

Connecticut at 1000 Stanley Drive, New Britain, CT. Its common stock trades on the New York Stock Exchange ("NYSE") and is traded under the symbol "SWK".

22. Defendant Donald Allan, Jr. ("Allan") is Stanley's President, Chief Executive Officer ("CEO"), and a member of Stanley's board of directors. Allan was employed as Stanley's CEO effective July 1, 2022, previously serving as Stanley's President and Chief Financial Officer ("CFO").

23. Defendant James M. Loree ("Loree") was Stanley's CEO prior to Allan, serving from August 1, 2016 through June 30, 2022. Loree joined Stanley in 1999, and served in numerous roles throughout his tenure including as CFO, and later as President and Chief Operating Officer ("COO").

24. Defendant Lee McChesney ("McChesney") was Stanley's Vice President of Corporate Finance, as well as the CFO of Stanley's Tools & Storage business segments at all times during the Class Period. McChesney departed Stanley in October 2022.

25. Allan, Loree, and McChesney are collectively referred to herein as the "Individual Defendants."

26. Stanley and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

27. By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Stanley's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein

to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## CONFIDENTIAL WITNESSES

28. As part of its investigation of the facts underlying this Action, Plaintiff's counsel sought to contact former Stanley employees with knowledge of the matters alleged herein and have them interviewed. Confidential witnesses will be identified herein by number (i.e., CW1, CW2, etc.). All CWs will be described in the masculine to protect their identities.

29. Confidential witness ("CW") 1 is a former Stanley employee who worked for the Company from July 2021 to June 2022. CW1 was the global demand planning manager at Stanley. He led an aspect of demand planning for all the Tools & Outdoors business globally. He coordinated demand planning among different teams in the Americas, Asia & Europe. He had to understand how the teams performed demand planning and if there was "cross-pollination and/or synergies" and was responsible for "pulling together all the numbers." He was also responsible for integrating a new software tool for demand planning, called SAP, which was canceled mid-way through his employment. CW1 worked closely with Vice President, Global Demand Planning, Global Tools & Storage, who reported to Vice President, Supply Chain Jason Stremmel.

30. CW2 worked for Stanley for more than two decades in a variety of positions. From 2014 until early 2022, CW2 was Director of Supply Chain Operations for Lowe's. In that position,

CW2 interacted directly with Lowe's personnel on forecasting and order fulfillment. Lowe's, along with Home Depot and Amazon, were Stanley's three largest customers, much larger than any others, with Lowe's usually Stanley's second largest but during some quarters, Lowe's was Stanley's largest customer. CW2 worked out of Stanley's Towson, MD office and reported to, among others, Jason Stremmel, who reported to Nick DeSimone, Chief Supply Chain Officer, who reported to Loree.

31. CW3 was employed by Stanley for 8 years until October 2022. Among other positions, CW3 was Vice President of supply chain for the Americas region from December 2019 to January 2022 and Vice President of Global Planning from January 2022 to October 2022. CW3 reported to the chief supply chain officer who reported to President and CEO Allan.

32. CW4 had worked in sales at a company called MTD Holdings ("MTD") since 2017, in which Stanley acquired a 20% stake in 2018 and then acquired the remainder in 2021. CW4 then became a Stanley employee in December 2021 until July 2022. CW4 was a national e-commerce sales manager at Stanley, servicing Amazon, and handled outdoor products. CW4 reported to Mike Axline, Vice President of the outdoor e-commerce segment.

33. CW5 worked at Stanley from September 2013 to August 2022 in a variety of roles, such as sales operations analyst and sales operations manager, and then became North American supply chain manager from July 2020 to July 2021 and then demand planning manager from July 2021 to August 2022, assigned to the Lowe's account. CW5 most recently reported to Vice President of Supply Chain John Weetenkamp, who worked in Stremmel's Global Planning organization.

## SUBSTANTIVE ALLEGATIONS

### I. Background

34. Stanley is a global manufacturer of, *inter alia*, hand tools, power tools, and outdoor products for consumer and commercial customers, as well as engineered fastening systems for industrial customers.

35. Over the last few years, Stanley implemented a "corporate simplification" to spin off some of its business units and focus Company investments and attention into two main business segments: Tools & Outdoor, and Industrial.

36. Stanley's Tools & Outdoor segment sells products to a variety of customers including retail consumers, professional end users, distributors, and industrial customers across a wide variety of industries and geographies. The Company has multiple business units within its Tools & Outdoor segment, including: Power Tools Group (PTG), which includes drills, impact wrenches and drivers, grinders, saws, routers, sanders, and pneumatic tools *inter alia*; Hand Tools/Accessories & Storage (HTAS), which includes planes, hammers, clamps, vises, knives, saws, chisels *inter alia*; and Outdoor Power Equipment, which includes hedge trimmers, lawn mowers, tractors, and other lawn and garden products.

37. The majority of sales for the Tools & Outdoor segment, which comprised approximately 82% and 85% of Stanley's total revenues in 2021 and 2022, respectively, are distributed through retailers, including home centers, mass merchants, hardware stores, and retail lumber yards. Stanley manufactures and markets multiple brands of consumer and professional products across its Tools & Outdoor segment, including DeWalt, Black+Decker, Stanley, Craftsman, Irwin, Mac Tools, Porter-Cable, Cub Cadet, Hustler, and Troy-Bilt. Stanley is heavily dependent on the United States market, from which the Company derived approximately 63% of

its revenue in 2022, and monitors sales volume and point-of-sale ("POS") data for its products to measure demand.

38. Stanley has made a concerted effort in recent years through divestitures and acquisitions of certain business units to focus the Company around its Tools & Outdoor segment. In November and December 2021, the Company acquired the remainder of MTD that it did not already own (an outdoor power equipment manufacturer) and Excel Industries (a turf-care equipment company), which were folded into the umbrella of Stanley's Tools & Outdoor business. The purchase price for these two transactions was stated by Stanley to total $1.9 billion.

39. In July 2022, Stanley sold its Convergent Security Solutions business, comprising commercial electronic security and healthcare operations, to the Swedish company Securitas AB, then sold its Mechanical Access Solutions mechanical doors business to Allegion PLC, and announced an agreement to sell its Stanley Oil & Gas business to British oil services company Pipeline Technique Limited. This simplified portfolio means that Stanley, which was once a highly diversified company, was increasingly focused on its Tools & Outdoor business.

## II. The CWs Describe Demand Planning, Pull-ins and Executive Knowledge[1]

### A. Demand Planning at Stanley

40. According to the CWs, demand planning at Stanley was part of the commercial organization and demand planners worked to meet the sales goals. Sales planning began mid-year from the top down with executives setting the sales goals. The demand forecast was based on sales goals. Goals were set for each team and region. As the year end neared, goals were finalized and a sales forecast was relayed to the supply chain, including demand planners. Demand planners were subjected to sales goals with the demand forecast close to the sales goal.

[1] The following sections are based on interviews conducted with former Stanley employees.

41. Demand planners were tasked with breaking down the sales goal to the item level. CW1 stated that demand forecast numbers could not be adjusted by the demand planners because those numbers were "owned" by sales. Moreover, according to CW1, you did not want to reduce a forecast because a push for a realistic forecast might lead to a layoff. The demand forecast was described by CW1 as a target rather than a true and accurate forecast. CW2 stated that demand planners and supply chain personnel felt pressure to formulate the plan based on the sales target. They attended the same meetings and the sales team wanted the demand forecast to be in line with the sales targets, which is what occurred.

42. According to CW5, supply planning at Stanley was product based and they worked with the manufacturing plants to ensure there would be enough inventory to meet the expected volumes. The demand planners were customer focused and wanted to have sufficient inventory to meet their specific customers' inventory position and POS rates.

43. Demand planners at Stanley were assigned by customer and forecast at the item level, and further delineated by, for example, hand tools at Lowe's, but not for overall hand tools. Planners knew the inventory level of products at their customers, such as Home Depot, Lowe's or Amazon, and where Stanley faced competition, and adjusted the statistical forecast accordingly. Stanley used the JDA system as a tool for demand planning and during 2021 was going to transition to SAP, a different software system for demand planning, but while in the midst of switching, Stanley abruptly canceled the change to SAP and continued with the JDA system. While it was in use, SAP was used to track and manage orders – for order processing. Business Warehouse software was used to run reports, incorporating JDA & SAP. Stanley began to use Tableau reporting in early 2022 but its use was in its infancy during the Class Period. According to CW1, the JDA system was adjusted to conform to the demand the sales group wanted. Its purpose was

to get the product mix right so there was sufficient inventory to meet the sales target.

44. At Stanley, sales goals controlled the demand forecast. Demand planners were not projecting demand but were determining which products would meet the overall goal by assigning a demand estimate to particular items. For example, if the sales department instructed the demand planners that they needed $70 million in hammers for the next month to sell to a particular customer, such as Lowe's, the planner would then decide which hammers to load into the system. The planner would not decide that demand would be $70 million, but would input that amount of hammers into the system based on the direction from sales. Demand planners also had to understand pricing elasticity at the item level, such as if hammers went up 10% there might not be a demand impact but if a different item increased in price, sales could stall.

45. The demand forecast was based on what sales wanted to achieve not what anyone believed would ship. The JDA system was adjusted to conform to the demand the sales group wanted. Its purpose was to get the product mix right so there was sufficient inventory to meet the sales (or demand) target.

46. CW5 confirmed that Stanley had access to customers' POS data, such as the Lowe's link system used by Lowe's. Stanley used this data to determine replenishment values and to make sure the customer had adequate inventory available to sell. By using this data, Stanley could assess which products were selling and help it determine demand for its products.

**B. Internal Reports and Meetings**

47. Reports regarding demand were prepared and circulated at Stanley at least monthly. CW1 prepared Excel-based reports that specifically spelled out the demand plan, which was updated on a four-week integrated business planning cycle. At the end of the first or second week of the cycle, the forecast was due, which CW1 evaluated and met with Stremmel, the Vice

President of Planning. In those meetings, CW1 reviewed what had changed in the forecast and what was going on in certain regions.

48. Other data available internally included the sales that Stanley made to customers, such as Lowe's, Home Depot, or Amazon. There was access to this data via the information system, which updated either nightly or weekly. Customers ordered products and Stanley shipped those products within a few days to the customers' warehouses, which was reflected in the data Stanley had on its system.

49. Stanley also had access to the customers' inventory level data, which was sent either weekly or monthly and provided how much inventory a given customer had on hand. This data was used by Stanley's demand planners to signify that if a customer, such as Home Depot or Lowe's, had 1,700 boxes of hammers, it was probably not going to buy hammers for a while. The sales team members could also use the customer inventory data to compare it to what Stanley had sold to the customer to gain an understanding of what the customer had sold.

50. CW5 identified what were called "Business Objects" reports. These showed the variances between sales targets and actual sales.

**C. MAP Meetings**

51. Stanley conducted monthly meetings that were known in the Company as MAP meetings. These meetings were part of the sales and operations planning with a focus on reviewing major accounts. They were held on a Monday, usually in a conference room in Towson, Maryland, which was called the War Room at one time. About 80-100 employees attended the monthly MAP meetings, including finance, sales, supply and demand personnel. About 50 employees attended in-person and another 30-50 employees participated by phone. Defendant McChesney worked out of the Towson, Maryland office and was in the room for most of these meetings.

52. The MAP meetings typically were 4-6 hours in length. At the meetings, the sales leaders for each account reviewed the targets and where they were in relation to those targets. The attendees discussed projections, opportunities and risks for each account. The leaders made PowerPoint presentations, using the same format for every customer, which were about 15-20 pages and covered each division. For example, for Lowe's, the PowerPoint deck covered power tools, consumer tools, outdoor tools and accessories. The presenters went through targets and identified opportunities and then finance asked questions with supply chain personnel reporting whether there was enough inventory to support decisions and sharing any supply risks.

53. The sales leaders emailed the PowerPoint decks before meetings, which went to McChesney, who was on the email list that included many other recipients. McChesney also brought a binder into the meetings with all the PowerPoint decks and his notes. If changes were made to the PowerPoint decks during the meetings, they were recirculated by email after the meeting.

54. McChesney participated at the monthly MAP meetings and asked questions regularly. His questions generally seemed about trying to hit the sales targets and what they needed to do to get there. Everyone attending the meetings knew that they needed to be prepared to answer questions about making the sales targets. Sales, demand and supply personnel were conditioned to talk about the sales target number all the time. Everyone involved knew the sales target and if they were on track to hit it. There were reports at Stanley that showed the difference between actual and forecasted sales and also reported on demand and inventory. CW2 used such reports that were specific to Lowe's. Certain of these reports showed the pulling-in of orders and the month-by-month gap that existed between actual and forecasted sales. The monthly PowerPoint at the MAP meetings contained such details. CW5 also prepared slides for the Lowe's account that were

presented at the MAP meetings, which showed, among other things, the month-over-month change in sales. CW5 confirmed that Brendan McNulty, CFO for North American Tools & Outdoor, who reported to McChesney, attended the MAP meetings.

55. During 2021, the conversation at the MAP meetings was centered on whether the sales target was going to be hit and whether Lowe's would help close the gap. CW2 stated that Stanley never wanted to reduce a number so they did everything to hit the sales target. There were no discussions at any MAP meetings in 2021 about reducing the plan; it was always about hitting the plan. The task of the demand planners was to roll out the demand to meet the sales target. CW2 described frustration among the supply, demand and commercial Lowe's team that Stanley would get stuck with millions of dollars of unsold product because the rest of the Company was not hitting the plan and Lowe's would have to "carry Stanley" in covering the shortfall.

56. On the Thursday after the Monday MAP meetings, McChesney typically met with Allan and Loree for a regularly scheduled meeting, where McChesney provided a summary of the Monday meeting information. The Monday meeting was held as preparation for the Thursday meeting. After the Thursday meeting of the Company's top executives, additional feedback was provided to the sales and operations teams. At these Thursday meetings, executives received summarized versions of the PowerPoint presentations made during the MAP meetings.

57. CW3 attended the monthly Monday MAP meetings and the follow-up meeting on Thursday with the top executives. At the MAP meetings, there was a roll-up of the regions and the performance across all customers was discussed, including demand and actual results compared to targets. The pull-ins (described in more detail below) were discussed at these meetings to drive demand. At the Thursday meetings, there was an executive roll-up that summarized business, including demand and actual results across all regions. Allan and McChesney were on most of

these calls with Loree also being on some of them.

58. While not identifying either the MAP meetings or the meetings on the following Thursday by name, Stanley essentially acknowledged their occurrence in a letter to the SEC dated December 21, 2021 in which, in response to an SEC inquiry about, among other things, details about business trends, Stanley stated: "On a monthly basis, the Company has a robust comprehensive review process of its results at both consolidated and business group levels and includes the month-to-date, quarter-to-date and year-to-date actual results of operations, comparative prior year periods, and the operating plan. Significant variances versus the comparative period and operating plan and any changes from expected results are investigated."

**D. Covid-19 Increases Demand and Stanley Pull-ins Orders**

59. Covid-19 began to spread worldwide in 2020, which caused many people to stay at home, and resulted in increased business for Stanley. Because people tended to engage in do-it-yourself projects more than they had previously, Stanley realized increased demand for many of its products. It also reported revenue and earnings that were better than had been expected before Covid-19 occurred.

60. According to CW3, Stanley went into 2021 assuming the same demand trends as it experienced in 2020 would occur in 2021 but that it would be better positioned to meet demand because it staffed up to manage demand and the supply chains were better. The increase in people staying home and the increased do-it-yourself projects continued into 2021 and Stanley continued to report that it saw increased demand for its products. Stanley reported record revenue and earnings growth for 2021. It reported full year revenue growth of 20% to $15.6 billion and diluted GAAP earnings per share of $9.62. Full year 2021 adjusted earnings per share was $10.48, a 30% increase versus 2020.

### E. Stanley Engaged in Pull-ins

61. Stanley's workforce was structured in a manner that assigned certain employees to large customers, such as Lowe's or Home Depot. For example, demand planners in Stanley would be assigned to Lowe's to make sure Lowe's had sufficient product to be sold to consumers.

62. On occasion, Stanley sought to convince certain of its customers to agree to take more inventory at an earlier time period than the customer intended to purchase. These "pull-ins" or "pull-forwards" were done by Stanley in order for it to try to meet sales targets and resulted in it reporting better results for the period in which the additional inventory was sold than it otherwise would have reported. CW2 stated that Lowe's was generally the account pursued for pull-ins when Stanley was not meeting its targets, which it had done in the second quarter of 2021. Despite that June 2021 pull-in, CW2 stated that by July 2021, "we saw we were going to be off our target" for the year. CW2 also stated that Stanley was off from its sales target "company-wide."

63. During Q4 2021, Stanley engaged in such a pull-in. As detailed by several CWs, Stanley induced Lowe's to take on a massive amount of additional inventory in Q4 2021 that it otherwise was expected to purchase during 2022. By shipping out this inventory early, Stanley was attempting to meet its Q4 2021 and entire year 2021 sales targets. The estimates by the CWs of the amount of additional inventory Lowe's took in Q4 2021, which were mostly done in December, were up to $300 million, which Stanley reported as sales for that time period. CW5 stated that the Lowe's Q4 2021 pull-in stood out as a "historic high."

64. CW2 stated that there was a sales target for Lowe's, which as an incentive to meet, Stanley would provide Lowe's with about a 10% payout of actual sales. To induce Lowe's to take extra inventory, Stanley increased the payout amount to about 12-15%. This incentive payout allowed Stanley to improve sales and get inventory off the books. Despite the pull-ins into Q4

2021, CW2 was not certain Lowe's met its sales target. For the pull-ins, CW2 met with Lowe's personnel regarding the extra inventory that Lowe's might take and had to check to determine what inventory Stanley had that it could ship immediately to Lowe's. Lowe's then agreed to take certain of those products and Lowe's issued purchase orders for those products. CW5 stated that the Q4 2021 pull-in with Lowe's was comprised of numerous product types but that power tools were not a large part of the pull-in because of some component issues at the time.

65. The pull-in into Q4 2021 from Lowe's (and possibly some additional pull-ins from Amazon during that time period), allowed Stanley to be able to claim that its forecasted demand for that period had been exceeded. Without the pull-in from Lowe's, demand would not have exceeded Stanley's forecast.

66. CW5 stated that while the Q4 2021 pull-in was not done to bring sales to Lowe's in line with their target, it was necessary to move Stanley closer to an overall target for the Company. CW5 further stated that demand had declined and Stanley relied on Lowe's because the Company needed to make up for that decline, particularly where it had negatively impacted Stanley's ability to attain sales targets with other customers.

67. While Stanley orchestrated this pull-in of product to Q4 2021 that would otherwise have been sold during 2022, Stanley did not revise its demand estimates for 2022 downward. Because its demand forecast was not revised, Stanley's demand forecast for 2022 began the year in an immediate shortfall. CW1 stated that the biggest problem with the pull-in was that it robbed money from future periods and that while December 2021 was not that great, there was nothing there in January 2022, meaning that December sales were softer than expected but pulling in orders into December exacerbated the January shortfall from which Stanley did not recover.

68. CW4 also described a practice that Stanley engaged in with Amazon that was

essentially a pull-in. Amazon allowed sellers, such as Stanley, to ship whatever amount of product they wanted to Amazon and record it as a sale as long as the seller agreed that Amazon might fine them if the product did not ultimately get sold to consumers.

69. CW5 stated that because of the Q4 2021 pull-in, CW5 believed that the 2022 demand plan for Lowe's should have been revised downward. In early 2022, however, CW5 stated that "leadership" wanted the demand plan to conform to the sales plan. The 2022 sales plan had not been revised because of the Q4 2021 pull-in. CW5 disagreed because "there was nothing [to] see in the numbers that would leave me to believe they [Lowe's was] going to need anything like [the inventory levels included in Stanley's plans]." CW5 informed the sales and operations staff that justification was needed to increase the demand plan but that justification was never received.

70. At the end of Q1 2022, CW5 began to be pressured to lower the demand numbers because Stanley had excess inventory. CW5 stated that by the end of Q1 2022, more senior management in the Tools & Outdoor sector realized that the demand forecast was too high.

**F. Demand Begins to Decline at Stanley**

71. As stated, when 2021 began, Stanley was seeing increased demand for its products, as the Covid-19 pandemic continued. That increased demand began to change as the year progressed. The CWs stated that demand at Stanley began to decline during the second half of 2021. According to CW2, the decline in demand was evident as of mid-2021, based on meetings CW2 attended during that time.

72. CW3 also confirmed that it was noticed that demand was slowing in the second half of 2021. Stanley had ramped up production, believing demand would be there but it was declining and Stanley ended up having a lot more inventory. According to CW3, the pull-ins started because Stanley had so much inventory and cash was tied up in inventory for which there was clear

declining demand. The Q4 2021 pull-ins were to get cash for its build-up of inventory, not just to hit the number. However, because of declining demand, the inventory that Stanley sent to Lowe's in Q4 2021 was not selling.

73. By Q4 2021, the only way for Stanley to meet its demand forecast was to pull-in sales that were expected to occur during 2022 into 2021. To meet its demand forecast, Stanley convinced Lowe's to accept up to approximately $300 million in inventory into Q4 2021 that it otherwise would not have purchased during that time.

74. CW3 stated that Lowe's continued to order from Stanley in Q1 2022 even though it still had a great deal of inventory that it could not sell because demand had declined. Because Lowe's continued ordering in Q1 2022, that quarter ended up being better for Stanley than it should have been but also caused more of a decline to occur in Q2 2022. Stanley could see the inventory Lowe's had because Stanley personnel had access to Lowe's Link and knew that inventory was not being sold.

75. Although Lowe's had excess inventory in 2022 because of the Q4 2021 pull-in, according to CW5, it continued to order products from Stanley in 2022 despite not having a need for the inventory. CW5 attributed these Lowe's orders to the fact that Lowe's stored the pull-in products in a warehouse in Chicago and did not effectively distribute those products to regional centers. Accordingly, Lowe's regional centers did not have the products they needed to supply their stores and continued to order from Stanley while Lowe's distribution system got sorted out. CW5 stated that it was apparent to Stanley that Lowe's did not need the inventory it was ordering in 2022 because Stanley had access to Lowe's existing, real-time inventory. CW5 further stated that there were meetings among CW5's team, colleagues at Stanley and Lowe's representatives in 2022 to try to understand how long it would take for Lowe's excess inventory to be sold.

76. CW4, who worked at MTD when Stanley first acquired a stake in that company and then at Stanley when Stanley bought the rest of it, stated that there was an artificial spike in demand during 2020 and that there was a "widespread decrease" in sales throughout the industry beginning in 2021 when demand was "absolutely declining." The "rampant decline" in demand began in fall 2021, with that decline either remaining consistent or getting worse until CW4 left Stanley in July 2022.

77. CW4 knew first-hand about the decline in demand in the outdoor segment because of CW4's responsibilities for e-commerce channel in that space and CW4 understood from conversations with Stanley colleagues that the decline in demand was "across all brands and categories."

78. CW4 was aware of the demand decline in the fall 2021 at MTD and noted that Stanley was also experiencing a decline at that time. Because of Stanley's 20% ownership of MTD, CW4 worked with the Stanley Amazon team before Stanely acquired the entire MTD and CW4 knew from discussions with those colleagues that Stanley was suffering from the same downturn as MTD. Once CW4 joined Stanley, there was access to Excel-based spreadsheets that showed the "major decline in demand." The reports also included goals to try to figure out how to increase sales. The goals were "top-down" and, according to CW4, not achievable and the majority of teams at Stanley did not achieve these goals. CW4's manager, Mike Axline, had access to these reports, as did the other executives, and shared them with CW4.

79. CW4 stated that Stanley over-forecasted sales for 2022 and experienced a decline in demand that had begun in 2021. According to CW4, Stanley seemed to be "hoping" that the Covid artificial increase in demand from 2020 and early 2021 would continue but it did not, across the board.

80. CW5 stated that the Q4 2021 pull-in had "ripped out" the inventory from the 2022 demand plan and that the pull-in was "very disruptive" to Stanley but that Stanley was more focused on the dollar than on how the pull-in would impact planning in the future.

81. Although it pulled this inventory into 2021 from 2022, Stanley did not change its demand forecast for 2022 and consequently, began the year with a demand shortfall. CW2 stated that Stanley expected "a soft first quarter because of the volume we shipped in December" 2021, but did not reduce its forecast. CW1 described Stanley's demand forecast for 2022 as being "very aggressive" and that Stanley was "in the hole" month after month from the start of 2022. By the end of Q1 2022, Stanley had missed its forecast by approximately $900 million - $1 billion, missing each month of the quarter.

82. CW1 recalled looking at the projections Stanley was making publicly and thinking: "You are calling for all time, bestselling months ahead and there is nothing to back that up." CW1 further recalled that there was no "healthy" conversation, based on the reality of the performance, that was occurring at Stanley during 2022. Executives set the sales goals and CW1 stated that those 2022 sales projections were "insane" to the "rank and file" employees. Those goals for 2022 were described as "aggressive" and "delusional."

83. CW1 stated there were "a lot of incentives for everyone to over forecast and that was the unfortunate reality" at Stanley. CW1 further stated that executives set the "insane" goals, that the supply chain would make all the product to coincide with the forecast, and that demand would magically materialize. CW1 stated that there was no data showing demand was still strong in 2022. When doing a forecast, there were actuals, which were the sales results and they showed slowing demand, and there was no reliable reason to expect a turnaround. Although the Q1 2022 demand forecast missed by almost $1 billion, CW1 stated that the demand forecast at Stanley

remained the same. CW1 provided reports to Stremmel from the start of January 2022, which captured the demand decline. It was not improving as the quarter progressed. While sales maintained the same unrealistic forecast, the data was showing something different about demand.

84. Stanley also had access to Lowe's inventory and its sell-through data. Ace and Home Depot also had these portals and Stanley could see what was selling and not selling. Ben Dunn from Stanley was assigned to the Lowe's Link and ran and circulated reports every Monday on Lowe's sell-through of products. The distribution list for these reports was described as being massive.

85. CW1 also stated that by the end of Q1 2022, it was "pretty clear to a lot of people that it was going to be an ugly year." There was a gap that existed between the financial forecast and the demand forecast that was not being met. In conversations with sales staff during this period, CW1 stated that they "seemed very miserable" as a result of Stanley's poor performance and that the sales team members were just getting the "thumb screws on them," with pressure to "go get more" business.

86. As the demand forecast misses were occurring, CW1 stated that there were just excuses and denials at Stanley. As demand forecast shortfalls were happening month after month, a trend developed, yet the excuses continued. Stanley had no system of checks and balances in place because demand planning was part of the commercial (i.e., sales) organization. The sales group was unwilling to reduce its forecast, so demand planning had to continue to forecast what sales was saying was possible, although CW1 stated it was unrealistic and nothing supported those forecasts. CW1 stated that internal politics and fear prevented sales from adjusting the forecast downward.

### G. The Confidential Witnesses Confirm the Lowe's Pull-in, Declining Demand and Knowledge By Senior Executives

87. The CWs confirmed that Stanley pulled-in as much as $300 million of product into Q4 2021 that was otherwise expected to be sold during 2022 while not revising its 2022 demand forecast. The CWs also confirmed that Stanley began experiencing a decline in demand during 2021, which continued into January 2022 and each month thereafter until at least July 2022. The CWs stated that the authorization for the pull-in into Q4 2021 came from Stanley's top executives and that they were informed about declining demand and that the demand forecast was being missed from at least January 2022 and each month thereafter, as indicated in reports circulated throughout the Company.

88. CW1 stated that the pull-in (also called a pull-forward or a buy-forward) from Lowe's in Q4 2021 from 2022, which allowed Stanley to meet or exceed its demand forecast for 2021 and Q4 2021, and allowed Stanley to "really blow the doors off" for 2021 results, had a detrimental effect on 2022, as those sales had been forecast for 2022. CW1 also stated that Stanley did not revise its demand forecast for 2022 despite pulling these sales into 2021 and that consequently, the Company began 2022 with a shortfall in demand. Not only was this extra amount that had been pulled-in to 2021 not removed from 2022, but it was added to 2021 results, making it much more difficult to replicate those results in 2022, much less surpass them, and created a hole for 2022 that was challenging to fill. CW1 stated that without Stanley reducing the 2022 expectations, it made attaining the stated growth rate for 2022 no longer possible.

89. CW1 described the process by which Lowe's agreed to take additional inventory in Q4 2021 as a negotiation as to the amount of volume Lowe's would take and the terms. Because Lowe's took a great deal of extra inventory in Q4 2021, CW1 believed that the terms were negotiated by the two companies' top executives.

90. CW1 further stated that although Stanley met its demand forecast by pulling in orders into Q4 2021, there were signs of financial pressure at the Company. Stanley canceled a new software for demand planning that it had begun to implement. The SAP software system was stopped either at the end of 2021 or the beginning of 2022. Also, CW1 stated that layoffs were instituted at Stanley during that time period of various personnel, including those not connected to the SAP software system.

91. CW1 stated that Stanley both over-forecasted demand for 2022 as a result of the pull-in and declining demand. Because Lowe's was still holding a lot of inventory that it took in 2021 rather than in 2022, it was only ordering what it knew it could sell. CW1 further stated that it was not a specific item that missed the demand forecast that Stanley could hope to make back. Instead, at the close of each month, the "money was off the table" and Stanley was "not going to make it back." Demand forecast misses in 2022 were described as being everywhere (i.e., not concentrated in particular products). But, declines in larger business units, such as power tools, were more material. CW1 stated that this scenario persisted at least for the time CW1 still worked at Stanley, which was until the end of May 2022.

92. CW2 confirmed the decline in demand, the pull-ins in Q4 2021, particularly from Lowe's and that Stanley's top executives knew this information. CW2 stated that the instruction to pull-in orders "came from the top." There was a directive from finance to "go get the number," meaning that sales staff along with supply and demand personnel should coordinate to determine the inventory on hand and what could be immediately moved to Lowe's to improve sales numbers. CW2 stated that Stanley senior level executives began talking with Home Depot and Lowe's in November 2021 to determine whether Stanley could move forward with early order fulfillment, i.e., pull-ins. CW2 stated that sales and demand personnel at Stanley and their

counterparts at Lowe's were not in favor of the pull-ins because it took expected sales away from a later period but were overridden by senior executives. CW2 stated that McChesney participated in monthly meetings in which sales shortfalls and the pull-in strategy were discussed. Pull-ins were discussed at meetings CW2 attended and were up for review and approval at meetings Allan and Loree attended with McChesney. CW2 believed Allan approved the Lowe's pull-ins and quoted him as stating: "Yes, we gotta hit this number. Go get it."

93. CW3 also confirmed that demand at Stanley was declining during the second half of 2021 and that it executed the pull-in during Q4 of 2021. CW3 stated that pull-ins were done at Stanley to meet targets that leadership set, but that the 2021 pull-ins were large and out of the ordinary and were done at the direction of senior leadership. CW3 believed that 3 months or more of inventory was pulled into 2021, which was described as "unnatural." CW3 stated that Stanley had about 100 products that were big ticket items, such as table saws, miter saws, hand tools, power tools and stationary tools, and those were the ones that were primarily pulled-in and shipped to Lowe's in Q4 2021, some in excess of 6 months of the typical inventory shipped to Lowe's. CW3 stated that some pull-ins were also done with Amazon during Q4 2021 but Lowe's was the big pull-in.

94. CW3 also stated that discussions about the 2021 pull-ins went all the way to the top-level executives. Meetings and emails centered on discussions about pull-ahead opportunities and "let's try to execute this." According to CW3, Allan was involved in the discussions on this topic, more so than McChesney or Loree. Nonetheless, CW3 stated that the pull-ins were well-known in Stanley and they could not have been executed without Loree knowing about it. The amount and size of the Q2 and Q4 2021 pull-ins got the senior executives' attention and sanctioned them. All knew the objective was to drive to hit the Q4 2021 target.

95. CW5 also stated that the directive to pull-in orders for Q4 2021 was "coming from the top" executives at Stanley. CW5 stated that the policies in place at Stanley dictated "dollar thresholds" for authority for transactions, meaning that different levels of management and executives could authorize transactions by a certain dollar amount. The CEO or CFO was required to sign off on transactions that were beyond a vice president's level of authority, which, according to CW5, was the Q4 2021 pull-in transaction. CW5 stated that it was "common knowledge and practice" at Stanley that authorizations occurred in this manner.

96. CW3 stated that all the executives had the same incentive plan predicated on performance. All were incentivized to hit the targets.

97. The pull-ins into Q4 2021 and the approximate amount were also confirmed by another Stanley former employee. Jarred Rahn, a former director of supply chain analytics at the Company, who stated on his Linked-In page that he was responsible for "closing" a "regional gap" for Q4 2021 by moving $300 million of additional inventory to customers.

98. CW1 prepared Excel-based reports that specifically spelled out the demand forecast shortfalls. The demand plan was updated on a four-week business planning cycle. During 2022, Stremmel began requesting that CW1 provide these reports weekly rather than monthly.

99. CW2 attended meetings among 80-100 other employees (likely the MAP Meetings) where, month after month, during the Class Period, they discussed and acknowledged that the Company was not meeting its sales targets.

100. CW4 called into the monthly MAP meetings. At those meetings, CW4 focused on sales to Amazon. CW4 stated that the decline in demand was discussed at those MAP meetings, with the sales decline stated to be about 30% overall across all categories.

101. CW1 confirmed that the explanation Stanley provided to shareholders in July 2022

about the decline in demand was not complete or accurate – the decline was evident much earlier than May or June 2022 that Stanley claimed. CW1 emphasized, "absolutely the bubble had burst and the consumption number had dropped off." The Company knew that consumption had declined and it had consecutively missed the demand forecast every month in 2022. It was evident that the trend of increased demand from 2021 "was gone" and demand was "not panning out" to the Company's forecast.

## III. Defendants' Material Misrepresentations and Omissions

102. The Class Period begins on October 28, 2021, when Stanley reported its financial results for the third fiscal quarter ending October 1, 2021. On that date, Stanley filed a Form 8-K with the SEC, attaching a press release regarding its third fiscal quarter results. Defendants largely expressed excitement over the extraordinarily high consumer demand environment that the Covid-19 pandemic had brought for Stanley's products. Defendants reassured investors that the booming demand would remain heightened and that Defendants were carefully monitoring consumer demand.

103. The October 28, 2021 press release issued by Stanley reported topline financial and operating results for the Company's third fiscal quarter of 2021. In the release entitled "Record Third Quarter Revenue Driven By Robust Customer Demand Across All Segments Resulting in Double-Digit Organic Revenue Growth", Defendant Loree informed investors enthusiastically that "[w]e are pleased to deliver 10% organic growth and record third quarter revenues ***as customer demand remains robust*** across the majority of our end markets", adding that Stanley's "multi-year growth story remains compelling given the ***positive secular demand trends and unique opportunities ahead***".[2] Rather than disclose the Company's slowing demand, Defendant Loree in the press release falsely blamed a "universally difficult supply chain environment" and "inflationary

[2] Emphasis added unless otherwise specified.

trends" as the primary headwinds for Stanley's growth. The press release went on to further assuage investors that "***[d]emand was robust across all markets*** as the ***secular shifts*** related to the reconnection with the home and garden and eCommerce were amplified by our industry-leading innovation and ***strong professional demand***." The press release indicated that, due to the demand, "North America ***reflected retail growth*** as well as ***consistently strong commercial and industrial channels***."

104. On the same morning as the October 28, 2021 press release, Stanley held a pre-market conference call with investors to discuss the Company's financial and operating results for the third fiscal quarter of 2021. On the call, Defendant Loree again identified the "unusually complex supply chain environment" as a primary headwind while reassuring investors that "[c]ustomer ***demand remained at robust levels***." Indeed, Defendant Loree called customer demand "extraordinary", stated that Tools generated growth in "the ***strongest demand environment in our history***" and falsely assured investors that the elevated demand would persist, stating "***we remain highly confident in our multiyear growth***" and that "***several positive secular demand trends*** … are benefiting our businesses, and ***we remain bullish on the resi[dential] and nonresi[dential] construction markets*** as well as the industrial recovery." Defendant Allan, who at the time of the call was Stanley's President and CFO, stated that the Company was positioned for "significant growth in 2022 and beyond" and then chimed in to suggest that Stanley had accurately forecast the changing demand environment across 2021 into 2022, stating that "***[o]ur thesis on demand is playing out*** as underlying construction activity remains strong and the Pro is driving growth[.]" Defendant Allan also went as far as to reassure investors the high-demand trend would last, adding that Defendants tracked POS data to monitor demand:

> Further ***demonstrating the durability of these trends***, our latest POS results showed mid-single-digit growth over the last 4 weeks, covering late September through

> mid-October, with the last measured week up double digits, ***a very good signal of the healthy backdrop in U.S. retail***.

105. Later during the October 28, 2021 earnings call, Defendant McChesney echoed the false reassurance Defendant Loree had provided regarding continued growth in Stanley's Tools & Outdoor business, stating that Stanley had "invested in inventory to serve the ***robust demand environment here in 2021*** and in '22 and beyond." In doing do, Defendant McChesney noted that the heightened demand was "***a major item that explains*** [Stanley's] ***year-over-year performance***."

106. Further, Defendant Loree misstated during the October 28, 2021 call that Stanley was "enjoying positive ***secular trends***, vibrant markets and a strong array of growth catalysts, ***and we expect this to continue***." Moreover, Defendant Allan reassured that:

> [T]he ***market demand environment remains very strong and supportive***. We have a phenomenal set of growth catalysts across the businesses, and ***we are actively addressing the supply and inflation environment***, ***which has not worsened*** from what we have experienced in Q3. ***We remain well positioned to deliver above-market organic growth*** with operating leverage, resulting in strong free cash flow generation that will drive top quartile shareholder returns over the long term.

107. On the same October 28, 2021 earnings call, Defendant Loree summarized the prepared remarks for the call by reiterating to investors that "***we continue to execute on the strong demand trends and deliver exceptional organic growth despite the temporarily challenging supply chain environment***."

108. In response to an analyst question on the same earnings call regarding sales volume growth, Defendants Loree and Allan reiterated that demand was strong and further growth was on the horizon for Stanley. Defendant Loree reaffirmed that:

> The ***demand is strong***. ***The conditions are supportive***" and "[s]o ***serving the demand, I think, is the challenge***. … ***[W]e're confident we've created the demand and the environment is supportive***, and we need to serve the demand. That is challenging. But you can see we delivered on our third quarter organic growth commitment, 10% despite the challenges that we faced. And so we have a resilient organization and we have all the growth programs in place, and ***we have a high***

***level of confidence that we can deliver that sort of growth***.

109. On November 12, 2021, Stanley filed with the SEC a Form 10-Q for its 2021 third fiscal quarter ended October 2, 2021 ("Q3 10-Q"). In the Q3 10-Q, in the section entitled Management's Discussion and Analysis of Financial Condition and Results of Operations, in describing the Tools & Storage segment, it stated that: "***Demand was robust across all markets*** as the secular shifts related to the reconnection with the home and garden and eCommerce were amplified by the Company's industry-leading innovation and strong professional demand. North America reflected retail growth as well as consistently strong commercial and industrial channels. Point-of-sale demand remained at robust levels in U.S. retail and channel inventory ended below historical levels."

110. On February 1, 2022, Stanley issued a press release that began with the title "Robust Customer Demand Drove Record 2021 Full Year Organic Revenue Growth of 17% and 30% Adjusted Diluted EPS Expansion . . . ", and held an earnings call for investors to report its financial results for the fourth quarter and fiscal year 2022 ended January 1, 2022. That press release was attached to a Form 8-K that Stanley filed with the SEC. In the press release, Defendant Loree was quoted as stating that the Company "delivered record revenue and earnings growth in 2021 supported by robust customer demand . . . . and ***that customers [were] experiencing unprecedented demand***." The press release further reported that a key point of the fourth quarter was that "[n]et sales for the quarter were $4.1 billion, up 2% versus prior year . . . . " Defendant Allan was quoted in the press release as stating: "[i]n 2021, we delivered 17% organic revenue growth with operating profit expansion and 30% adjusted EPS growth." The press release further stated that "[e]nd-user demand remained strong across all markets . . . . "

111. During the February 1, 2022 earnings call, Defendant Loree repeatedly reassured

investors that demand would remain high. Defendant Loree assured that the demand environment of 2021 was continuing, stating "[***w]e benefited from extraordinarily strong customer demand, which continues for our innovative products and portfolio of brands***," and that such demand would be buoyed by "***several positive secular demand trends that are benefiting our businesses.***" Defendant Loree further stated that "***we are focused on continuing to serve the robust demand in our markets***" and Defendant Allan added during the earnings call that "[***e]nd-user demand strength remains persistent across all markets***."

112. Further, during the February 1, 2022 earnings call, Defendant Loree reassured investors that management was actively monitoring for potential changes in demand, adding "we will carefully watch for any impacts from a higher interest rate environment or changes in the elasticity of demand following price increases and react accordingly if things change" and that management was "confident in our ability to execute in today's dynamic, volatile environment."

113. When asked by an analyst just how exactly Stanley was prepared to mitigate changes in demand, Defendant Loree further states "we just need to continue to monitor price elasticity, competitive dynamics, all those different things that one does when one manages in an environment like this." Specifically as to the effect of product price increases on demand, Defendant Allan told another analyst that management would "watch this very closely, and it's why we're taking this approach on the volume side where we're not being overly aggressive in forecasting where the volume might go."

114. On February 22, 2022, Stanley filed with the SEC its Form 10-K for its 2021 fiscal year ended January 1, 2022 (the "2021 10-K"), which included, among other things, its 2021 financial results reported in the February 1, 2022 press release. The Company stated in the 2021 10-K that working capital turned more quickly in 2021, among other reasons, "due to inventory

investments ***to support the sustained strong demand outlook***" and elsewhere referred to "the increasing demand from customers" and how Tools & Storage sales in 2021 were "driven by stronger volumes due to the consumer reconnection with the home and garden, eCommerce and ***strong professional demand***." The 2021 10-K did not disclose the trend of slowing demand, the Q4 2021 pull-ins that were used by the Company to increase 2021 earnings or the risks that demand was slowing and would continue to decline.

115. The statements in paragraphs ¶¶102-14 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) by the beginning of the Class Period, demand was stalling from the Covid-19 fueled levels and that decline was continuing throughout the Class Period; (ii) in order to meet sales targets, and concurrently hide that demand was slowing, in Q4 2021 Stanley pulled-in a massive amount of orders by inducing one or more customers to take additional product by providing a discount for orders that were otherwise expected to be made in 2022, which not only allowed Stanley to report better results for Q4 2021 and full year 2021 than it otherwise would have reported but also misled investors by allowing Defendants to claim, inaccurately, that demand was staying strong going into 2022; (iii) that the combination of pulling-in orders into Q4 2021 and the slowing of demand would result in Stanley's customers accumulating inventory that was slow to sell and would result in lower orders in 2022; (iv) that there was no reasonable basis for Defendants to claim that demand would continue to remain strong, as demand was already slowing; (v) that demand trends were not positive as claimed by Defendants but were slowing and/or declining; and (vi) the heightened, extraordinary demand

Stanley had enjoyed as a result of the Covid-19 pandemic in 2020 and 2021 was returning to 2019 pre-pandemic levels. As a result of the foregoing, Stanley's public statements were materially false and misleading at all relevant times.

## IV. The Truth Emerges In A Series Of Partially Corrective Disclosures

116. On the morning of April 28, 2022, Stanley issued a press release reporting first quarter earnings that in its title attributed the 20% year-over-year increase in total revenue growth as being "Driven By Strategic Outdoor Power Equipment Acquisitions And A ***Sustained Strong Demand Environment***." On that date, Stanley also filed a Form 8-K with the SEC that attached a copy of the press release. Defendant Loree was quoted as stating in the press release that Stanley, among other things, "capitalized on ***the strong demand environment*** . . . to drive 20% quarterly revenue growth." That press release also provided that "[n]et sales for the quarter were … partially offset by lower volume (-6%)[.]"

117. Also on April 28, 2022, Stanley filed a Form 10-Q with the SEC detailing the Company's financial and operating results for the first fiscal quarter ended April 2, 2022. Stanley disclosed in the 1Q Fiscal 2022 Form 10-Q that net sales for the Company's first quarter were "partially offset by a 6% … decrease from volume", furtively indicating that demand was slowing. Diluted earnings per share from continuing operations for the first quarter of 2022 were reported as $0.94 per share compared with $2.74 per share for the first quarter of 2021. Stanley also reported that its Tools & Outdoors segment profit declined from $644.7 million for the first fiscal quarter of 2021 to $378.5 million for the first fiscal quarter of 2022.

118. On an earnings call held the morning of April 28, 2022, Defendant Allan confirmed that, as a result of the foregoing, Defendants were "updating … adjusted earnings per share to a range of $9.50 up to $10.50", representing a cut of nearly 16 to 21% from the adjusted earnings

per share range of $12 up to $12.50 Stanley had announced for its fiscal year 2022.

119. On this news, Stanley's stock declined from a close at $139.14 per share on April 27, 2022 to a close at $127.13 on the day of the report and call. This represented a drop of $12.01 per share, or around 8.6% in one day.

120. However, Defendants continued to falsely misrepresent the nature and extent of Stanley's deteriorating demand and sales. For example, the April 28, 2022 press release falsely portrayed the drop in sales volume as "in line with expectations", blaming "temporary electronic component supply challenges, which have continued to improve."

121. Further, Defendant Loree stated in the press release that "[w]hile inflationary pressures remain a macro headwind" on demand, "***we have demonstrated our ability to offset those pressures***." Despite the drop in volume, the press release continued to describe demand in the Tools & Outdoor segment as healthy:

> Using 2019 as a baseline, ***U.S. retail point-of-sale demand remained robust*** driven by strong professional construction markets and innovation with POS growth rates stronger than the growth rates experienced in 2H'21. ***Channel inventory in U.S. retail remained below historical levels***, in particular for professional power tools.

122. During the April 28, 2022 earnings call, Defendant Allan stated that "our focus remains on ensuring we serve the ***continued healthy demand***." He described the financial results for the quarter, by stating "***[t]he headline for the first quarter is that demand for our products remains healthy***" and that "***we have not seen evidence of broad demand destruction*** related to price elasticity." In describing the results of Tools & Outdoor segment, Allan continued to reassure investors that:

> U.S. retail point-of-sale remains at healthy levels, supported by strong professional construction markets and our innovation. While the POS comps were down versus a stimulus-aided Q1 2021, the normalized 2019 comparative growth rates accelerated from the levels we experienced in the back half of 2021. This strengthens our conviction that ***we continue to experience a very solid demand environment***.

123. Defendant Allan further stated during the earnings call: "So in summary, we are actively managing a very dynamic supply chain and responding with agility to position ourselves ***to meet the continued strong demand we are experiencing***, especially within the professional power tool portion of our business." Defendant Allan additionally made materially false and misleading statements during the question-and-answer portion of the earnings call. In response to an analyst who noted that Defendants had revised sales volumes for Stanley's fiscal year 2022 down from single-digit growth to "kind of flat," Defendant Allan countered repeatedly that demand was not a driver: "***[i]t's not necessarily a view that we think demand is slowing***. … ***[I]t is not an assumption that there's some significant slowdown related to overall demand.***"

124. Defendant Loree also continued to make false and misleading statements during the April 28, 2022 earnings call. For example, Defendant Loree stated that first quarter results "benefited from ***a sustained strong demand environment***" and reassured that while "[o]rganic revenue was down 1% … ***customer demand remained strong*** across many of our global markets and price realization accelerated sequentially from the fourth quarter." Defendant Loree again blamed the downturn on supply chain and procurement issues rather than consumer demand, stating that "volume could have been higher, but for the supply-constrained environment that we continue to make progress on resolving, with added supply of semiconductors and electronic components during this quarter."

125. On the same call, Defendant Loree specifically reassured investors that Stanley would adapt to the end of the pandemic demand boom accordingly, stating "while the boom global conditions of 2020 and 2021 have leveled off, ***the fundamentals and secular drivers remain healthy and are still very much intact***. As we look out over the balance of the year, the combination of repair/remodel, new residential construction and commercial construction have

***plenty of runway to continue to drive enduring demand*** in many of our markets around the world." While Defendant Loree pointedly acknowledged that the days of a pandemic demand boom were coming to a close, he reassured investors that "we see ***continued momentum within our core markets***". Defendant Loree further reassured investors that Stanley management was prepared for any change in the demand environment, stating that "we will monitor and respond accordingly if and when we observe any adverse impact from a higher interest rate environment and/or significant elasticity of demand effects following our pricing actions."

126. The statements in paragraphs ¶¶116, 120-25 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) by the beginning of the Class Period, demand was stalling from the Covid-19 fueled levels and that decline was continuing throughout the Class Period; (ii) in order to meet sales targets, and concurrently hide that demand was slowing, in Q4 2021 Stanley pulled-in a massive amount of orders by inducing one or more customers to take additional product by providing a discount for orders that were otherwise expected to be made in 2022, which not only allowed Stanley to report better results for Q4 2021 and full year 2021 than it otherwise would have reported but also misled investors by claiming, inaccurately, that demand was staying strong going into 2022; (iii) that the combination of pulling-in orders into Q4 2021 and the slowing of demand would result in Stanley's customers accumulating inventory that was slow to sell and would result in lower orders in 2022; (iv) that there was no reasonable basis for Defendants to claim that demand would continue to remain strong, as demand was already slowing; (v) that demand trends were not positive as claimed by Defendants but were slowing

and/or declining; and (vi) the heightened, extraordinary demand Stanley had enjoyed as a result of the Covid-19 pandemic in 2020 and 2021 was returning to 2019 pre-pandemic levels. As a result of the foregoing, Stanley's public statements were materially false and misleading at all relevant times.

127. In addition, throughout the Class Period, Stanley's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Stanley] speculative or risky" and an explanation of "how [the] risk affecte[d] [Stanley]." Defendants' failure to disclose that demand was slowing at Stanley violated Item 303 because the decline in demand represented a known trend and uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because the slowing of demand created a significant risk that was not disclosed even though that was one of the most significant facts that made an investment in Stanley speculative or risky. Defendants also violated Items 303 and 105 by failing to disclose that Stanley pulled-in a significant amount of sales into Q4 2021, which made its 2022 sales uncertain and made an investment in Stanley speculative or risky.

128. On July 28, 2022, before the market opened, Stanley issued a press release reporting the Company's financial and operational results for the fiscal second quarter of 2022 ended July 2, 2022. On that date, Stanley also filed a Form 8-K with the SEC that attached a copy of the press

release. Notably, unlike at least its prior three press releases reporting on earnings, this press release did not mention robust or strong demand in its title. The press release stated, in pertinent part, that "the macroeconomic environment—including inflation, rising interest rates and significantly slower demand in late May and June—drove the majority of the challenges we faced this quarter", "the softening of the demand environment accelerated rapidly during the last portion of the quarter", and that "[n]et sales for the quarter were … partially offset by lower volume (-13%).".

129. Also on July 28, 2022, Stanley filed a Form 10-Q with the SEC detailing the Company's financial and operating results for the second fiscal quarter ended July 2, 2022. Diluted earnings per share from continuing operations for the second quarter of 2022 were reported as $0.51 per share compared with $2.70 per share for the second quarter of 2021. Stanley also reported that its Tools & Outdoors segment profit declined from $627 million for the second fiscal quarter of 2021 to $361.6 million for the second fiscal quarter of 2022.

130. Additionally, that same day, Defendants held an earnings call for investors where they had admitted demand had seen a sharp drop-off. Defendant Allan—who become CEO on July 1, 2022—stated, in relevant part, that:

> [W]e continue to navigate a dynamic macro environment, including inflation, rising interest rates; and now late in the quarter, we started to see these factors impact retail customer demand across our global Tools & Outdoor markets. The significantly slower demand trends in June, combined with a very late start to the outdoor season due to weather, resulted in significant volume pressure versus expectations, and revenue landed well below our plan. In response to the sudden shift in demand, we have taken immediate corrective cost actions, which are already in progress. We are now expecting demand to normalize closer to 2019 levels for the remainder of 2022.

131. Defendants could not hide that demand for Stanley's Tools & Outdoor segment had nosedived, with Defendant Allan stating on the call that Stanley "saw a swift deterioration in

consumer Tools & Outdoor demand" and that "the changes from this new demand environment… caused us to revise our 2022 adjusted diluted EPS range down to $5 up to $6", representing over a 50% cut to the EPS figures Stanley had projected for its fiscal year 2022.

132. On this news, Stanley's stock price declined $18.87 per share, ***or more than 16%***, from a close of $117.45 per share on July 27, 2022 to a close of $98.58 per share on July 28, 2022.

133. The financial media and analysts were quick to react to the news, with analysts from Mizuho Financial Group stating that the massive guidance cut "***truncates anything that occurred in the quarter***", adding "***this is significantly worse than we could have imagined***." MarketWatch, a Dow Jones company, reported that July 28, 2022 was the "stock's biggest percentage decline since … March 18, 2020." Analysts from Raymond James and CGS-CIMB co-authored a July 29, 2022 report about Stanley titled "***Bordering on 'Un-Investible'…***", emphasizing "Stanley's sharply deteriorating volumes and bloated inventories[.]"

## IV. Stanley's Executive Compensation Provided Defendants With An Incentive To Approve Undisclosed Pull-ins

134. Stanley's executive compensation system provided an incentive for Defendants to meet sales targets in any manner possible, including by using pull-ins.

135. For 2021, the corporate performance goals used to determine Stanley's executive annual incentive compensation were: adjusted diluted earnings per share, cash flow multiple, organic sales growth and adjusted gross margin rate. This incentive compensation was in addition to the executive's base salary. Executives also received Long-Term Incentive Compensation, Stock Options and Restricted Stock Units and Performance Units.

136. For 2021, Stanley was able to exceed target amounts of adjusted earnings per share and organic sales growth, in part, by conducting pull-ins.

137. Stanley's 2021 Proxy Statement, filed with the SEC on or about March 9, 2022,

contained the following statement under a sub-heading titled Our Pay for Performance Philosophy:

> Our compensation programs are ***designed to incentivize our employees to achieve or exceed pre-established, objective financial goals for the Company*** and deliver superior returns to our shareholders. As depicted in the charts below, 79-89% of our executives' target compensation opportunity for 2021 was variable and tied directly to the achievement of financial goals or share price performance. . . . The ***incentive compensation earned by our executives in 2021, and historically, reflects our financial performance*** and achievement relative to our pre-established goals, and is aligned with our pay for performance philosophy. (emphasis added)

138. As Stanley further stated in the 2021 Proxy Statement about how it compensates executives:

> **Pay for Performance.** A significant portion of annual and long-term compensation is variable, dependent on and directly linked to Company financial performance, including achievement relative to our Compensation Peer Group. The annual incentive plan goals align with our earnings guidance while the three-year performance plan goals are linked to our strategic framework and long-term financial objectives.

139. The 2021 Proxy Statement further provided regarding 2021 executive compensation:

> The Compensation Committee believes that a significant portion of each executive officer's compensation opportunity should be variable in order to ensure that median or above median compensation is delivered only when business results are strong and we have created value for our shareholders.

140. According to Stanley's 2021 Proxy Statement, Defendant Loree's total compensation in 2021 was $13,167,893 and Defendant Allan's total compensation in 2021 was $5,522,007.

## V. Additional Class Period or Relevant Corporate Events

### A. Stanley Completes a Notes Offering During the Class Period

141. On February 24, 2022, Stanley completed a public offering (the "Offering") of $500,000,000 aggregate principal amount of the Company's 2.300% Notes due 2025 (the "2025 Notes") and $500,000,000 aggregate principal amount of the Company's 3.000% Notes due 2032 (the "2032 Notes" and, together with the 2025 Notes, the "Notes").

142. Stanley stated that it intended to use the net proceeds from the Offering for general

corporate purposes, including repayment of indebtedness.

143. From the Offering, Stanley received net proceeds of approximately $991.9 million, after deducting expenses and underwriting discounts.

**B. Allan Is Appointed CEO and Ramirez Departs**

144. On May 31, 2022, Stanley announced that its Board appointed Defendant Allan as its next CEO effective July 1, 2022. Allan joined the Board and retained the title of President.

145. The Company also announced that it entered into a letter agreement with Allan, providing compensation and benefits, including a base salary of $1.25 million, an annual cash bonus based on certain metrics multiplied by his earned base salary, a long-term incentive grant with an aggregate grant date value of $3.6 million, annual grants of equity awards that result in a total fiscal year 2022 grant date value of $6.75 million, and with respect to fiscal year 2023 a target long-term incentive award of no less than $9.25 million, and employee benefits and perquisites provided to other senior executives of the Company.

146. On July 12, 2022, Stanley announced that "Jaime Ramirez, Executive Vice President and President, Tools & Storage, will be stepping down from his role to pursue opportunities outside of the Company, effective July 22, 2022."

**C. Stanley Admits It Filed False and Misleading Documents With the SEC Concerning Executive Compensation**

147. The Company's Fiscal 2022 Form 10-K contained the following disclosure under Item 3, Legal Proceedings: "As previously disclosed, the Company has identified that certain expenses it incurred in previous years constituted undisclosed perquisites."

148. On June 20, 2023, the SEC announced that in anticipation of the institution of Cease-and-Desist proceedings against Stanley pursuant to Section 21 C of the Exchange Act, "Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has

determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21 C of the Securities Exchange Act of 1934." The SEC noted its Findings, and imposed a Cease-and-Desist Order ("Order") stating:

> This matter arises from Stanley Black & Decker, Inc.'s failure to disclose in its definitive proxy statements at least $ 1.3 million worth of perquisites and personal benefits paid to, or on behalf of four of its executive officers and one of its directors from 2017 through 2020. The perquisites predominantly consisted of expenses associated with the executives' use of corporate aircraft.

149. According to the SEC's Order against the Company, the SEC also stated: "In connection with this conduct, [Stanley] violated Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, and 14a-3 thereunder." It further stated:

> In definitive proxy statements disclosing executive compensation paid for 2017 through 2020, which were filed in 2018 through 2021, [Stanley] disclosed a total annual average of approximately $1 million worth of "All Other Compensation" for the four named executive officers and one director at issue. The proxy statements listed zero dollars in compensation attributable to the officers' and director's use of corporate aircraft.
>
> However, these same definitive proxy statements failed to disclose at least $1.3 million worth of perquisites and personal benefits, predominantly related to corporate aircraft usage, that were provided to these four named executive officers and the director, thereby understating the "All Other Compensation" portion of their compensation by a total annual average of at least $325,000.
>
> From 2018 through 2021, SBD incorporated its definitive proxy statements into its annual reports by reference.

150. As a result of the conduct described above, Stanley violated Section 14(a) of the Exchange Act and Rule 14a-3 thereunder.

151. On June 20, 2023 the SEC also announced that it had instituted Cease-and-Desist

proceedings against Jeffery D. Ansell ("Ansell"), a former Stanley executive, pursuant to Section 21 C of the Exchange Act. In addition, the SEC announced that Ansell agreed to settle charges that he caused the Company to violate proxy solicitation and books and records provisions of the federal securities laws, stating:

> This matter arises from Jeffery D. Ansell's role in Stanley Black & Decker, Inc.'s ("SBD") failure to disclose in its definitive proxy statements certain perquisites and personal benefits that it provided to Ansell from 2017 through 2020, while he was a senior officer at SBD. As a result of his conduct, Ansell caused SBD to violate Sections 13(b)(2)(A) and 14(a) of the Exchange Act and Rule 14a-3 thereunder.
>
> Respondent Jeffery D. Ansell was Executive Vice President of SBD and President of SBD's Tools & Storage segment from October 2016 through June 2020, Executive Vice President of SBD from July 2020 through December 31, 2021, and a strategic advisor to SBD from January 1, 2022 until February 4, 2022.
>
> * * *
>
> In definitive proxy statements disclosing executive compensation earned for 2017 through 2020, which were filed in 2018 through 2021, SBD disclosed an annual average of approximately $167,000 in "All Other Compensation" for Ansell.
>
> However, these same definitive proxy statements failed to disclose a total of over $647,000 worth of perquisites and personal benefits provided to Ansell, thereby understating the "All Other Compensation" portion of his compensation by an annual average of approximately $162,000.
>
> * * *
>
> From at least 2018 through 2020, SBD incorrectly recorded payments for the benefit of Ansell as business expenses and not compensation, based at least in part on Ansell's submission of expense reimbursement requests and his approval of certain payments to vendors. As a result, SBD's books, records, and accounts did not, in reasonable detail, accurately and fairly reflect its disposition of assets.

152. On March 9, 2022 the Company filed a Form 14A, together with a letter signed by Loree and a letter signed by Andrea J. Ayers ("Ayers"), Chair-elect of the Board, which stated:

> The perquisite amounts reported for fiscal years 2020 and 2019 have been amended to include amounts not previously reported. The amended amounts include personal use of corporate aircraft in the amount of $100,140, $66,845, $22,606 for fiscal year 2020 for Messrs. Loree, Allan, and Ramirez, respectfully, and $79,557, and $218,546 for fiscal year 2019 for Messrs Loree and Allan. respectively. The amended amounts also include a total of $13,942 in fiscal year

> 2020 and $37,426 in fiscal year 2019 for additional products, home Internet service and technology upgrades, token and commerative gifts and incidental and commercial travel expenses.

153. As evidenced by the SEC's findings set forth above, the March 9, 2022 disclosure in the Form 14A was inadequate and concealed material facts.

154. As noted above, on June 20, 2023, the SEC announced enforcement actions against the Company pursuant to Section 21 C of the Exchange Act stating that the Company failed to disclose in its definitive proxy statements (which were filed in 2018 through 2021) at least $1.3 million worth of perquisites and personal benefits paid to, or on behalf of four of its executive officers and one of its directors from 2017 through 2020. This amounted to an understatement of approximately $325,000 for each of the four years at issue ($1.3 million divided by 4 = $325,000).

155. In its enforcement action, the SEC noted that in the referenced proxy statements the Company disclosed a total annual average of approximately $1 million worth of "All Other Compensation" for the four named executive officers and one director at issue. Hence the understatements for each of the four years approximated 32.5%.

156. The SEC considered the $1.3 million understatement of perquisites and personal benefits paid to officers and executives in the Company's definitive proxy statements which set forth earnings during 2017 through 2020 to be material to said documents as disseminated to the investing public.

157. Similarly, as noted above, on June 20, 2023 the SEC also announced that it had brought an enforcement action against Ansell who was Executive Vice President of the Company and President of the Company's Tools & Storage segment from October 2016 through June 2020, Executive Vice President of the Company from July 2020 through December 31, 2021, and a strategic advisor to the Company from January 1, 2022 until February 4, 2022. As stated in the enforcement action:

> In definitive proxy statements disclosing executive compensation earned for 2017 through 2020, which were filed in 2018 through 2021, SBD disclosed an annual average of approximately $167,000 in "All Other Compensation" for Ansell.

> However, these same definitive proxy statements failed to disclose a total of over $647,000 worth of perquisites and personal benefits provided to Ansell, thereby understating the "All Other Compensation" portion of his compensation by an annual average of approximately $162,000.

158. The SEC determined that the nearly 100% understatement of Ansell's reported "All Other Compensation" was material to the referenced proxy statements as disseminated to the investing public.

**D. Stanley Restates Its Financial Statements**

159. On January 26, 2022, Stanley filed a Form 8-K with the SEC stating that previously issued financial statements needed to be restated and should not be relied on. The restatements were apparently in response to an SEC inquiry that objected to the Company's claim that there were no material misstatements in the historical financial statements. Those restatements, concerning accounting for equity units, impacted the previously issued (i) consolidated financial statements as of and for the three-year period ended January 2, 2021 included in the Company's Annual Report on Form 10-K, filed with the SEC on February 18, 2021, (ii) unaudited interim financial statements included in the Company's Quarterly Report on Form 10-Q for the period ended April 3, 2021, filed with the SEC on April 28, 2021, (iii) unaudited interim financial statements included in the Company's Quarterly Report on Form 10-Q for the period ended July 3, 2021, filed with the SEC on July 27, 2021 and, (iv) unaudited interim financial statements included in the Q3 2021 Form 10-Q filed with the SEC on November 12, 2021.

160. Stanley stated in the Form 8-K that, among other effects of the restatements, "diluted GAAP earnings per share for the third quarter 2021 quarter-to-date and year-to-date periods is reduced by $0.05 and $0.19, respectively, and non-GAAP diluted earnings per share for the third quarter 2021 quarter-to-date and year-to-date periods is reduced by $0.06 and $0.20, respectively." In addition, the Company stated that "management has concluded that there were material weaknesses in internal control over financial reporting relating to each of the errors described."

### E. Stanley Reports That It May Have Violated the FCPA

161. The Company's fiscal 2022 Form 10-K contained the following disclosure under Item 3, Legal Proceedings:

> Also, the Company has identified certain transactions relating to its international operations that may raise compliance questions under the U.S. Foreign Corrupt Practices Act ("FCPA") and has voluntarily disclosed this information to the U.S. Department of Justice ("DOJ") and the SEC. The Company is cooperating with both agencies in their investigations.

162. The FCPA is a United States federal law that prohibits U.S. citizens and entities from bribing foreign government officials to benefit their business interests.

163. Those who violate this law typically do so by recording the bribe as either a fictitious business expense (i.e., a consulting expense), purchase of a non-existent asset, or as an asset acquisition (i.e., property, plant, and equipment) at an inflated price. Because the recordation of the bribe as a business expense serves to diminish profitability on a dollar for dollar basis (i.e., payment of a $25,000 bribe which is recorded as an expense in order to obtain a $250,000 sale will result in a $225,000 net profit on the transaction), whereas paying for a non-existent asset or overpaying for an asset, which is depreciated over time, (i.e., payment of a $25,000 bribe which is recorded as an amount in excess of the worth of equipment purchased, in order to obtain a $250,000 sale will result in a net profit only slightly lower than $250,000). For example, if the non-existent or overvalued equipment is depreciated over twenty-five years (in this instance depreciation of $1,000 per year), then the $250,000 sale would only be offset by $1,000 of depreciation, yielding a $249,000 net profit on the transaction.

164. Only a company official with a great deal of authority and the ability to override the company's internal controls will have the ability to authorize issuance of a bribery payment and cause the payment to be recorded in the company's books and records as a fictitious asset or expense, or cause the acquisition of an asset to be recorded in the company's books and records at a significantly inflated cost.

165. Stanley prepared budgets and circulated reports at least monthly that compared actual expenditures to budget.

166. Loree and Allan could not have avoided knowing the inordinate variance between budgeted and actual amounts.

## ADDITIONAL SCIENTER ALLEGATIONS

167. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Stanley, their control over, and/or receipt and/or modification of Stanley's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Stanley, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

168. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Stanley's common stock and operated as a fraud or deceit on Class Period purchasers of Stanley common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Stanley's common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Stanley common stock during the Class Period,

Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

169. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiff and the other members of the Class purchased or acquired Stanley common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

170. At all relevant times, the market for Stanley's common stock was an efficient market for the following reasons, among others:

(a) Stanley common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Stanley filed periodic public reports with the SEC and the NYSE;

(c) Stanley regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Stanley was followed by numerous securities analysts employed by major brokerage firms.

171. As a result of the foregoing, the market for Stanley common stock promptly digested current information regarding Stanley from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Stanley common stock during the Class Period suffered similar injury through their purchase of Stanley common stock at artificially inflated prices and a presumption of reliance applies.

172. Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

**NO SAFE HARBOR**

173. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of

Stanley who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

174. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Stanley common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

175. The members of the Class are so numerous that joinder of all members is impracticable, since Stanley, as of March 18, 2023, had more than 153.1 million shares of stock outstanding and because the Company's shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

176. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of

business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of Stanley common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Stanley's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

177. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

178. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

179. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

180. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

181. This Count is asserted by Plaintiff on behalf of itself and the other members of the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

182. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Stanley's common stock; and (iii) cause Plaintiff and the other members of the Class to purchase or otherwise acquire Stanley's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

183. Defendants, by the use of means and instrumentalities of interstate commerce:(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Stanley's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

184. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

185. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

186. As a result of Defendants' fraudulent activity, the market price of Stanley was artificially inflated during the Class Period.

187. In ignorance of the true financial condition of Stanley, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Stanley containing the misleading information, purchased or otherwise acquired Stanley's common stock at artificially inflated prices during the Class Period.

188. Plaintiff and the other members of the Class's losses were proximately caused by Defendants' active and primary participation in Stanley's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Stanley's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Stanley's common stock through their misconduct as described herein. Plaintiff's and the other members of the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Stanley.

189. Throughout the Class Period, Defendants were aware of material non-public information concerning Stanley's fraudulent conduct (including the false and misleading statements and omissions described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the other members of the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

190. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Stanley common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants)**

191. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

192. During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains, solely under the control of the Defendants.

193. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with

copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

194. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Stanley's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Stanley's corporate releases detailed herein and are therefore responsible and liable for the misrepresentations and omissions contained herein.

195. The Individual Defendants acted as controlling persons of Stanley within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Stanley to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Stanley and all of its employees. As alleged above, Stanley is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

196. As a direct and proximate result of the wrongful conduct of Stanley and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in

connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A) Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Abraham, Fruchter & Twersky, LLP as Class Counsel;

(B) Awarding Plaintiff and the other members of the Class damages against all Defendants, jointly and severally, including interest thereon;

(C) Awarding Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(D) Awarding such other or further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 13, 2023

**ABRAHAM, FRUCHTER**
**& TWERSKY, LLP**

*/s/* Lawrence D. Levit
Mitchell M.Z. Twersky (*pro hac vice* to be filed)
Atara Twersky (*pro hac vice* to be filed)
Lawrence D. Levit (*pro hac vice*)
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
mtwersky@aftlaw.com
atwersky@aftlaw.com
llevit@aftlaw.com

**Counsel for General Retirement System of the City of Detroit and Lead Counsel for the Class**

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Erin Green Comite (CT 24886)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
ecomite@scott-scott.com

**Local Counsel for the Class**

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Michael Vanoverbeke
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
mvanoverbeke@vmtlaw.com

**Additional Counsel for Plaintiff**