**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NARESH VISSA RAMMOHAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>STANLEY BLACK & DECKER, INC., DONALD ALLAN, JR., JAMES M. LOREE, AND LEE MCCHESNEY,<br><br>        Defendants. | **CIVIL CASE NO. 3:23-cv-00369** |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS COMPLAINT**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| TABLE OF AUTHORITIES | | | ii |
| I. | INTRODUCTION | | 1 |
| II. | STATEMENT OF FACTS | | 3 |
| | A. | Stanley's Tools & Outdoor Segment | 3 |
| | B. | Information and Discussions About Demand Were Prevalent at Stanley | 3 |
| | | 1. CWs Provided Detailed information Regarding Demand | 3 |
| | | 2. The Company's MAP Meetings Detail Sales, Supply and Demand | 4 |
| | | 3. The Company's Executive Meetings Summarize the MAP Meetings | 6 |
| | C. | The Deterioration of Consumer Demand for the Tools & Outdoor Segment | 6 |
| | D. | A Massive Pull-in From Lowe's Allowed the Company to Claim Demand Remained Strong | 7 |
| | | 1. The Lowe's Pull-in | 7 |
| | | 2. Defendants Knew and Approved of the Lowe's Pull-in | 9 |
| | | 3. The Q4 Pull-in Hides Declining Demand | 10 |
| III. | ARGUMENT | | 12 |
| | A. | Legal Standards | 12 |
| | B. | Defendants Made Materially False and Misleading Class Period Statements or Omissions | 13 |
| | | 1. Stanley's Undisclosed Fourth Quarter 2021 Pull-in Gives Rise to An Actionable Federal Securities Law Claim | 13 |
| | | 2. Defendants' Contested Statements Were Materially False and Misleading | 18 |

a.      October 2021 Statements ................................................................18

b.      February 2022 Statements.............................................................20

c.      April 2022 Statements...................................................................21

3.     Defendants' Claims That Their Statements Were Non-Actionable
Opinions, Forward-Looking, or Puffery Do Not Apply ............................27

C.     Actionable Items 303 and 105 Claims Are Alleged................................................33

D.     Plaintiff Pleads a Strong Inference of Scienter .......................................................34

E.     Plaintiff's Section 20(a) Control-Person Claim is Properly Pled ...........................39

F.     Leave to Amend is Appropriate if Any Part of the Motion is Granted ..................40

IV.   CONCLUSION..............................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)...................................................................................................29

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,*
    28 F.4th 343 (2d Cir. 2022) ................................................................................................ 34

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (D. Conn. 2021) ................................................................................ 37

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................................... 37

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)........................................................................................25, 36

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................16

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................................................33

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
    2014 WL 6982233 (N.D. Ohio Dec. 9, 2014) ...................................................................28

*In re Ambac Fin. Grp., Inc.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010)................................................................................13

*In re Bristol-Myers Squibb Sec. Litig.*,
    2005 WL 2007004 (D.N.J. Aug. 17, 2005) ...........................................................29, 30, 31

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ...................................................................................16

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) .......................................................16, 18, 28, 33

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)................................................................................12

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004)................................................................................32

iii

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................................12

*In re Mylan N.V. Sec. Litig.*,
No. 16-cv-7926, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)........................................16

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) .....................................................................................31

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...........................................................................26, 28, 30

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...................................................................32

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002) ..................................................................... 15-16

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...................................................................32

*In re St. Jude Med. Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)...............................................................................16

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
2011 WL 494753 (D. Conn. Feb. 7, 2011) ................................................................. 36-37

*In re Supercom Inc. Sec. Litig.*,
2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018)....................................................................37

*In re Vander Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)...............................................................................12

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)...............................................................................31

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)......................................................................................12, 31

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)...............................................................................39

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)............................................................27, 30

*Local No. 38 Intern. Broth. Of Elec. Workers Pension Fund v. Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010) ..............................................................................38

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...................................................................................33

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007) ...................................................................38

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014) .............................................................................12, 16

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
2022 WL 17815767 (2d Cir. Dec. 20, 2022) ...................................................33, 34

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .....................................................................32

*Murphy v. Precision Castparts Corporation*,
2017 WL 3084274 (D. Or. June 27, 2017) ............................................................15

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
2013 WL 1188050 (D. Conn. Mar. 23, 2013) ........................................................39

*Noto v. 22nd Century Grp., Inc.*,
35 F.4th 95 (2d Cir. 2022) .....................................................................................40

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ............................................................................29, 34

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ........................................................28, 29, 37, 38

*Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
517 F.Supp.3d 196 (S.D.N.Y. 2021) ......................................................................34

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019) ....................................................................39

*Plumbers v. Davis*,
2020 WL 1877821 (S.D.N.Y. ___) ...........................................................15, 16, 33

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................38-39

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
792 F. Supp. 2d 328 (D. Conn. 2011) ....................................................................39

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..............................................................................31-32

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)........................................................................29

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) .....................................................................................34-35

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
    2018 WL 1587457 (D. Conn. Mar. 31, 2018) .................................................12, 24, 32, 34

*Stadium Capital LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)........................................................................37

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019)................................................................... 29, 38-39

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015).................................................................................................34

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)....................................................................................... 29-30

*Woolgar v. Kingstone Co., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ..............................................................................38

**Statutes & Rules**

17 C.F.R. § 229.105(a)...........................................................................................................33

Lead Plaintiff General Retirement System of the City of Detroit ("Plaintiff") hereby respectfully opposes Defendants' Motion to Dismiss Plaintiff's Amended Complaint (the "AC").

## I. INTRODUCTION

During the pandemic, demand for Defendant Stanley Black & Decker, Inc.'s ("Stanley" or the "Company") home improvement products surged. As stay-at-home orders diminished, so did demand. In response, over a nine-month period, from late October 2021 through July 2022,[1] Defendants issued statements that hid significant post-pandemic deteriorating demand.

Indeed, on October 28, 2021, the first day of the Class Period, Defendants repeatedly claimed that the Company's record demand-driven revenue was "robust", "extraordinary", and the "strongest demand" in its history. ¶¶103-04, 107; [2] *see also* ¶¶105-06, 108-09*.* Meanwhile, according to one Company executive and four managers – Confidential Witnesses (each, a "CW") herein – by the fourth quarter ("Q4") of 2021 it was evident, through internal reports, spreadsheets and presentations, that demand for Stanley's Tools & Outdoor products was in "rampant decline." *See*, *e.g.,* ¶¶29-33, 47-50, 56-57, 66, 71, 76-78, 98.[3] According to the CWs, this deteriorating demand was discussed not only at meetings attended by the Individual Defendants[4] and several of the CWs, but also throughout the Company. ¶¶29-33, 56-57, 78, 92, 99-100.

To hide deteriorating demand, the Individual Defendants authorized a massive pull-in of as much as $300 million of product that may have been sold in 2022 into Q4 of 2021. ¶¶73, 87, 92-93, 97. To achieve this pull-in, the Company induced one of its three largest customers – Lowe's

---

[1] October 28, 2021, through July 28, 2022 (the "Class Period").

[2] Unless otherwise specified, references to "¶__" are to paragraphs of the AC. ECF 41. Defendants' Memorandum in Support of Their Motion (ECF 42-1) is referred to as "MTD."

[3] Stanley's Tools & Outdoor segment comprised 82% and 85% of total revenues in 2021 and 2022, respectively. ¶37.

[4] The "Individual Defendants" are former Chief Executive Officer ("CEO") James M. Loree, current CEO and former Chief Financial Officer ("CFO") Donald Allan, Jr., and Lee McChesney, the then Vice President of Corporate Finance and CFO of the Tools & Storage business.

– to accept extra inventory at an increased discount. ¶¶62, 115, 126. According to the CWs the pull-in was a "historic high," consisting of 3-6 months of typical inventory shipped to Lowe's, varying by product. ¶¶63, 93.  Only by executing that "historic" pull-in was Stanley able to report that its Q4 2021 sales exceeded its Q4 2020 sales. But it put Stanley "in the hole" month after month from the start of 2022. ¶81.

After the pull-in, Defendants continued their unfounded claims regarding "unprecedented," and "extraordinarily strong customer demand." ¶¶110-11. Indeed, on February 1, 2022, Defendants even reassured investors that they were closely watching demand and would act quickly if they saw any signs it was diminishing. ¶¶112-13. Three weeks later, on February 22, 2022, Defendants claimed, among other things, that the Company still had a "sustained strong demand outlook" and "increasing demand from customers." ¶114. These statements continued into late April when, in a Company press release, Defendant Loree stated that Stanley "capitalized on the strong demand environment" and that its "U.S. retail point-of-sale demand remained robust." ¶¶116, 121.

While Stanley reduced the range of its expected full-year 2022 earnings on April 28, 2022, Defendants falsely blamed the deteriorating sales on "temporary electronic component supply challenges, which have continued to improve" – thereby intimating that but for their inability to manufacture and deliver more goods, demand remained robust. ¶¶117-20. Meanwhile, Defendant Allan also claimed that "demand for our products remains healthy," including that its Tools & Outdoor products continued "to experience a very solid demand environment." ¶122.

Despite these claims, as detailed *infra*, by the end of the first quarter of 2022, Stanley's pro-forma net sales had declined $146.8 million over the same quarter in the prior year, despite increasing the prices of its products.  In the second quarter, its pro-forma net sales had declined $279.8 million than the year prior.  It was not until July 28, 2022, that the truth regarding declining demand was fully revealed – resulting in a 16% day-over-day drop of Stanley's stock price. ¶132.

2

## II.    STATEMENT OF FACTS

### A.    Stanley's Tools & Outdoor Segment

Stanley's Tools & Outdoors division manufactures, among other things, hand tools, power tools, and outdoor products. ¶¶2, 35, 34, 39.  Stanley distributes those products through retailers, including home centers, mass merchants, hardware stores, and retail lumber yards. ¶37. During all times relevant herein, Lowe's was one of Stanley's three largest customers, at times the largest, and the Tools & Outdoor segment comprised the majority of the Company's revenues. ¶¶30, 37.

### B.    Information and Discussions About Demand Were Prevalent at Stanley

### 1.    CWs Provided Detailed Information Regarding Demand

The AC details information provided by five former Stanley employees with specific knowledge regarding Stanley's business practices and the demand for its Tools & Outdoor products during the Class Period. These CWs held positions in Stanley's Tools & Outdoor segment's demand planning, supply chain, and sales divisions. ¶¶29-33. Each held a management or executive position. They include two demand planning managers, a supply chain director, a supply chain Vice President, and a sales manager. *Id.*

CW1 was the global demand planning manager for the Company from July 2021 to June 2022 and led an aspect of demand planning for the Tools & Outdoor business globally and coordinated demand planning among different teams in the Americas, Asia & Europe. ¶29. Stanley demand planners were customer focused and tasked with ensuring there was sufficient inventory to meet specific customers' inventory position and point-of-sale ("POS") rates. ¶42. He worked closely with Vice President, Global Demand Planning, Global Tools & Storage, who reported to Vice President, Supply Chain Jason Stremmel. ¶29.[5]

---

[5] For convenience, the CWs are all referenced as "he" although they all may not be male.

CW2 worked for Stanley for more than two decades in a variety of positions. From 2014 until early 2022, CW2 was Director of Supply Chain Operations for Lowe's. ¶30. In that position, CW2 interacted directly with Lowe's personnel on forecasting and order fulfillment. CW2 worked out of Stanley's Towson, Maryland office and reported to, among others, Stremmel, who reported to Nick DeSimone, Chief Supply Chain Officer, who reported to Defendant Loree. *Id.*

CW3 was employed by Stanley for 8 years until October 2022, including as Vice President of supply chain for the Americas region from December 2019 to January 2022 and Vice President of Global Planning from January 2022 to October 2022. CW3 reported to the Chief Supply Chain Officer who reported to President and CEO, Defendant Allan. ¶31.

CW4 had worked in sales at a company called MTD Holdings since 2017, in which Stanley acquired a 20% stake in 2018 and then acquired the remainder in 2021. ¶32. CW4 then became a Stanley employee in December 2021 until July 2022. CW4 was a national e-commerce sales manager at Stanley, servicing Amazon, and handled outdoor products. CW4 reported to Mike Axline ("Axline"), Vice President of the outdoor e-commerce segment. *Id.*

CW5 worked at Stanley from September 2013 to August 2022 in a variety of roles, such as sales operations analyst and sales operations manager, and then became North American supply chain manager from July 2020 to July 2021 and then demand planning manager from July 2021 to August 2022, assigned to the Lowe's account. ¶33. CW5 most recently reported to Vice President of Supply Chain John Weetenkamp, who worked in Stremmel's Global Planning organization. ¶33.

### 2.    The Company's MAP Meetings Detail Sales, Supply and Demand

Stanley conducted monthly meetings known as MAP meetings, which were part of planning with a focus on reviewing major accounts. They were held on a Monday, usually in a conference room in Towson, Maryland, in preparation for Thursday meetings among Stanley's top executives. ¶¶51, 56. About 80-100 employees attended these meetings, including finance, sales,

supply and demand personnel. *Id.* About 50 employees attended in-person, including Defendant McChesney, Brendan McNulty (the CFO for North American Tools & Outdoor who reported to McChesney), CW2, and CW3. Another 30-50 employees participated by phone, including CW4. ¶¶51, 54, 99-100.

MAP meetings were typically four-six hours long, during which sales leaders for each account reviewed performance (including demand and results compared to targets), projections, opportunities (including pull-ins used to drive demand), and risks. ¶¶52, 57, 92, 99-100.

Notably, Stanley had access to portals providing Lowe's, Ace Hardware and Home Depot's inventories and sell-through data, allowing Stanley to see what was selling and not selling through with each of these customers. ¶84. Ben Dunn from Stanley was assigned to Lowe's and ran and circulated reports every Monday on Lowe's sell-through of products, using the portal known as Lowe's Link. ¶¶46, 74, 84. The distribution list for these reports was described as massive. ¶84.

Each MAP meeting included a fifteen-to-twenty-page PowerPoint presentation which used the same format for every customer and covered each division. *Id.* Prior to the MAP meetings, the sales leaders emailed the PowerPoint decks to numerous recipients, including Defendant McChesney. ¶53. If changes were made to the PowerPoint decks during the meetings, they were recirculated by email afterwards. *Id.* McChesney regularly asked questions at the meetings and brought a binder with him which included all the PowerPoint decks and his notes. ¶¶53-54.

Among other things, the MAP presentations used information from Company reports that showed: (i) the month-by-month gap that existed between actual and forecasted sales; and (ii) the pulling-in of orders. ¶54. From July 2021 to August 2022, CW5 prepared slides for the MAP meetings regarding demand planning for Lowe's. Until early 2022, CW2 used those reports to perform his job functions as Director of Supply Chain for Lowe's. ¶¶30, 33, 54.

### 3.    The Company's Executive Meetings Summarize the MAP Meetings

On the Thursday after the MAP meetings, McChesney typically met with Defendants Allan and Loree, and other top executives for a regularly scheduled meeting. At the meeting, which CW3 attended, McChesney provided a summary of the MAP meeting. ¶¶56-57. These meetings had an executive roll-up that summarized business, including demand and actual results across all regions. ¶57. Pull-ins were also discussed. ¶92. Executives received summarized versions of the PowerPoint presentations made during the MAP meetings, and feedback was provided to the sales and operations teams. ¶56.[6]

In addition to the summarized versions of the MAP PowerPoint presentations, executives and other employees, including, but not limited to, CW1, CW4, Axline, and Stremmel created and/or had access to Excel reports which showed the demand decline in the fall of 2021. ¶¶78-79, 83, 98. At the start of January 2022, CW1 provided reports to Stremmel that spelled out the demand forecast shortfalls. ¶98. Originally, the demand plan was updated on a four-week business planning cycle. However, during 2022, Stremmel requested that CW1 provide these reports weekly rather than monthly. *Id*.

### C.    The Deterioration of Consumer Demand for the Tools & Outdoor Segment

In the beginning of 2021, Stanley saw increased consumer demand for its Tools & Outdoor products as Covid-19 pandemic stay-at-home orders spurred increased home remodeling and do-it-yourself projects. ¶¶3, 71. However, as the world reopened in the second half of 2021, consumer demand for its Tools & Outdoor products began to deteriorate. *See*, *e.g.* ¶¶62, 71-72, 74-80, 83, 85-86, 99-101.

---

[6] Stanley seemingly acknowledged these meetings in a letter to the SEC dated December 21, 2021. ¶58.

According to CW2, the then Director of Supply Chain Operations for Lowe's, and CW3, the then Vice President of supply chain for the Americas region, it was evident that demand was slowing in the second half of 2021. ¶¶71-72, 93. Per CW4, the "rampant decline" in demand began in fall 2021, with that decline either remaining consistent or getting worse until CW4 left Stanley in July 2022. ¶¶76, 78. CW4 knew first-hand about the decline in demand in the outdoor segment because of CW4's responsibilities for e-commerce channel in that space and CW4 understood from conversations with Stanley colleagues that the decline in demand was "across all brands and categories." ¶77. The CWs stated that the declining demand gave rise to discussions about executing pull-ins to make up for falling demand. ¶¶87-88, 92.

According to CW4, the Excel reports which Axline and other executives had access to showed a "major decline in demand" in the fall of 2021 and included "top-down" goals to try to figure out how to increase sales. ¶78. As a result, to get cash for its inventory, Stanley needed to try to execute a pull-in from 2022 to increase sales and to hide the decline in demand. *See*, *e.g.* ¶¶8, 72.

### D. A Massive Pull-in From Lowe's Allowed Defendants to Claim Demand Remained Strong

At times when it needed to increase sales, Stanley sought to convince certain of its customers to agree to take more inventory earlier than intended. ¶63. This practice, known as a pull-in, pull-forward or buy forward (herein, a "pull-in") was done to try to increase sales during a financial reporting period. ¶¶63, 88. The practice resulted in the Company reporting better results for an earlier period. ¶63.

### 1. The Lowe's Pull-in

During Q4 2021, Stanley induced Lowe's to take on a massive amount of additional inventory that Lowe's otherwise may have purchased during 2022. By shipping out this inventory

7

early, Stanley was attempting to enhance its Q4 2021 and entire year 2021 results. ¶¶63, 66. Indeed, if not for the pull-in, Stanley's Q4 2021 sales would have been lower than its Q4 2020 sales and Defendants would have had to admit that demand, rather than remaining strong, was declining. Without the $300 million pull-in, the $4.068 billion in net sales that Stanley reported for Q4 2021 would have been $3.768 billion, lower than the $4.003 billion reported for Q4 of 2020.[7] This undisclosed Q4 2021 pull-in created uncertainty as to future demand. Indeed, as noted *supra*, this pull-in was of a "historic" size, consisting of 3-6 months of inventory, which increased uncertainty for 2022 demand. ¶¶63, 93. Despite this, Stanley did not revise its demand estimates for 2022. ¶¶67, 69.

According to CW2, Stanley senior level executives began talking with Lowe's in November 2021 to determine whether Stanley could move forward with a pull-in. ¶92. To induce Lowe's to take extra inventory, Stanley increased the payout amount (or discount) to about 12-15%, higher than the usual 10% payout provided. ¶64. For the pull-in, CW2 met with Lowe's personnel regarding the extra inventory that Lowe's might take and had to determine what inventory Stanley could ship immediately, and Lowe's agreed to take certain of those products. ¶64.

The CWs stated that Stanley's top executives were informed about declining demand and authorized the Q4 2021 pull-in (¶¶87, 89, 92, 94-95), with as much as $300 million of product pulled into Q4 2021, while not revising its 2022 demand forecast. ¶¶73, 87, 97. According to CW5, the amount of the Lowe's Q4 2021 pull-in stood out as a "historic high." ¶¶63, 93. CW2 described frustration among the Lowe's team that Stanley would get stuck with millions of dollars of unsold

---

[7] See Declaration of Lawrence D. Levit ("Levit Decl.") filed concurrently herewith, Ex. B.

product because the rest of the Company was not hitting the plan and Lowe's would have to "carry Stanley" in covering the shortfall. ¶¶54-55.

CW1 stated that the biggest problem with the pull-in was that it robbed money from future periods and that while December 2021 was not that great, there was nothing there in January 2022, meaning that December sales were softer than expected but pulling in orders into December exacerbated the January shortfall from which Stanley did not recover. ¶67.

However, according to CW3 and CW5, Lowe's continued to order from Stanley in Q1 2022 even though it still had a great deal of inventory.  ¶¶74-75.  CW5 attributed these Lowe's orders to the fact that Lowe's sent the pull-in products to a warehouse in Chicago and did not effectively distribute those products to regional centers. Accordingly, Lowe's regional centers did not have the products they needed to supply their stores and continued to order from Stanley even though Lowe's already had sufficient products. ¶75. Because Lowe's continued ordering in Q1 2022, that quarter ended up being better for Stanley than it should have been but also caused more of a decline to occur in Q2 2022. ¶74. According to CW5, it was apparent to Stanley that Lowe's did not need the inventory it was ordering in 2022 because Stanley had access to Lowe's existing, real-time inventory and knew that inventory was increasing. ¶75.

### 2. Defendants Knew and Approved of the Lowe's Pull-in

According to CW2, the instruction to pull-in orders "came from the top." ¶92. There was a directive from finance to "go get the number," meaning that sales staff along with supply and demand personnel should coordinate to determine the inventory on hand and what could be immediately moved to Lowe's to improve sales numbers. *Id.*

CW2 stated that personnel at Stanley and their counterparts at Lowe's were not in favor of the pull-ins because it took expected sales away from a later period but were overridden by senior executives. Pull-ins were discussed at meetings CW2 attended in which McChesney participated

9

and were up for review and approval at meetings Defendants Allan and Loree attended with McChesney. CW2 believed Allan approved the Lowe's pull-ins and quoted him as stating: "Yes, we gotta hit this number. Go get it." ¶92.

CW3, who attended the monthly Thursday Executive meetings, also stated that discussions about the 2021 pull-ins went all the way to the top-level executives. Meetings and emails centered on discussions about pull-ahead opportunities and "let's try to execute this." ¶94. According to CW3, Defendant Allan was involved in the discussions on this topic and the pull-in could not have been executed without Loree knowing about it. *Id.*

CW5 also stated that the directive to pull-in orders for Q4 2021 was "coming from the top" executives at Stanley.  CW5 stated that the policies in place at Stanley dictated "dollar thresholds" for authority for transactions, meaning that different levels of management and executives could authorize transactions by a certain dollar amount. ¶95. The CEO or CFO was required to sign off on transactions that were beyond a vice president's level of authority, which, according to CW5, was the Q4 2021 Lowe's pull-in transaction. *Id.* CW1 stated that given the size of the pull-in, the terms were believed to have been negotiated by the top executives at Stanley and Lowe's. ¶89.

### 3.     The Q4 Pull-In Hides Declining Demand

Although Stanley pulled-in inventory from 2022 into 2021, the Company did not change its demand forecast for 2022. *See, e.g.*, ¶¶67, 69, 81, 88. CW5 stated that the Q4 2021 pull-in had "ripped out" the inventory from the 2022 demand plan and that the pull-in was "very disruptive" to Stanley but that Stanley was more focused on the dollar than on how the pull-in would impact planning in the future. ¶80. Consequently, the Company began the year with a demand shortfall.

CW2 stated that Stanley expected "a soft first quarter because of the volume we shipped in December" 2021 but did not reduce its forecast. ¶81. CW1 described Stanley's demand forecast for 2022 as being "very aggressive" and that Stanley was "in the hole" month after month from

the start of 2022. *Id.* CW1 stated that, by the end of Q1 2022, it was "pretty clear to a lot of people that it was going to be an ugly year." ¶85. In conversations with sales staff, CW1 stated that they "seemed very miserable" as a result of Stanley's poor performance and that the sales team members were just getting the "thumb screws on them," with pressure to "go get more" business. *Id.*

According to CW1, there was no data showing demand was still strong in 2022. When doing a forecast, there were actuals, which were the sales results and they showed slowing demand, and there was no reliable reason to expect a turnaround. ¶83. CW1 provided reports to Stremmel from the start of January 2022, which captured the demand decline. It was not improving as the quarter progressed. *Id.*

CW5 stated that because of the Q4 2021 pull-in, CW5 believed that the 2022 demand plan for Lowe's should have been revised downward. In early 2022, however, CW5 stated that "leadership" wanted the demand plan to conform to the sales plan. ¶69.

Tellingly, on April 28, 2022, Stanley reported that that its pro-forma Q1 2022 net sales were $146.8 million less than Q1 2021, despite increasing the prices of its products. *See* Q1 2022 Form 10-Q; [8] *see also* ¶¶81, 112-13. It is evident that, while the pull-in saved the Company's 4Q 2021 and full-year 2021 earnings, demand was continuing to decline. On July 28, 2022, Stanley reported that is pro-forma Q1 2022 net sales were $279.8 million less than Q2 2022 – nearly double the quarter over quarter decline seen in Q1. *See* Q2 2022 Form 10-Q. With no other choice, Defendants finally, on that date, acknowledged that demand had drastically deteriorated and nothing, not even increasing product prices, could save its 2022 earnings. ¶¶129-31. Indeed, that trend continued

---

[8] The Q1 2022 and Q2 2022 Form 10-Qs and 2022 Form 10-K are attached to the Levit Decl. as Exs. D, F, G. As recognized by Defendants, the Court can take judicial notice of the statements made in these types of documents. *See* MTD at 3.

throughout the year, with Stanley reporting $943.4 million less in pro-forma net sales than it had in 2021. *See* 2022 Form 10-K.

## III.   ARGUMENT

### A.   Legal Standards

"To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 462 (S.D.N.Y. 2017).[9]When a corporation or its representatives speak to the market, there is a duty to make such disclosure complete and accurate. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[T]here is a duty to tell the whole truth.").[10] Moreover, when a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *In re Vander Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005).

Generally, to withstand a motion to dismiss, "a complaint must contain sufficient actual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, *6 (D. Conn. Mar. 31, 2018). All factual allegations are accepted as true and viewed in the light most favorable to the plaintiff. *Id.* In

---

[9] Unless stated otherwise, all emphasis is added and internal quotations and citations are omitted.

[10] *See also In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("When a corporation does make a disclosure . . . there is a duty to make it complete and accurate."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic.").

12

deciding this motion, the Court is to draw all reasonable inferences in favor of Plaintiff. *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 261 (S.D.N.Y. 2010).

> **B.     Defendants Made Materially False and Misleading Class Period Statements or Omissions**

> **1.     Stanley's Undisclosed Fourth Quarter 2021 Pull-in Gives Rise to An Actionable Federal Securities Law Claim**

Defendants' statements made throughout the Class Period regarding demand were materially false and misleading because Defendants failed to disclose that demand was declining at the time they repeatedly stated that demand remained strong. In addition, Defendants did not disclose that Stanley's Q4 2021 results were boosted by an unusually large pull-in with Lowe's, and that those results, accordingly, were materially misleading because they were generated only through reliance on an unsustainable practice that did not reflect normal demand. *See* ¶¶63-64, 66-67, 69, 73-75, 78, 80-81, 85, 87-88, 92, 94-95. Defendants also did not disclose that Stanley needed to offer a larger discount to Lowe's in order to induce it to accept extra inventory so that Stanley could report those propped-up results. ¶63. Only by executing that pull-in with Lowe's was Stanley able to report that its Q4 2021 sales exceeded its Q4 2020 sales and continue its charade that demand remained strong. ¶60. Defendants not only made material misstatements by stating that demand was strong and robust when it was declining, they also misled investors by providing Q4 2021 results while omitting to disclose the massive pull-in with Lowe's.

Defendants largely ignore the pull-in allegations, which is not surprising, considering that Defendants do not deny that this Q4 2021 pull-in with Lowe's occurred, that the pull-in was unusually large, or that Stanley needed to offer Lowe's a larger discount to take this additional product, none of which Stanley disclosed. Indeed, beyond simply ignoring the allegations, Defendants misrepresent what was alleged. They incorrectly claim that no allegations explain why

13

Lowe's would take this additional product (MTD at 2) when it is plainly alleged that Stanley induced Lowe's to execute this massive pull-in by offering a larger discount, likely costing Stanley, and saving Lowe's, tens of millions of dollars. *See* ¶63.

Former Stanley employees confirm this large Lowe's pull-in and Defendants' reliance on these unsustainable, pull-in sales practices, including CW2 and CW3. *See*, *e.g.*, ¶¶55, 64, 92-93; *see also* ¶97 (Jarred Rahn stating that he was responsible for "closing" a Q4 2021 gap by moving $300 million of additional inventory to customers). CW1 provides additional details about the Q4 pull-in and that, given its size, believed it was negotiated by top executives at each of those companies. *See* ¶89; *see also* ¶¶92, 94-95 (CW2, CW3 and CW5 also stated that Stanley's top executives, including Allan, approved the Q4 pull-in). CW1 described Stanley's reliance on the pull-in as, essentially, borrowing from the future to make its numbers. ¶67. CW2 and CW5 provided further details that although demand at Lowe's was not necessarily down without the pull-in, Stanley needed the pull-in to cover-up declining demand from Stanley's other customers. *See* ¶¶55, 66.

Sales tactics such as the pull-in with Lowe's are inherently unsustainable because they create an illusion of real demand, when in reality customers are actually purchasing product not because they need it (or want it), but because they are monetarily incentivized to do so. These tactics are also unsustainable because they depend on the continued participation and willingness of customers to accept excess, unneeded inventory, which cannot be guaranteed.

Plaintiff does not allege that these sales tactics are inherently improper or fraudulent. Instead, Plaintiff allege that Defendants' failure to disclose reliance on these sales practices to generate revenue—and to instead attribute sales to strong demand—is what forms the basis of liability. By choosing to hide these material facts from investors - facts that would alter the total

mix of available information – Defendants' disclosures are actionable. Here, the failure to disclose the pull-in was particularly egregious because it allowed Defendants to continue their charade that demand continued to be strong and robust. Given its size, if not for the pull-in, Stanley's Q4 2021 sales would have been lower than its Q4 2020 sales and Defendants would have had to admit that demand, rather than remaining strong, was declining. Rather than the $4.068 billion in net sales that Stanley reported for its Q4 of 2021, without the $300 million pull-in, that number would have been approximately $3.768 billion, lower than the $4.003 billion reported for Q4 of 2020. *See* ¶¶63, 73, 87, 97 and Q4 2021 Form 8-K & 2021 Form 10-K.[11]

Courts regularly find statements actionable (i.e., materially misleading) when a company attributes sales to factors such as strong demand, but fails to disclose reliance on unsustainable sales practices, such as persuading customers to accept advance inventories, even if there is nothing inherently improper about the practice. For example, in *Murphy v. Precision Castparts Corporation*, the court found that plaintiffs adequately stated a claim for failure to disclose reliance on pull-in sales practices to generate revenue, explaining that "[a]lthough there is nothing inherently wrong with the practice of 'aggressively pursuing quarterly results' by pulling in sales . . . such a practice may be misleading to the extent it creates the impression of a sustainable demand for [the company's] products." 2017 WL 3084274, at *9 (D. Or. June 27, 2017); *see also Plumbers v. Davis*, 2020 WL 1877821, at *8-9 (S.D.N.Y. Apr. 14, 2020) (court upholds claim alleging manipulation of the timing of orders to meet quarterly sales targets).

Similarly, in *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362-63 (N.D. Ga. 2002), the court found that "a plaintiff may state a claim for securities fraud by alleging that a

---

[11] While the 2020 sales numbers are not cited in Complaint, the Form 8-K, which attached the applicable press release announcing Q4 results and the Company's 2021 Form 10-K are referenced in the Complaint and those documents include the 2020 sales numbers. Defendants already submitted the Form 10-K with its motion and asked the Court to take judicial notice of it. Plaintiff do not oppose the request. *See* Levit Decl. Exs. B-C.

company materially misrepresented its financial condition by failing to disclose sales practices that encouraged customers to purchase substantial advance inventories of product because such practices could reduce the company's future revenues," despite there being nothing inherently wrongful it."[12]

Moreover, because Defendants put the source of Stanley's revenue at issue (*i.e.*, attributing it to strong demand), the failure to disclose the true source of such revenue gives rise to liability under Section 10(b) and Rule 10b-5(b). In *Plumbers*, an undisclosed pulling-in of orders was actionable where "strong demand" was claimed to have caused results, 2020 WL 1877821, at *9. Similarly, in *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283-84 (E.D.N.Y. 2023), a claim based on "strong demand" was actionable where sales were inflated by channel inventory not end-user demand.[13]

Defendants claim that Plaintiff has nothing to support their claim that Lowe's did not need the product supplied in the pull-in and that Lowe's continued to order product in early 2022, purportedly showing that Lowe's continued to experience consumer demand. Defendants are again incorrect. First, Plaintiff has support - the CWs provided information about the pull-in into Q4 2021, about its unusually large size, how Stanley's results would have been lower without the pull-

---

[12] *See also In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 890-91 (D. Minn. 2011) ("[defendant] misled investors by stating that its earnings and growth rate would be maintained even though [defendant] was engaging in an unsustainable pattern of channel stuffing and not properly accounting for its sales"); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001) (finding that once defendants disclosed the company's sales figures and growth projections, they "had the concomitant obligation to divulge their loading"—*i.e.*, offering customers discounts at the end of a quarter to meet sales targets).

[13] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (once a company puts the topic of the cause of its financial success at issue, it is obligated to disclose information concerning the source of its success); *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (once Defendants made statements attributing sales to certain factors, they had an obligation to "tell the whole truth."); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018) ("[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading.").

16

in, how the pull-in was discussed at the Company and how Defendant Allan seemingly gave a direct order to execute it, and how it impacted Lowe's 2022 orders. *See*, *e.g.*, ¶¶63, 88-89, 92-95.

Second, the CWs explained that the product Lowe's took in the Q4 pull-in was sent to one central warehouse in Chicago. Because Lowe's had problems getting that product from Chicago to its regional facilities, those regions still needed to order product from Stanley in 2022 even though Lowe's already had sufficient product sitting in the Chicago warehouse. *See* ¶75. Defendants do not address these allegations but merely reiterate that Plaintiff does not explain Lowe's continued ordering, while also ignoring the CWs statements that they were able to monitor Lowe's demand because those Stanley personnel on the Lowe's account had access to Lowe's Link, which provided them with the ability to see the products Lowe's had in its inventory and which products were selling. *See* ¶¶74, 84. Accordingly, these Stanley employees, including the CWs, were able to determine that Lowe's had sufficient product, as they could assess Lowe's demand.

Third, Defendants attempt to claim that because Lowe's continued to order product into 2022 and because Lowe's stated that it continued to have demand for its products as 2022 proceeded, Defendants are somehow exonerated. (MTD at 2-3). Besides the warehouse logistic problem described above, Lowe's is a much different company than Stanley. Even if Lowe's was experiencing demand in 2022, it did not follow that Stanley was experiencing similar demand. Lowe's is bigger than Stanley. Lowe's sold many more products than Stanley, and Lowe's was not as dependent as Stanley on one aspect of its business. *See* Levit Decl., Ex. H Lowe's Form 10-K at 1-3 (as of January 2022, Lowe's was about 4-5 times greater in size than Stanley). For Stanley, Tools & Outdoor made up approximately 85% or more of its revenues. *See* ¶37.

17

In any event, this action was brought regarding Stanley, not Lowe's. Stanley cannot hide behind Lowe's demand and then conclude that if Lowe's demand (or, at least, Lowe's statements about demand) was continuing apace in 2022, it meant Stanley was fine. Moreover, even if Lowe's demand trends continued into 2022, it merely emphasized how much worse demand was from Stanley's other customers given how much Stanley belatedly admitted demand had drastically declined.

Defendants are attempting to turn that information on its head. They are using the massive Q4 pull-in, achieved only by providing a greater discount to Lowe's, as a justification for their statements that demand remained strong, when the opposite was true. Demand was declining and they needed the pull-in for them to claim it remained strong. The Court should not condone Defendants' tactics.

### 2. Defendants' Contested Statements Were Materially False and Misleading

There can be no doubt that at the start of the Class Period, Defendants affirmatively attributed the Company's results, including its record revenue, to demand. Defendants' statements were not just reporting historical results or making forward-looking comments about what was going to happen, they were also stating demand was driving revenues, demand was presently remaining robust, and that the demand trends were currently positive. *See* ¶¶4-5, 7, 103-114, 116, 120-125. If these statements about the then-present condition of the Company and demand were false, as Plaintiff alleged, then they are actionable. *See*, *e.g.*, *Dentsply*, 665 F. Supp. 3d at 283-84 (claim that demand was strong was actionable).

### a. October 2021 Statements

On October 28, 2021, Defendants issued a press release reporting Stanley's results, with the headline proclaiming record revenue "Driven By ***Robust Customer Demand*** Across All

Segments." ¶103. There cannot be a plainer connection between a company's results and demand. That same press release stated that the Company "deliver[ed] 10% organic growth and record third quarter revenues *as customer demand remains robust* across the majority of our end markets", adding that Stanley's "multi-year growth story remains compelling given the *positive secular demand trends and unique opportunities ahead.*" Demand was "*robust across all markets*." *Id.*

On the call with analysts regarding the October 28th earnings release, each of the Individual Defendants touted how the strong demand gave rise to these earnings and was continuing. ¶104. Defendant Loree stated that customer demand was "extraordinary", and that Tools generated growth in "the *strongest demand environment in our history.*" ¶104.[14] He further stated that "*we continue to execute on the strong demand trends and deliver exceptional organic growth.*" ¶107.

During the earnings call, Loree also assured investors that the situation would continue by stating "*we remain highly confident in our multiyear growth*" and that "*several positive secular demand trends* … are benefiting our businesses, and we remain bullish on the resi[dential] and nonresi[dential] construction markets as well as the industrial recovery." ¶¶7, 104.

Defendant Allan stated that the Company "was positioned for significant growth in 2022 and beyond[]" and assured investors that the Company's point of sale tracking demonstrated the durability of these trends. He also stated that: "[T]he *market demand environment remains very strong and supportive[]*" and that they "*remain[ed] well positioned to deliver above- market organic growth.*" ¶106. Defendant McChesney stated that Stanley's inventory investment served "the *robust demand environment here in 2021* and in '22 and beyond" and that "heightened demand was "a major item that explains [Stanley's] year-over-year performance." ¶105.

In response to a specific question from an analyst about sales volume growth, Defendant Loree stated: "The *demand is strong*. *The conditions are supportive*" and "[s]o *serving the demand, I think,*

---

[14] Lorree also stated that demand remained robust and positive demand trends are benefiting our businesses. ¶104.

19

*is the challenge*. … *[W]e're confident we've created the demand and the environment is supportive*, and we need to serve the demand." ¶108.

Defendants sought to distract investors from any scrutiny about demand by claiming that rather than declining demand, other factors may cause results to sputter, such as the supply chain or inflation. *See* ¶¶4,7, 102-08; *see also* ¶109. Whether or not these other factors had any impact was irrelevant, as the CWs reported it was demand that was declining. *See, e.g.*, ¶¶71-72, 76-79, 83, 98.

At the time of the above statements, which start the Class Period, Stanley was one-third of the way through its Q4, a time when the CWs stated that the Company was already experiencing declining demand. Shortly after, the Company was considering how to execute a massive pull-in of orders to allow it to continue touting strong demand. *See* ¶92.

b.      **February 2022 Statements**

Defendants' statements about strong demand continued when they reported Q4 2021 and full-year 2021 results. The headline from Defendants' February 1, 2022 press release heralded demand, as it began with the title "Robust Customer Demand Drove Record 2021 Full Year Organic Revenue Growth of 17% and 30% Adjusted Diluted EPS Expansion . . . . " ¶110. In the press release, Defendant Loree stated that Stanley "delivered record revenue and earnings growth in 2021 supported by *robust customer demand* . . . . and that customers [were] experiencing *unprecedented demand*." It further stated that *"[e]nd-user demand remained strong across all markets* . . . . " *Id.*

During an earnings call on February 1, 2022, Defendant Loree repeatedly assured investors that demand would remain high. He stated that "[w]e benefited from *extraordinarily strong customer demand, which continues* for our innovative products and portfolio of brands," and that such demand would be buoyed by "*several positive secular demand trends* that are benefiting our businesses." ¶111. He further stated that "*we are focused on continuing to serve the robust*

20

*demand in our markets.*" Defendant Allan added during the earnings call that "[*e]nd-user demand strength remains persistent across all markets*." *Id.*

Reinforcing the fact that Defendants' statements included current demand at Stanley, Defendants re-assured investors that they were closely watching demand and would act quickly if they saw any signs that demand was diminishing. For example, Defendant Loree stated during the earnings call that "we will carefully watch for any impacts from a higher interest rate environment or changes in the elasticity of demand following price increases and react accordingly if things change*"* and that management was "confident in our ability to execute in today's dynamic, volatile environment." ¶112. In response to an analyst question about changes in demand, Defendant Loree stated: "we just need to continue to monitor price elasticity, competitive dynamics, all those different things that one does when one manages in an environment like this." ¶113. Regarding the impact of product price increases on demand, Defendant Allan told another analyst that management would "watch this very closely*.*" *Id.*

On February 22, 2022, when Stanley filed with the SEC its Form 10-K for its 2021 fiscal year ended January 1, 2022 (the "2021 10-K"), Defendants continued to make statements about demand when they stated that it made "investments *to support the sustained strong demand outlook*" and also referred to "the increasing demand from customers" and how Tools & Storage sales in 2021 were "driven by stronger volumes due to the consumer reconnection with the home and garden, eCommerce and *strong professional demand*." ¶114. Additionally, the 2021 10-K contained Stanley's Q4 results and how net sales increased while omitting to disclose how sales (and demand) were propped up by the massive pull-in with Lowe's. ¶¶114.

### c.     April 2022 Statements

On April 28, 2022, Stanley issued a press release reporting first quarter earnings that again mentioned strong demand in its headline when it stated how revenue growth was "Driven By

Strategic Outdoor Power Equipment Acquisitions And A ***Sustained Strong Demand Environment***." Defendant Loree was quoted in the press release as stating that Stanley, among other things, "capitalized on ***the strong demand environment***." ¶116. This press release was the third consecutive quarterly earnings release that mentioned strong or robust demand in its headline.

While Stanley reduced the range of its expected full-year 2022 earnings, Defendants continued to falsely misrepresent the nature and extent of Stanley's deteriorating demand and sales. For example, the April 28, 2022 press release falsely portrayed the drop in sales volume as "in line with expectations", blaming "temporary electronic component supply challenges, which have continued to improve." ¶120.

During the earnings call that day, Defendant Allan reinforced the statements since at least October 2021 that demand was still strong. He stated that "***[t]he headline for the first quarter is that demand for our products remains healthy***" and that "***we have not seen evidence of broad demand destruction*** related to price elasticity." ¶122. He further stated that "our focus remains on ensuring we serve the ***continued healthy demand***." Regarding the Tools & Outdoor segment, Allan reassured investors that examining point of sale data "strengthens our conviction that ***we continue to experience a very solid demand environment***." *Id*.

Defendant Allan also stated during the earnings call: "So in summary, we are actively managing a very dynamic supply chain and responding with agility to position ourselves ***to meet the continued strong demand we are experiencing***, especially within the professional power tool portion of our business." ¶123. In response to an analyst question about sales being "kind of flat," Allan did not acknowledge that demand was slowing but instead stated that demand was not a driver of slower sales: "***[i]t's not necessarily a view that we think demand is slowing***. … ***[I]t is not an assumption that there's some significant slowdown related to overall demand.***" *Id.*

Defendant Loree also made statements about strong demand during the April 28, 2022 earnings call when he stated that first quarter results "benefited from *a sustained strong demand environment[.]*" ¶124. As to the end of the pandemic boom, Defendant Loree assured investors during the earnings call that Stanley would adapt, stating that "*the fundamentals and secular drivers remain healthy and are still very much intact*. As we look out over the balance of the year, the combination of repair/remodel, new residential construction and commercial construction have *plenty of runway to continue to drive enduring demand* in many of our markets around the world." ¶125.

Loree further reassured investors that "we see *continued momentum within our core markets*" and that Stanley management was prepared for any change in the demand environment, stating that "we will monitor and respond accordingly if and when we observe any adverse impact from a higher interest rate environment and/or significant elasticity of demand effects following our pricing actions." *Id.*

These statements, without a doubt, informed investors that demand for Stanley's products was strong, robust, and continuing. The statements are essentially repeated in October 2021, February 2022, and April 2022 in press releases, SEC filings and earnings calls. No one reading these statements would understand that Stanley's demand had been declining in the second half of 2021 and that decline was accelerating going into 2022, as the CWs stated.

Putting aside Defendants' ignoring that the pull-in allowed them to state, incorrectly, that demand remained strong, Defendants claim that none of the identified statements is actionable under the federal securities laws, because they were not false and misleading. Specifically, Defendants claim that Plaintiff has not adequately alleged the statements are false because they have not identified any documents showing the statements were false, they have not specified why

23

the statements were false, and that Plaintiff is relying on non-public internal forecasts or goals, not actual demand. MTD at 3-4, 15-19.

Defendants' position disregards the CWs, who provided remarkably similar statements as to what was happening at Stanley during the second half of 2021 and the first half of 2022. They uniformly stated that demand was declining during that time period. *See, e.g.*, ¶¶71-72, 76-79, 83, 98. If true, then Defendants' Class Period statements regarding strong demand were false. There is no reasonable basis to believe that the CWs were not making truthful and accurate statements about demand at Stanley during the Class Period. They each had relatively high positions at Stanley, they each had access to information about customers and demand, and they participated in meetings and/or reviewed documents showing that demand was declining. *See, e.g.*, ¶¶29-33, 43, 46, 48-49, 51-52, 84. Most importantly, they each described what was occurring with demand at Stanley as being in decline during the same time period. The chances that five unconnected former employees would be located and would relay essentially the same information and not be truthful is virtually nil. Indeed, Defendants do not directly challenge the CWs' statements or claim that the information they provided was false.[15] By itself, that is sufficient to conclude that they are credible and the information they provided is accurate. *Terex*, 2018 WL 1587457, *4-5, 7 (multiple CWs reported that the company's true state of affairs was at odds with public statements).

Instead of attacking the CWs or their credibility, Defendants try a different tactic. They claim that Plaintiff has not identified any specific documents to support the claims. But a specific document is not a requirement of alleging falsity. *Terex*, 2018 WL 1587457, *7 (reliance on CWs to allege securities fraud claims is permitted in this circuit). Here, Plaintiff has put forth the statements of five witnesses, each of whom stated that Defendants' statements about demand were

---

[15] Defendants merely attempt to disparage the CWs by labeling them "anonymous." MTD at 18.

24

false. They explain how they knew, what they had access to, and how the true situation was hidden by Defendants. *See, e.g.*, ¶¶29-33, 43, 46, 48-49, 51-52, 63-65, 73, 88, 92-93. Nothing more is needed at this stage. *Id.*; *see also Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (witnesses disputed statements about increasing demand for products).[16]

In any event, despite Defendants' contentions, Plaintiff does reference documents. Plaintiff describes the slide decks that were presented at the monthly MAP meetings, the Excel spreadsheets that CW1 prepared that provided ongoing information on sales and demand, and "Business Objects" reports identified by CW5 that showed variances in Stanley's results. *See, e.g.*, ¶¶47, 50, 52-54, 78, 83. In addition, the CWs identified databases, such as Lowe's Link, which they specifically referenced as supporting their statements that demand was declining during the Class Period at the time Defendants were making statements to the contrary and hiding that decline, and that Stanley employees had access to other customers' databases showing inventory levels. *See, e.g.*, ¶¶43, 46, 48-49, 84.

In addition to the CWs' statements and the documents they identified, further support comes from the meetings they identified. CW1 referenced meetings with CW1's supervisor that were monthly, but then weekly during the Class Period, where they reviewed results. From this data and meetings, CW1 was able to confirm that demand was slowing. *See, e.g.*, ¶¶71-72, 76-78, 87. Several of the CWs spoke of the monthly MAP meetings, including what occurred at those meetings, what documents were presented, and who attended. These meetings further confirmed the slowing of demand. *See, e.g.*, ¶¶51-52, 54. The CWs also stated that the Company's top

---

[16] Unlike the cases cited by Defendants, such as *In re LuLulemon Sec. Litig.*, 14 F. Supp. 3d (S.d.N.Y. 2014), here the allegations are sufficient to create a plausible inference of falsity at the time the statements were made given the CW statements, the documents they referenced and the meeting they attended. Moreover, the undisclosed Q4 pull-in was enough to allege that Stanley's Q4 results were materially misleading.

executives, including the Individual Defendants, held Thursday meetings after the Monday MAP meetings, and that the information presented at the MAP meetings, which were showing declining demand, was the same information discussed at the MAP meetings. *See, e.g.*, ¶¶54, 56-57, 99-100.

This information – the CWs' statements, the documents identified, and the meetings conducted, all support the allegations that Defendants' Class Period statements about demand were false and misleading.

Defendants further contend that Plaintiff has not properly alleged falsity because Plaintiff has not specifically alleged how their statements were false. MTD at 15. Defendants are wrong because Plaintiff alleges that Defendants' statements were not true because demand was declining, not remaining strong with each CW explaining the declining demand. While Defendants argue that Plaintiff need to show the extent to which a specific statement was false, at the pleading stage, Plaintiff's allegations are sufficient where Defendants claimed to be keeping a close watch on demand. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145-46 (9th Cir. 2017) (knowledge of falsity was adequately pleaded where "executives themselves told investors they had real-time access to, and knowledge of, sales information .... [and] repeatedly described the state of [the company's] sales pipeline to analysts and investors").[17]

Moreover, Plaintiff has stated that the Q4 2021 pull-in was for approximately $300 million, so if quantification is needed, it was provided. Further, it was only because of that pull-in that Stanley was able to claim that sales for Q4 of 2021 were higher than Q4 of 2020. *See supra*. These allegations also refute Defendants' claim that Plaintiff relies only on speculation and do not explain

---

[17] Similarly, Defendants claim that Plaintiff does not identify any information that statements about point-of-sale data were false (MTD at 16-17). But, Plaintiff identifies the CWs, who were the ones on the front lines of sales and knew demand was declining. If the CWs are truthful, and there is no reasonable basis to believe otherwise, then Defendants' statements were false and Plaintiff has plausibly alleged that was the case.

how their statements were fraudulent. MTD at 17-18. These are specific facts based on the CWs' statements, which explain that a massive Q4 pull-in was needed because demand was declining. Defendants' statements that demand remained strong was misleading because they also did not disclose that an unsustainable pull-in propped up those sales.[18]

Defendants further claim that falsity was not alleged because the CWs were only speaking about forecasts and goals, not actual results. MTD at 19-20. However, the CWs were clear that Defendants' statements about **demand** were false. While demand was declining, those statements falsely claimed it was strong, robust and continuing. Although the CWs also referenced forecasts, they left no mistake that they saw demand declining, not just forecasts being missed.

### 3.    Defendants' Claims That Their Statements Were Non-Actionable Opinions, Forward-Looking, or Puffery Do Not Apply

In addition to claiming their statements were not false and misleading, Defendants also try to evade liability by claiming their statements were not actionable under the federal securities laws either because they were forward-looking, opinions, or puffery. Defendants are wrong.[19]

A reading of the alleged false statements makes plain that they are discussing then-present demand for Stanley products and how that demand continues and remains strong, which was also described as an ongoing trend. In a desperate attempt to fall under the *Omnicare* analysis for opinion statements (which leads to the same result, as shown below), Defendants focus on portions of some of the statements to make them sound like opinions. But Defendants cannot remove the statements from the context in which they were made in an attempt to hide their factual nature. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *24 (S.D.N.Y. Sept. 30, 2021) ("As the

---

[18] Defendants also challenge the allegations about the MAP meetings. MTD at 17-18. The CWs plainly stated that presentations at those meetings showed that demand was not strong, as Defendants were stating. Plaintiff alleged how the CWs described the power point presentations at those meetings and that the slides contained information showing that demand was declining. *See, e.g.*, ¶55.

[19] Defendants' attempt to hide behind Covid-19 as a liability shield is addressed below concerning risk disclosures.

27

Supreme Court explained, 'some sentences that begin with opinion words like 'I believe' contain embedded statements of fact.'"); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 6982233, at *4 (N.D. Ohio Dec. 9, 2014) ("merely because Defendants couch some of their statements with terms like 'our belief' or 'we believe' or 'our highest priority' or 'in my opinion,' the Court is not swayed.").

Indeed, during earnings calls with investors, Defendants were asked directly about demand and the response was that they were not seeing a decline in demand. *See* ¶112. This statement (and others) were not opinions, and Defendants have made no meaningful argument as to how they could be. This statement was a clear statement of a then-existing fact that demand at Stanley remained as strong as it had been and that there was no decline in that demand. *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019) (statements about strong end-user demand were not opinions); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (defendants' statements "about the current and past state of [defendant's] pipeline went beyond 'feel good' optimistic statements . . . [r]ather, they provided a concrete description of the past and present state of the pipeline"). Moreover, any statements of opinion or belief were false and misleading because of the omitted material facts available to Defendants about Stanley's declining demand.[20] *See Dentsply*, 665 F. Supp. 3d at 287-88 (if real facts conflict with what a reasonable investor would take from the statement, then an opinion statement will mislead).

---

[20] Defendants also claim that Plaintiff has not alleged that the Defendants did not believe that their statements of opinion were untrue at the time they were made. MTD at 26. This is incorrect. Plaintiff has alleged that Defendants had access to documents showing declining demand and attended meetings where declining demand was discussed and gave their approval to the massive Q4 pull-in with Lowe's, without which they would have been unable to claim demand remained strong. *See, e.g.*, ¶¶92-93.

Similarly, Defendants' other statements, while couched in their same historical strong confidence about demand for their products, were not opinions. ¶¶104, 106, 108, 111-13, 120-25. Rather, they were statements of the Company's then-existing situation. *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *24 (D.N.J. Aug. 17, 2005) (even if statement "ha[s] an air of opinion to it, because the statement as a whole refers to what 'the data indicate,'" it is actionable); *see also Novak*, 216 F.3d at 315 (statements were actionable when defendants made optimistic statements about inventory while they allegedly knew that the contrary was true).

At minimum, Defendants' reporting of the Company's Q4 results, while also not disclosing the massive pull-in, were statements of fact, and therefore not opinions or forward-looking. But again, it was misleading to tout these financial metrics, while not disclosing that they were enhanced by an unsustainable pull-in from Lowe's and that without that pull-in, Defendants would have been unable to claim that demand remained strong. *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 30-31 (S.D.N.Y. 2019) ("[e]ven if 'literally true,' affirmative statements may be rendered false by what they fail to disclose"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018) ("By putting the issue of organic growth 'in play,' Defendants 'acquire[d] a duty to disclose information relating to that topic.'").[21]

Even if Defendants' statements are considered opinions (they should not), they are actionable under *Omnicare*. "By increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion . . . *Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020). Opinion statements may be actionable even if "[although] sincerely

---

[21] None the cases cited by Defendants are similar because here, unlike in a case such as *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353 (S.D.N.Y. 2019), Defendants repeatedly emphasized and attributed Stanley's results to continued strong demand and claimed that any headwinds would come from other factors.

29

held and otherwise true as a matter of fact . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

Each of the alleged statements were made misleading by Defendants' failure to disclose that demand was declining and many of the statements were misleading by failing to disclose the Q4 pull-in. *Wells Fargo*, 2021 WL 4482102, at *24 ("A reasonable investor 'expects not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.'"); *Quality Sys.*, 865 F.3d at 1143 ("even 'general statements of optimism, when taken in context, may form a basis for a securities … claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly.").

Similarly, Defendants' statements about continued demand are actionable because they were stating that the Company's then-existing strong demand was ongoing. While "[t]aken out of context, the phrase[s] Defendants extract from [this] statement indeed sound[] forward-looking", "the statement is actually somewhat of a hybrid: It is a present expression of forward-looking expectations." *Bristol-Myers*, 2005 WL 2007004, at *25. By referring to "continued demand", a reasonable investor would have understood Defendants to be stating that current demand was in line with historic demand.[22] *Bristol-Myers*, 2005 WL 2007004, at *24-25 ("referenc[ing] historical facts" "changes the meaning, from a simple expression of future possibility, to one expressing a current, certain and present possibility."). But at the time of their statements, Defendants were aware that demand was declining. ¶¶56-57, 78, 87, 89, 92, 94, 99-100.[23]

---

[22] Merriam-Webster Dictionary defines continue as "to maintain without interruption a condition, course, or action." The Cambridge Dictionary defines continue as "to keep happening, existing, or doing something."

[23] Even as late in the Class Period as June 1, 2022, Defendants refused to admit that declining demand was having a drastic impact on the Company. In a Form 8-K filed with the SEC on that date, Defendants re-affirmed the prior

For similar reasons, the safe harbor for forward-looking statements does not apply. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ("the safe harbor does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events."); *Bristol-Myers*, 2005 WL 2007004, at *37 ("A forward-looking statement carries various testable factual assertions . . . [including whether] the speaker knows of no uncontested facts that contradict the opinion.").

Here, the misleading nature of Defendants' statements "can be verified at the time they are made," because by the time of the statements Stanley was already experiencing declining demand. *See, e.g.*, ¶¶71-72, 76-78, 87. *In re Vivendi*, 765 F. Supp. 2d at 569; *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("[P]laintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements. The safe harbor and bespeaks caution doctrines do not apply to these omissions."). Moreover, Defendants unquestionably knew about the massive Q4 pull-in when they reported results and claimed demand was strong. *See, e.g.*, ¶¶66, 88, 92-93.

Nor can Defendants escape liability through their boilerplate warnings in prior SEC filings about Covid-19 and that the increased demand Stanley realized ***may*** not last, which failed to disclose that demand was already declining. MTD at 24. "Cautionary words about future risk

---

guidance they provided even though Stanley was two-thirds of the way through a quarter in which Stanley would belatedly admit that demand had plummeted and guidance was cut by approximately half. *See* Levit Decl. Ex. E. While that re-affirmation of guidance in the Form 8-K is not referenced in the Amended Complaint, the Court can take judicial notice of that SEC filing.

31

cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) (refusing to apply safe harbor to omissions concerning existing operational difficulties); *see also Terex*, 2018 WL 1587457, at *13 (warning that demand could decline are no protective when demand had already declined).[24]

Defendants also cannot claim their statements were just corporate puffery, as they were plainly misleading investors about Stanley's demand, exacerbated by their failure to disclose the Lowe's pull-in. *See*, *e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (statements concerning defendant's credit portfolio, including that it was "strong", "robust" and "consistent" not puffery where defendant failed to disclose "additional fact necessary to make the statements already contained therein not misleading."); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1228 (N.D. Okla. 2003) (statements that company would "continue to perform" and "deliver on our promises" were "neither puffery nor immaterial");.

Defendants' statements were neither vague nor puffery as they were emphatically telling investors how strong demand was at Stanley. *See Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (the "Court may not assess the statements listed in the [complaint] in a vacuum, 'plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery.'"). Defendants' describing demand as strong and robust, as they did in their press release headlines, the statements contained therein, and during earnings calls, were informing investors about the Company's performance and how that

---

[24] *See also In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (boilerplate or generic cautionary language inadequate to warn of risks); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (generalized warnings about potential problems with email system were not sufficient given allegation that email system was failing at the time of the offering).

performance would remain.[25] *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 288-89 (S.D.N.Y. 2018) (claim that inventory was in good shape, not puffery); *Plumbers v. Davis*, 2020 WL 1877821, at *9 (claims of "strong demand" not puffery); *Dentsply*, 665 F. Supp. 3d at 283-84 (same).

Finally, Plaintiff does not allege "fraud-by-hindsight," as Defendants claim. MTD at 5, 14. Plaintiff alleges Defendants misrepresented ***then-existing facts*** that were indisputably in their possession at the time of the alleged statements. *See, e.g.*, ¶¶63-66, 88, 92-93; *see Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254-55 (5th Cir. 2009) ("Contrary to the defendants' argument, the plaintiff's partial reliance on alleged facts dating from the postclass period does not amount to 'fraud by hindsight'; that is, it does not 'infer[ ] earlier knowledge based only on the situation that later came to pass.'") (brackets in original).

### C.      Actionable Items 303 and 105 Claims Are Alleged

"Item 303 requires that a company disclose certain information 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *2 (2d Cir. Dec. 20, 2022). Defendants had an independent disclosure obligation under Item 105, requiring a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Defendants failed to disclose in Stanley's SEC-mandated reports, such as its Form 10-K and Forms 10-Qs during the Class Period, the trend or uncertainty

---

[25] The Cambridge dictionary defines robust to mean "strong and healthy" and unlikely to break or fail. It defines remain as "to stay in the same place or in the same condition." Merriam-Webster defines remain as "to continue unchanged."

caused by the decline in demand or the needed risk disclosures. ¶127. During Q4 of 2021, the uncertainty was reasonably likely to have (and already had) a material effect on Stanley's results and Item 303 required disclosure. *Moab Partners, L.P.*, 2022 WL 17815767, at \*2*; Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015) ("Item 303 [requires a disclosure that] . . . is 'necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results.'").

In violation of Item 105, Defendants failed to advise potential investors of an already-occurring change in the demand for Stanley's products. *See, e.g.*, *Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F.Supp.3d 196, 210 (S.D.N.Y. 2021) ("Under [Item 105], risk disclosures are actionable 'half-truths' when a company discloses a risk that ***could*** have an impact on its business when, in fact, that risk ***has already materialized***."); *Terex*, 2018 WL 1587457, \*13 ("'[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired'")). As such, Items 303 and 105 have been violated.[26]

### D.      Plaintiff Pleads a Strong Inference of Scienter

Plaintiff alleges a strong inference of scienter through facts showing "strong circumstantial evidence of conscious misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,* 28 F.4th 343, 355 (2d Cir. 2022) (cleaned up). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *Setzer v. Omega Healthcare Invs., Inc.,* 968 F.3d 204, 215 (2d Cir. 2020) (finding "the allegations in the [c]omplaint raise a strong inference that [d]efendants acted, at the very least,

---

[26] Defendants do not address their alleged violation of either Item 105 or Item 303 (*see* ¶127), and have waived any contention those claims should be dismissed. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (arguments raised for the first time in a reply brief are waived). On that basis alone, their motion is to be denied.

recklessly in choosing to disclose incomplete and misleading information regarding . . . one of Omega's 'top' tenants to pay rent absent the Loan was material" because that tenant "represented seven present of Omega's investment portfolio; it was a significant source of income through rental payments.")

The Individual Defendants had knowledge or access to facts contradicting their statements. Indeed, the AC is replete with information from one executive and four management level CWs regarding Stanley and the Individual Defendants' knowledge and access to facts demonstrating declining demand of the Company's Tools & Outdoors products throughout the Class Period. *See, e.g.*, ¶¶29-33, 46-50, 54-57, 71, 74-75, 78, 82, 84, 87, 89, 92, 93-95, 98-100. Moreover, in a letter to the SEC dated in Q4 2021, Stanley and Allan[27] essentially acknowledged the occurrence of monthly meetings detailed by the five CWs.  ¶¶51-58, 99-100.

As alleged in the AC, *inter alia*, "Stanley conducted monthly meetings that were known in the Company as MAP meetings. These meetings were part of the sales and operations planning with a focus on reviewing major accounts." ¶51.  The AC provides the meetings' date (usually Monday), location (including room, city and state), approximate number of attendees and the areas in which they worked (finance, sales, supply and demand), length (4-6 hours), topics of discussions (*inter alia*, targets and projections), and type of presentations (PowerPoint decks). The AC also states that Defendant McChesney attended most of the meetings, with a binder of the PowerPoint decks and his notes, and regularly asked questions.  ¶¶51, 53-54.  CW2, CW3 and CW4 also attended these meetings. ¶¶57, 99-100. The AC also provides that if changes were made to the PowerPoint decks during the meetings, the decks were recirculated by email after the meeting. ¶53.

---

[27] That letter, of which the Court can take judicial notice, was signed by Defendant Allan. *See* Levit Decl. Ex. A.

Then after the Monday MAP meetings, McChesney typically met with Defendants Allan and Loree on the following Thursday for a regularly scheduled meeting. ¶56. Other top executives, including CW3, also attended this meeting during which McChesney provided a summary of the MAP meeting. ¶¶56-57. Executives also received summarized versions of the PowerPoint presentations made during the MAP meetings. After the Thursday meeting additional feedback was provided to the sales and operations teams. ¶56. Among other things discussed at these meetings were demand, actual results (compared to targets), and pull-ins. ¶57.

The CWs also detailed how Stanley had access to portals providing Lowe's, Ace Hardware and Home Depot's inventories and sell-through data, allowing Stanley to see what was selling and not selling through with each of these customers. ¶84. Notably, every Monday a massive Company distribution list received a report ran from Lowe's Link, regarding Lowe's sell-through of products. ¶¶46, 74, 84.

Most importantly, each of the five CWs provide first-hand knowledge that declining demand for Stanley's Tools & Outdoor products was evident at these meetings and through accessible business reports/documentation beginning during the second half of 2021. *See, e.g.*, ¶¶29-33, 46-50-57, 62-72, 74-79, 83-95, 98-101. As a result, to make up for the declining demand and meet Company targets, Defendants arranged a massive pull-in of orders from Lowe's. *See, e.g.*, ¶¶8, 63-69, 72-73, 80, 87-88, 91-95, 97. Such actions have been found to satisfy the scienter requirement. *See*, *e.g.*, *Blanford*, 794 F.3d at 308.

These allegations show circumstantial evidence of Defendants' conscious misbehavior or recklessness regarding the accuracy of their public statements, and their motion to dismiss should be denied. *See In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 2011 WL 494753, at *9 (D. Conn. Feb. 7, 2011) ("By specifically alleging that the defendants were at Executive Operations

Committee meetings, received daily updates about production levels, and had an internal system for tracking inventory, plaintiffs have offered circumstantial evidence of conscious misbehavior or recklessness."); *Stadium Capital LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024) (finding a strong inference of scienter after the complaint specifically alleges the CEO and CFO had access to the company's books and records).[28]

An inference of scienter is buttressed by Plaintiff's "core operations" allegations. *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 137 (D. Conn. 2021), *citing  Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019). The Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012). "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *Bos Ret.*, 357 F. Supp. 3d at 37 (cleaned up), *citing In re Supercom Inc. Sec. Litig.,* 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) ("a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'").[29]

In this instance, Defendants were "likely to know whether demand had fallen substantially" for the segment of their business (Tools & Outdoor) which comprised approximately 82% and 85% of Stanley's total revenues in 2021 and 2022, respectively. ¶37. *See Stadium Capital*, 2024 WL 456745, at *5 (finding the individual defendants "were likely to know whether demand had fallen

---

[28] Additional allegations that support a finding of scienter are that all the executives had the same incentive plan predicated on performance and were incentivized to hit the targets. ¶¶96, 134-140. There was also an incentive for the Company to appear to be financially strong as Stanley completed a $1 billion public Notes offering on February 24, 2022. ¶141.

[29] In contrast to these multiple recent decisions, citing cases more than a decade old, Defendants meaninglessly assert that "district courts in the Second Circuit have ventured to guess that the future of the doctrine may be tenuous." MTD at 34, n.9.

substantially for the product that accounted for more than 99% of the company's revenue."); *Oklahoma Firefighters*, 367 F. Supp. 3d at 38 (finding "the importance of a [Europe, Middle East, and Africa segments] channel inventory" from a division that comprised 83% of the company's business "moves the needle in [p]laintiffs' favor.")

The cases cited by Defendants are not dispositive. Unlike in *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 161 (D. Conn. 2007), among other things, Plaintiff herein alleges that throughout the Class Period Defendant McChesney attended monthly, four-to-six-hour, Monday MAP meetings with 80-100 other Stanley employees, including CW2, CW3 and CW4.  ¶¶51, 54, 99-100.  Before these meetings, McChesney, along with other participants, was provided 15-20-page PowerPoint decks covering each division for every customer and containing details regarding demand and the month-by-month gap that existed between actual and forecasted sales. ¶¶52-54.  Then, on the following Thursday, McChesney attended a regularly scheduled meeting with Allan, Loree, and others, including CW3.  At these executive meetings McChesney provided a summary of the MAP meeting and the executives received summarized versions of MAP PowerPoint decks. ¶¶56-57.  According to CW2, CW3 and CW4 declining demand was discussed at the MAP meetings (¶¶55, 57, 99-100),  and according to CW3 declining demand and pull-ins were discussed at the Thursday executive meetings. ¶57.

Clearly, this is not an instance of a plaintiff "fail[ing] to reference any actual reports reviewed by any specific individuals, including the Individual Defendants . . . on any specific date."  MTD at 32, *citing Malin*, 499 F. Supp. 2d at 161. For these same reasons, the vague allegations of "numerous meetings and discussions" pled in *Woolgar v. Kingstone Co., Inc.*, 477 F. Supp. 3d 193, 237 (S.D.N.Y. 2020) are inapposite.  Unlike in *Woolgar* and *Local No. 38 Intern. Broth. Of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), Plaintiff pleads what was in the PowerPoint decks and discussed at the subject meetings. Similarly, the AC is unlike *Plumbers &*

38

*Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010), where the "[p]laintiff alleges perfunctorily that Defendants received information contradicting their public statements because they held management roles and monitored CIBC financial reports." *Id.* at 299. Moreover, by itself, the Q4 pull-in shows Defendants' scienter as it was needed to "close the gap" on results, which was known by and approved by the Individual Defendants. *See* ¶¶55, 97.

Neither *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050 (D. Conn. Mar. 23, 2013) nor *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011), cited by Defendants, include allegations that any confidential witness even met or had contact with the individual defendants. *Id.*, at *35. In contrast, each of the CWs cited in the AC held, at minimum, a management position and CW3 was an executive Vice President who attended executive meetings with each of the Individual Defendants during the Class Period, and CW2 and CW4, as well as CW3, attended meetings with McChesney. *See* ¶¶29-33, 56-57, 92, 100.

### E. Plaintiff's Section 20(a) Control-Person Claim is Properly Pled

Because the AC adequately pleads violations of §10(b), including scienter, the §20(a) control-person claim is not subject to dismissal for failure to establish predicate liability or each of the Individual Defendants' culpability. *See* 15 U.S.C. §78t(a). With respect to the element of control, "courts in the Second Circuit only require the plaintiff to satisfy the pleading requirements of Rule 8(a), rather than the heightened Rule 9(b) standard. *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 176 (D. Conn. 2019), *citing Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 334-35 (D. Conn. 2011) (collecting cases). As a result, "the factual issue of a Section 20(a) defendant's control over a primary violator is ordinarily not resolved summarily at the pleading stage." *Id., quoting Poptech*, 792 F. Supp. 2d at 335. "A plaintiff can establish control by showing that the defendants were members of the core

39

management team." *Id.* (cleaned up). Among other things, the AC alleges that each of the Individual Defendants, including McChesney, were "executive officers" with the "power and authority to control the contents of Stanley's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.,* the market," and who each made alleged false and misleading statements during the Class Period. *See, e.g.*, ¶¶22-24, 27, 103-08, 110-13, 116, 118, 121-25. Nothing more is needed.

**F.    Leave to Amend is Appropriate if Any Part of the Motion is Granted**

If this Court is inclined to grant any part of the Motion to Dismiss, Plaintiff respectfully requests leave to amend or leave to file a motion to amend after the Court issues any order on Defendants' Motion to Dismiss. The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107–08 (2d Cir. 2022) (citation omitted).

**IV.    CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests this Court deny Defendants' Motion in its entirety.

March 8, 2024

**ABRAHAM, FRUCHTER
& TWERSKY, LLP**

*/s/*
Mitchell M.Z. Twersky (*pro hac vice* to be filed)
Atara Twersky (*pro hac vice* to be filed)
Lawrence D. Levit (*pro hac vice*)
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
mtwersky@aftlaw.com
atwersky@aftlaw.com
llevit@aftlaw.com

**Counsel for General Retirement System of the City of Detroit and Lead Counsel for the Class**

40

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Erin Green Comite (CT 24886)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
ecomite@scott-scott.com

**Local Counsel for the Class**

**VANOVERBEKE, MICHAUD
    & TIMMONY, P.C.**
Michael Vanoverbeke
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
mvanoverbeke@vmtlaw.com

**Additional Counsel for Plaintiff**

41