## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NARESH VISSA RAMMOHAN, individually and on behalf of all others similarly situated,<br><br>                                 Plaintiff,<br><br>v.<br><br>STANLEY BLACK & DECKER, INC., DONALD ALLAN, JR., JAMES M. LOREE, AND LEE MCCHESNEY,<br><br>                                 Defendants. | **CIVIL CASE NO. 3:23-cv-00369**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br><br>November 14, 2025 |

Lead Plaintiff General Retirement System of the City of Detroit ("Plaintiff"), by its attorneys, except for its own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Stanley Black & Decker, Inc. ("Stanley" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former Company employees and analyses by consultants. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Stanley common stock between October 28, 2021 and July 28, 2022, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the

"Exchange Act"). Plaintiff's claims are asserted against Stanley and certain of the Company's executive officers and directors.

2.       Throughout the Class Period, Defendants misled investors by assuring them that demand was strong and robust across all markets, that it was increasing its inventory to respond to the strong demand, and that risks of declining demand were only hypothetical. In reality, as confirmed by several confidential former Stanley employees with relevant job responsibilities and knowledge, demand had already begun to slow. As a consequence of that weakening demand, among other things, inventory levels were rising and free cash flow was materially contracting. To conceal this deterioration and turn excess inventory into cash, Stanley executed an undisclosed, massive, extraordinary pull-in of customer orders into the fourth quarter of 2021 ("Q4 2021"), shifting certain expected 2022 sales into that quarter in an effort to boost its results, meet its earnings guidance, reduce inventory, and raise cash. Without this undisclosed Q4 2021 pull-in, Stanley's net sales for Q4 2021 would have been lower than net sales for Q4 2020. Even with that massive Q4 2021 pull-in, Stanley still missed its already reduced earnings guidance for 2021. Accordingly, without the Q4 2021 pull-in and its consequent boost to Stanley's net sales, Defendants would have been forced to admit that demand was slowing and would not reduce ballooning inventory as they falsely stated repeatedly.

3.       Defendants' misstatements began on October 28, 2021. In a press release that day, Stanley stated that "demand was robust across all markets." On the same day, in an earnings call with investors, Defendant Loree (defined below) stated that "[c]ustomer demand remained at robust levels," and described customer demand as "extraordinary." Defendant Allan (defined below) similarly stated that "***the market demand environment remains very strong*** and

supportive."[1] These statements were materially false and misleading because by this time demand was already slowing from its COVID-fueled highs, was continuing to and would continue to decline throughout the Class Period and did not support the increasing inventory that was piling up.

4.      On October 28, 2021, Stanley, in its press release, attempted to explain collapsing free cash flow by representing that it was strategically investing in inventory. At the start of the Class Period, Stanley's inventory stood at approximately $4.1 billion, including $2.8 billion in finished goods, based on its data as of October 2, 2021. This level already reflected a substantial build-up of inventory despite Defendants' representations of robust customer demand. Defendant Loree told investors in the press release: "We continue to invest in innovation, manufacturing automation, inventory and our supply chain to fuel our growth." The same press release stated that "[f]ree cash flow is expected to approximate $1.1–$1.3 billion due to an expectation for higher levels of inventory to support the strong demand and to serve our customers." In the earnings call that day, Defendant Loree reinforced this narrative, stating: "we are continuing to invest in innovation, manufacturing, automation, inventory and our supply chain to meet the strong demand in the near term."

5.      These statements were false and misleading because Stanley's ballooning inventory and collapsing free cash flow were the consequence of plummeting demand, which Defendants attempted to obscure, in part, through the massive order pull-in at the end of 2021. Stanley induced at least one significant customer to accept additional product in Q4 2021 by offering substantial discounts—an action the Company would not have taken if demand was robust, the inventory build-up was needed to support that demand and any volume weakness was due to supply

---

[1] Emphasis is added unless otherwise specified.

constraints, as Defendants claimed. If demand was truly robust and the inventory build-up was needed to support that demand, as Defendants stated, the Company would not have offered larger-than-normal discounts to move its inventory.

6.      Even with the Q4 2021 pull-in temporarily inflating 2021 results, Stanley still missed its own 2021 guidance, which it had recently reduced. On October 28, 2021, the Company had revised full-year adjusted 2021 earnings per share guidance downward to $10.90–$11.10 but on February 1, 2022 reported only $10.48 earnings per share.[2]

7.      Notwithstanding knowingly or recklessly disregarding declining demand and resulting inventory build-up, Defendants falsely asserted, on October 28, 2021, that on-going inventory growth and negative free cash flow trends reflected a strategic investment to support demand in an apparent effort to explain why then stated year-to-date free cash flow was only $31.3 million (versus $390.7 million at the same point in 2020). Despite the low year-to-date free cash flow and the declining demand and resulting inventory increases, full-year free cash flow guidance of $1.1-$1.3 billion was provided. This guidance was unattainable and false when given and not supported by actual demand and demand trends at the time. In fact, Stanley's reported full-year free cash flow for 2021 ended at $144 million, far short of its guidance, primarily due to a $1.8 billion increase in inventory caused by falling demand.

8.      On November 12, 2021, Stanley filed its Form 10-Q, which misleadingly presented the ongoing decline in demand as a potential future risk. The filing warned that results could be affected by "the impact from demand changes within worldwide markets associated with

---

[2] The February 1, 2022 press release refers to "Diluted EPS," seemingly synonymous with the "Adjusted EPS" guidance issued on October 28, 2021.

On November 12, 2021, Stanley reduced its 2021 earnings per share guidance further to $10.70 to $10.90 because the SEC informed Stanley that it had incorrectly accounted for equity units. *See* ¶107 & n.9, *infra*.

homebuilding and remodeling" when demand changes were already occurring, which was not hypothetical but an existing trend materially affecting the Company. Indeed, at the same time that Form 10-Q was released, discussions were underway within Stanley about the need for a massive fourth quarter pull-in. Had demand continued to be as strong as Defendants stated, the massive pull-in would not have been necessary to boost results.

9.    On February 1, 2022, Defendants repeated their misrepresentations in a press release, earnings call, and investor presentation. Defendant Loree claimed that "customers [were] experiencing unprecedented demand." The Company similarly stated that "end-user demand remained strong across all markets." During that call, Defendant Loree said the Company "benefited from extraordinarily strong customer demand." Defendant Allan explained that Stanley had "increased [its] core inventory position by $1.8 billion" to meet outsized demand and improve fill rates. While touting its purportedly strong demand, Stanley reported an 8% decline in volume for Q4 2021, wrongly attributed, in part, to supply constraints. Moreover, inventory rose sharply from $4.1 billion (including $2.8 billion in finished goods) on October 2, 2021 to $5.4 billion (including $3.5 billion in finished goods) on January 1, 2022—an increase of roughly 32% in total inventory and 25% in finished goods in a single quarter. This sharp buildup of unsold finished products available for sale was claimed by Defendants to be needed to support robust demand when, in truth, unknown to investors, it underscored that weakening demand—not supply constraints—was driving the inventory surge.

10.    In its February 1, 2022 investor presentation, the Company touted a "$1.8 billion Core Inventory Investment in 2021 to Support the Strong Demand Environment" and promised "[a]t Least $500 Million of Inventory Reduction in 2022." These statements were false because inventory increases were being driven primarily by weakening demand that had already

materialized by the beginning of the Class Period. Moreover, Stanley did not reduce inventory in 2022 as promised—rather, inventory increased from $5.4 billion on January 1, 2022 to $5.9 billion on December 31, 2022, a rise of approximately 8%, rather than the promised reduction, and spiked even higher during the Class Period.

11.     On February 22, 2022, Stanley filed its Form 10-K for the year ended January 1, 2022, which repeated risk disclosures that misleadingly suggested demand "may decrease" as the pandemic recovery continued, stating that "as different geographical areas anticipate moving into a recovery era, demand for the Company's products may decrease as focus shifts to activities outside the home." The same filing warned of the potential "impact from demand changes within worldwide markets associated with homebuilding and remodeling." These statements were misleading because a demand decline was already occurring and materially impacting Stanley's financial performance.

12.     On April 28, 2022, Defendants issued a set of partial corrective disclosures revealing that Tools & Outdoor net sales had dropped and that Stanley was cutting its full-year adjusted 2022 earnings guidance from $12.00-$12.50 to $9.50–$10.50 per share.[3] The Company also disclosed that gross margins had declined materially year-over-year and that Stanley's inventory had grown further to approximately $6.3 billion, including roughly $4.0 billion in finished goods. On this news, Stanley's stock fell 8.6%, from $139.14 per share to $127.13 per share.

13.     Nevertheless, in the April 28, 2022 Form 10-Q, Stanley stated: "There has been no significant change in the Company's exposure to market risk during the first quarter of 2022," and further represented that "[t]here have been no material changes to the risk factors as disclosed in

---

[3] The April 28, 2022 press release refers to "Adjusted Diluted EPS" (a term it also uses in subsequent press releases), which is seemingly synonymous with adjusted earnings per share.

the Company's Form 10-K for the year ended January 1, 2022." The filing again included boilerplate language that results **could be affected** by "the impact from demand changes within worldwide markets associated with homebuilding and remodeling." These statements were false and misleading because Stanley's demand deterioration was no longer a risk but a present reality.

14.     Despite these partial disclosures, Defendants continued to attribute poor results to supply constraints. For example, in the April 28, 2022 press release and earnings call, Defendants blamed electronic component supply issues and semiconductor availability while continuing to insist demand fundamentals remained intact.

15.     The truth was fully revealed on July 28, 2022, when Stanley announced second-quarter 2022 results showing that "significantly slower demand in late May and June" had driven a sharp collapse in sales and profits. Net income fell to $87.6 million from $459.5 million a year earlier, and the Company drastically cut its full-year adjusted 2022 earnings per share guidance from $9.50-$10.50 per share to $5.00–$6.00 per share. Stanley also disclosed that inventory had risen to $6.6 billion, including $4.1 billion in finished goods.

16.     That same day, Wolfe Research downgraded Stanley's stock, explaining: "A disappointing 2Q22 performance, a much deeper FY22 EPS guidance reset (to $5–6 vs. prior $10) and continued cash burn ($0.5 bn as inventory continued to build) has led us once again to reappraise our rating." It further observed: "Weak Free Cash Flow: Inventories are heavily bloated, and the plan is to reduce working capital by $1–1.5 bn during 2H22. However, management has struggled to manage inventory over the past three quarters." These comments confirmed that analysts directly linked Stanley's stock decline to revelations about its bloated inventory, weak free cash flow, and the collapse of its earnings outlook due to declines in demand. Stanley

ultimately reported full-year adjusted 2022 earnings per share of $4.62, missing even the drastically reduced guidance issued in July.

17.    On this news, Stanley's stock price fell more than 16 percent in a single day—from $117.45 per share on July 27, 2022, to $98.58 per share on July 28, 2022—erasing billions of dollars in shareholder value. Investors suffered significant losses as the market finally absorbed the truth: that Stanley's purportedly "strong" demand had long since evaporated, its inventory was out of control as a result, and its prior statements about growth and cash flow had been materially false and misleading.

18.    As a result of Defendants' false and misleading statements and omissions concerning demand, inventory, free cash flow, and risk disclosures, and the subsequent revelation of the truth, investors suffered significant losses.

## JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

21.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from

this District. Stanley is headquartered in this District, with its principal place of business located at 1000 Stanley Drive, New Britain, CT 06053.

23.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail services, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

24.    Plaintiff City of Detroit General Retirement System purchased Stanley common stock during the Class Period as set forth in the certification it previously filed, and has been damaged thereby.

25.    Defendant Stanley is a corporation organized and headquartered in the state of Connecticut at 1000 Stanley Drive, New Britain, CT. Its common stock trades on the New York Stock Exchange ("NYSE") and is traded under the symbol "SWK".

26.    Defendant Donald Allan, Jr. ("Allan") was Stanley's President and Chief Financial Officer ("CFO") at the start of the Class Period, and was Chief Executive Officer ("CEO") and President effective July 1, 2022 through the end of the Class Period.

27.    Defendant James M. Loree ("Loree") was, during the Class Period, Stanley's CEO prior to Allan, serving from August 1, 2016 through June 30, 2022. Loree joined Stanley in 1999, and served in numerous roles throughout his tenure including as CFO, and later as President and Chief Operating Officer. Loree was also a member of Stanley's board of directors during the Class Period.

28.    Defendant Lee McChesney ("McChesney") was Stanley's Vice President of Corporate Finance, as well as the CFO of Stanley's Tools & Storage business segment at all times

during the Class Period. McChesney departed Stanley in October 2022.

29.    Allan, Loree, and McChesney are collectively referred to herein as the "Individual Defendants."

30.    Stanley and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

31.    By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Stanley's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## CONFIDENTIAL WITNESSES

32.     As part of its investigation of the facts underlying this Action, Plaintiff's counsel sought to contact former Stanley employees with knowledge of the matters alleged herein and have them interviewed. Confidential witnesses will be identified herein by number (i.e., CW1, CW2, etc.). All CWs will be described in the masculine to protect their identities.

33.     Confidential witness ("CW") 1 is a former Stanley employee who worked for the Company from July 2021 to June 2022. CW1 was the global demand planning manager at Stanley during his employment. He led the coordination and consolidation aspects of demand planning for all the Tools & Outdoors business globally, which included three main responsibilities. First, he coordinated demand planning among different teams in the Americas, Asia & Europe. He had to understand how the teams performed demand planning and if there was "cross-pollination and/or synergies." That is, he had exposure to Stanley's global workforce and was supposed to look for synergies among the teams, and identify processes used by one team that could be helpful for another team. Second, he was responsible for "pulling together all the numbers because" Stanley was a "very fractured business." Third, he was responsible for integrating a new software tool for demand planning, called SAP, which was canceled mid-way through his employment. Thus, CW1 had wide access across Stanley's operations to information concerning demand for Stanley products. CW1 worked closely with Vice President, Global Demand Planning, Global Tools & Storage, who reported to Vice President, Supply Chain Jason Stremmel.

34.     CW2 worked for Stanley for more than two decades in a variety of positions.  From 2014 until early 2022, CW2 was Director of Supply Chain Operations for Stanley's Lowe's account.  In that position, CW2 interacted directly with Lowe's personnel on forecasting and order fulfillment. Lowe's, along with Home Depot and Amazon, were Stanley's three largest customers,

much larger than any others, with Lowe's usually Stanley's second largest but during some quarters, Lowe's was Stanley's largest customer. CW2 worked out of Stanley's Towson, MD office and reported to, among others, Jason Stremmel, who reported to Nick DeSimone, Chief Supply Chain Officer, who reported to Loree.

35.    CW3 was employed by Stanley for 8 years until October 2022. Among other positions, CW3 was Vice President of supply chain for the Americas region from December 2019 to January 2022 and Vice President of Global Planning from January 2022 to October 2022. CW3 reported to the chief supply chain officer who reported to President and CEO Allan.

36.    CW4 had worked in sales at a company called MTD Holdings ("MTD"), an outdoor power equipment manufacturer, since 2017, in which Stanley acquired a 20% stake in 2018 and then acquired the remainder in 2021. CW4 then became a Stanley employee in December 2021 until July 2022. CW4 was a national e-commerce sales manager at Stanley, servicing Amazon, and handled outdoor products. CW4 reported to Mike Axline, Vice President of the outdoor e-commerce segment.

37.    CW5 worked at Stanley from September 2013 to August 2022 in a variety of roles, such as sales operations analyst and sales operations manager, and then became North American supply chain manager from July 2020 to July 2021 and then a demand planning manager from July 2021 to August 2022, assigned to the Lowe's account. CW5 most recently reported to Vice President of Supply Chain John Weetenkamp, who worked in Stremmel's Global Planning organization.

## SUBSTANTIVE ALLEGATIONS

**I.    Background**

38.    Stanley is a global manufacturer of, *inter alia*, hand tools, power tools, and outdoor

products for consumer and commercial customers, as well as engineered fastening systems for industrial customers.

39.    Over the last few years preceding and during the Class Period, Stanley was undergoing a multi-year simplification of its business units through acquisitions and divestitures to return to its roots as primarily a tool manufacturer. Stanley implemented a "corporate simplification" plan to spin off some of its business units and focus Company investments and attention into two main business segments: Tools & Outdoor, and Industrial.[4]

40.    Stanley's Tools & Outdoor segment sells products to a variety of customers including retail consumers, professional end users, distributors, and industrial customers across a wide variety of industries and geographies. The Company has multiple business units within its Tools & Outdoor segment, including: Power Tools Group (PTG), which includes drills, impact wrenches and drivers, grinders, saws, routers, sanders, and pneumatic tools *inter alia*; Hand Tools/Accessories & Storage (HTAS), which includes planes, hammers, clamps, vises, knives, saws, chisels *inter alia*; and Outdoor Power Equipment, which, in turn, includes hedge trimmers, lawn mowers, tractors, and other lawn and garden products.

41.    The majority of sales for the Tools & Outdoor segment, which comprised approximately 82% and 85% of Stanley's total revenues in 2021 and 2022, respectively, were distributed through retailers, including home centers, mass merchants, hardware stores, and retail lumber yards. Stanley manufactures and markets multiple brands of consumer and professional products across its Tools & Outdoor segment, including DeWalt, Black+Decker, Stanley, Craftsman, Irwin, Mac Tools, Porter-Cable, Cub Cadet, Hustler, and Troy-Bilt. Stanley is heavily

---

[4] Stanley's Tools & Outdoor segment seems to be the segment that it called "Tools & Storage" at the start of the Class Period. Those terms are used interchangeably herein.

dependent on the United States market, from which the Company derived approximately 63% of its revenue in 2022, and monitors sales volume and point-of-sale ("POS") data for its products to measure demand. Stanley's acquisitions and divestitures during or about the time of the Class Period increased the focus on, and importance of, the Company's Tools & Outdoor segment.

## II.    The CWs Describe Demand Planning, Pull-ins and Executive Knowledge[5]

### A.    Demand Planning at Stanley

42.    According to the CWs, demand planners at Stanley were generally focused on specific customers and sought to have sufficient inventory to meet their specific customers' inventory position and POS rates.

43.    CW5 confirmed that Stanley had access to customers' POS data, such as the "Lowe's Link" system used by Lowe's. Stanley used this data to determine replenishment values and to make sure the customer had adequate inventory available to sell. By using this data, Stanley could assess which products were selling and help it determine demand for its products. According to the CWs, Stanley had a software system to track and manage orders, and used Business Warehouse software to run reports incorporating the tracking data.

### B.    Internal Reports and Meetings

44.    Reports regarding demand were prepared and circulated at Stanley at least monthly. CW1 prepared Excel-based reports that specifically spelled out the demand plan, which was updated on a four-week integrated business planning cycle. At the end of the first or second week of the cycle, the forecast was due, which CW1 evaluated and discussed at meetings with Stremmel, the Vice President of Planning. In those meetings, CW1, who was the global demand planning manager involved in the Tools & Outdoor segment, reviewed what had changed in the forecast

---

[5] The following sections about the CWs and Stanley are based on interviews conducted with former Stanley employees.

and what was going on in certain regions.

45.     Other data available internally included the sales that Stanley made to customers, such as Lowe's, Home Depot, or Amazon. There was access to this data via the information system, which updated either nightly or weekly. Customers ordered products and Stanley shipped those products within a few days to the customers' warehouses, which was reflected in the data Stanley had on its system.

46.     Stanley also had access to the customers' inventory level data, which was sent either weekly or monthly and provided how much inventory a given customer had on hand. This data was used by Stanley's demand planners to signify that if a customer, such as Home Depot or Lowe's, had 1,700 boxes of hammers, it was probably not going to buy hammers for a while. The sales team members could also use the customer inventory data to compare it to what Stanley had sold to the customer to gain an understanding of what the customer had sold.

47.     CW5 identified what were called "Business Objects" reports. These showed the variances between sales targets and actual sales.

### C.    MAP and Executive Meetings

48.     Stanley conducted monthly meetings that were known in the Company as MAP meetings. These meetings were part of the sales and operations planning with a focus on reviewing major accounts. They were held on a Monday, usually in a conference room in Towson, Maryland, which was called the War Room at one time. About 80-100 employees attended the monthly MAP meetings, including finance, sales, supply and demand personnel. About 50 employees attended in-person and another 30-50 employees participated by phone. Defendant McChesney worked out of the Towson, Maryland office and was in the room for most of these meetings.

49.     The MAP meetings typically were 4-6 hours in length. At the meetings, the sales

leaders for each account reviewed the targets and where they were in relation to those targets. The attendees discussed projections, opportunities and risks for each account. The leaders made PowerPoint presentations, using the same format for every customer, which were about 15-20 pages and covered each division. For example, for Lowe's, the PowerPoint deck covered power tools, consumer tools, outdoor tools and accessories. The presenters went through targets and identified opportunities and then finance asked questions with supply chain personnel reporting whether there was enough inventory to support decisions and sharing any supply risks.

50.    The sales leaders emailed the PowerPoint decks before meetings, which went to McChesney, who was on the email list that included many other recipients. McChesney also brought a binder into the meetings with all the PowerPoint decks and his notes. If changes were made to the PowerPoint decks during the meetings, they were recirculated by email after the meeting.

51.    McChesney participated at the monthly MAP meetings and asked questions regularly. His questions generally seemed about trying to hit the sales targets and what they needed to do to get there. Everyone attending the meetings knew that they needed to be prepared to answer questions about making the sales targets. Sales, demand and supply personnel were conditioned to talk about the sales target number all the time. Everyone involved knew the sales target and if they were on track to hit it. There were reports at Stanley that showed the difference between actual and forecasted sales and also reported on demand and inventory. CW2 used such reports that were specific to Lowe's. Certain of these reports showed the month-by-month gap that existed between actual and forecasted sales. The monthly PowerPoint at the MAP meetings contained such details. CW5 also prepared slides for the Lowe's account that were presented at the MAP meetings, which showed, among other things, the month-over-month change in sales. CW5 confirmed that Brendan

McNulty, CFO for North American Tools & Outdoor, who reported to McChesney, also attended the MAP meetings.

52.     During 2021, the conversation at the MAP meetings was centered on whether the sales target was going to be hit and whether Lowe's would help close the existing gap between actual and forecasted sales. CW2 described frustration among the supply, demand and commercial Lowe's team that Stanley would get stuck with millions of dollars of unsold product because the rest of the Company was not buying enough product and Lowe's would have to "carry Stanley" in covering the shortfall that would exist because those other customers were not buying sufficient product.

53.     On the Thursday after the Monday MAP meetings, McChesney typically met with Allan and Loree, among others, for a regularly scheduled meeting, where McChesney provided a summary of the Monday MAP meeting information. The Monday meeting was held as preparation for the Thursday meeting. After the Thursday meeting of the Company's top executives, additional feedback was provided to the sales and operations teams. At these Thursday meetings, executives received summarized versions of the PowerPoint presentations made during the MAP meetings.

54.     CW3 attended the monthly Monday MAP meetings and the follow-up meeting on Thursday with the top executives. At the MAP meetings, there was a roll-up of the regions and the performance across all customers was discussed, including demand and actual results compared to targets. At the Thursday meetings, there was an executive roll-up that summarized business, including demand and actual results across all regions. Allan and McChesney were on most of these calls with Loree also being on some of them.

55.     While not identifying either the MAP meetings or the meetings on the following Thursday by name, Stanley essentially acknowledged their occurrence in a letter to the SEC dated

December 21, 2021 in which, in response to an SEC inquiry about, among other things, details about business trends, Stanley stated: "On a monthly basis, the Company has a robust comprehensive review process of its results at both consolidated and business group levels and includes the month-to-date, quarter-to-date and year-to-date actual results of operations, comparative prior year periods, and the operating plan. Significant variances versus the comparative period and operating plan and any changes from expected results are investigated."

### D.    Stanley Engaged in Pull-ins

56.     Stanley's workforce was structured in a manner that assigned certain employees to large customers, such as Lowe's or Home Depot. For example, demand planners in Stanley would be assigned to Lowe's, and worked with Lowe's personnel, to make sure Lowe's had sufficient product to be sold to consumers.

57.    On occasion, Stanley sought to convince certain of its customers to agree to take more inventory at an earlier time period than the customer intended to purchase. These "pull-ins" or "pull-forwards" were primarily done by Stanley in order for it to try to meet sales targets and cause it to report better results for the period in which the additional inventory was sold than it otherwise would have reported. CW2 stated that Lowe's was generally the account pursued for pull-ins when Stanley was not going to meet its targets.

58.    During Q4 2021, as detailed by several CWs, Stanley pursued a pull-in and ultimately induced Lowe's to take on an unusually massive amount of additional inventory in Q4 2021 that it otherwise was expected to purchase during 2022. By shipping out this inventory early, Stanley was attempting to meet its Q4 2021 and entire year 2021 sales targets, while also selling off its inventory that had been accumulating because demand was declining, and raising its free cash flow, which had been depleted by Stanley's spending on additional inventory. The estimates

by the CWs of the amount of additional inventory Lowe's took in Q4 2021, which were mostly done in December, were more than $200 million, with one estimate as high as up to $300 million, which Stanley reported as sales for that time period. CW5, who was demand planning manager assigned to Lowe's at the time, stated that the Lowe's Q4 2021 pull-in stood out as a "historic high." CW3, who was Vice-President of the supply chain for the Americas region and then globally during the Class Period, stated that the Q4 2021 Lowe's pull-in was unnatural and outside the norm, equivalent to approximately three months of inventory, and for some products as much as six months of inventory.

59.    CW2, who was Stanley's director of supply chain operations for Lowe's, stated that Lowe's was typically provided with about a 10% incentive payout to meet a sales target but to induce Lowe's to take extra inventory, Stanley increased the payout amount to about 12-15%. This incentive payout caused the Q4 2021 pull-in with Lowe's to go forward and allowed Stanley to improve sales and get inventory off the books.

60.    The pull-in into Q4 2021 from Lowe's (and possibly some additional pull-ins from Amazon during that time period), allowed Stanley to avoid missing its 2021 earnings guidance by an even wider margin, allowed it to be able to claim that its net sales for that period had exceeded net sales for Q4 2020, and that demand still continued to remain strong. Without the pull-in from Lowe's, net sales for Q4 2021 would have been below net sales for Q4 2020 and Defendants would have had to acknowledge that demand was declining given Stanley's net sales decline. CW5 stated that overall demand had declined and Stanley relied on Lowe's for the Q4 2021 pull-in because the Company needed to make up for that decline.

61.    While Stanley orchestrated this pull-in of product to Q4 2021 that would otherwise have been sold during 2022, Stanley did not revise its demand or sales estimates for 2022

downward to account for the extraordinary Lowe's pull-in. CW1, the global demand planning manager, stated that the biggest problem with the pull-in was that it robbed money from future periods and that while demand in December 2021 was not that great, demand in 2022 would be necessarily worse because of the Q4 2021 Lowe's pull-in.

62.     CW4 also described a practice that Stanley engaged in with Amazon that was essentially a pull-in. Amazon allowed sellers, such as Stanley, to ship whatever amount of product they wanted to Amazon and record it as a sale as long as the seller agreed that Amazon might fine them if the product did not ultimately get sold to consumers.

63.     CW5, a demand planning manager assigned to Lowe's at the time, stated that because of the Q4 2021 Lowe's pull-in, the 2022 demand and sales plans (at least for Lowe's) should have been revised downward. However, CW5 stated that "leadership" declined to do so. CW5 disagreed with that decision because the data showed no indication that Lowe's was going to need inventory that was anywhere close to the levels in Stanley's plans. CW5 informed the sales and operations staff that justification was needed for the Lowe's demand plan, but that justification was never received.

### E.     Demand Begins to Decline at Stanley

64.     When 2021 began, the demand that existed in 2020 continued as the COVID-19 pandemic persisted. That demand began to change as the year progressed. By the start of the Class Period, four CWs stated that demand at Stanley had declined.[6] According to CW2, Stanley's director of supply chain operations for Lowe's, who worked closely with Lowe's to determine the amount it would buy in a given period, the decline in demand was evident based on interactions with Lowe's personnel and meetings CW2 attended during the second half of 2021.

---

[6] The fifth CW did not provide a specific date as to when there was declining demand at Stanley but did acknowledge that it was occurring in Q4 2021.

65.     CW3, Vice-President of the supply chain for the Americas region and then globally during the Class Period, also confirmed that demand was slowing by the start of the Class Period. Stanley had ramped up production, believing demand would be there but it was declining and Stanley ended up having a lot more inventory, which was building during the year and depleting free cash flow because of that slowing demand. According to CW3, the Q4 2021 pull-in occurred, in part, because Stanley had so much inventory and cash was tied up in inventory for which there was clear declining demand. CW3 stated that the extraordinary Q4 2021 Lowe's pull-in was to generate cash from its build-up of inventory, not just to hit its targets. However, because of declining demand, the inventory that Stanley sent to Lowe's in Q4 2021 was not selling.

66.     By Q4 2021, the only feasible way for Stanley to claim that demand was remaining strong and that net sales were increasing was to pull-in sales that were expected to occur during 2022 into 2021 to conceal the deteriorating demand environment. Accordingly, Stanley convinced Lowe's to accept more than $200 million (and possibly as much as approximately $300 million) in inventory into Q4 2021 that it otherwise would not have purchased during that time.

67.     Despite agreeing to take a massive amount of additional product that it would not have otherwise purchased in December 2021, CW3 stated that Lowe's continued to order from Stanley in the first quarter ("Q1") of 2022 even though it still had a great deal of inventory.[7] Because Lowe's continued ordering in Q1 2022, that quarter ended up being better for Stanley than it should have been given that Lowe's was ordering product that it had already purchased from Stanley in Q4 2021 and would not otherwise have needed at the time but for a Lowe's distribution problem, which resulted in Lowe's being unable to send its inventory from a central location to its regional centers. However, while this dynamic made Stanley's Q1 2022 results look

---

[7] "Quarters" are referred to herein by "Q" and the applicable quarter and year.

better, it also caused more of a decline to occur in Stanley's Q2 2022. Stanley knew that Lowe's inventory levels were building because Stanley personnel had access to Lowe's Link and knew in Q1 2022 that inventory sent to Lowe's in the Q4 2021 pull-in was not being sold.

68.    Although Lowe's had excess inventory in 2022 because of the Q4 2021 pull-in, according to CW5, it continued to order products from Stanley in 2022 despite not having a need for the inventory. CW5, a demand planning manager assigned to Lowe's, attributed these Lowe's orders to the fact that Lowe's stored the pull-in products primarily in a warehouse it needed to lease in Chicago to store them, and did not effectively distribute those products from the Chicago area to regional centers. Accordingly, Lowe's regional centers did not have the products they needed to supply their stores and continued to order from Stanley while Lowe's distribution system got sorted out. CW5 stated that it was apparent to Stanley that Lowe's did not need the inventory it was ordering in 2022 because Stanley had access to Lowe's existing, real-time inventory. CW5 further stated that there were meetings among CW5's team, colleagues at Stanley and Lowe's representatives in 2022 to try to understand how long it would take for Lowe's excess inventory to be sold.

69.    CW4, who worked at MTD when Stanley first acquired a stake in that company and then at Stanley when Stanley bought the rest of it, stated that there was a big spike in demand during 2020, which represented an "artificial increase" in sales, and that there was a "widespread decrease" in sales throughout the industry beginning in 2021 when demand was "absolutely declining." According to CW4, the "rampant decline" in demand began in fall 2021, with that decline either remaining consistent or getting worse until CW4 left Stanley in July 2022.

70.    CW4 knew first-hand about the decline in demand in the outdoor segment because of CW4's responsibilities for e-commerce channel in that space and CW4 understood from

conversations with Stanley colleagues that the decline in demand was "across all brands and categories."

71.    CW4 was aware of the demand decline in fall 2021 at MTD and noted that Stanley was also experiencing a decline at that time. Because of Stanley's 20% ownership of MTD, CW4 worked with the Stanley Amazon team before Stanely acquired the entire MTD and CW4 knew from discussions with those colleagues that Stanley was suffering from the same downturn as MTD. Once CW4 joined Stanley, there was access to Excel-based spreadsheets that showed the "major decline in demand." The reports also included goals to try to figure out how to increase sales. The goals were "top-down" and, according to CW4, not achievable and the majority of teams at Stanley did not achieve these goals. CW4's manager, Mike Axline, had access to these reports, as did the other executives, and shared them with CW4.

72.    CW4 stated that Stanley over-forecasted sales for 2022 and experienced a decline in demand that had begun in 2021. According to CW4, Stanley seemed to be "hoping" that the Covid artificial increase in demand from 2020 and early 2021 would continue but it did not, across the board.

73.    CW5 stated that the Q4 2021 Lowe's pull-in had "ripped out" the inventory from the 2022 demand plan and that the pull-in was "very disruptive" to Stanley but that Stanley was more focused on the dollar than on how the pull-in would impact planning in the future.

74.    Although it pulled a massive amount of sales into 2021 from 2022, Stanley continued to insist that it benefited from "extraordinarily strong customer demand" and that strong demand persisted across all markets.

75.    CW1, the global demand planning manager, recalled looking at the projections Stanley was making publicly and thinking: "You are calling for all time, bestselling months ahead

and there is nothing to back that up." CW1 further recalled that there was no "healthy" conversation, based on the reality of the performance, that was occurring at Stanley during 2022. Executives set the goals and CW1 stated that those 2022 goals were "insane" to the "rank and file" employees given that the demand was not there. Those goals for 2022 were described as "aggressive" and "delusional."

76.     CW1 stated there were "a lot of incentives for everyone to over forecast and that was the unfortunate reality" at Stanley. CW1 further stated that executives set the "insane" goals, that the supply chain would make all the product to coincide with the forecast, and that demand was hoped to magically materialize. CW1 stated that there was no data showing demand was still strong in 2022. CW1 provided reports to Stremmel from the start of January 2022, which captured the demand decline, and it did not improve as the quarter progressed.  While the Company maintained the same unrealistic forecast, the actual data was showing something different about demand.

77.     Stanley also had access to Lowe's inventory and its sell-through data. Ace and Home Depot also had these portals and Stanley could see what was selling and not selling. According to CW2, Ben Dunn was assigned to the Lowe's team at Stanley and was responsible for generating and circulating reports on Lowe's every Monday using the Lowe's Link portal on Lowe's sell-through of products. The distribution list for these reports was described as being massive.

78.     CW1 also stated that by the end of Q1 2022, it was "pretty clear to a lot of people that it was going to be an ugly year." In conversations with sales staff during this period, CW1 stated that they "seemed very miserable" as a result of Stanley's poor performance and that the sales team members were just getting the "thumb screws on them," with pressure to "go get more"

business.

**F.     The Confidential Witnesses Confirm the Lowe's Pull-in, Declining Demand and Knowledge By Senior Executives**

79.     The CWs confirmed that Stanley pulled-in from Lowe's at least $200 million, and maybe as much as $300 million, of product into Q4 2021 that was otherwise expected to be sold during 2022 while not revising its 2022 forecasts or its public statements about demand. The CWs also confirmed that Stanley began experiencing a decline in demand during 2021, which continued into January 2022 and each month thereafter until at least July 2022. The CWs stated that the authorization for the pull-in into Q4 2021 came from Stanley's top executives and that they were informed about declining demand, as indicated in reports circulated throughout the Company.

80.     CW1 stated that the pull-in of product by Lowe's in Q4 2021 from 2022 allowed Stanley to exceed its net sales numbers for Q4 2021 compared with Q4 2020, but had a detrimental effect on 2022, as those sales had been forecast for 2022. Not only was this extra amount that had been pulled-in to 2021 not removed from 2022, but it was added to 2021 results, making it much more difficult to replicate those results in 2022, much less surpass them, and created a hole for 2022 that was going to be especially challenging to fill given the decline in demand. CW1 stated that without Stanley reducing the 2022 expectations, it made attaining the stated growth rate for 2022 no longer possible.

81.     CW1 stated that because Lowe's could not access the inventory it took into 2021 because of its logistical problems, it needed to order some of those same products during Q1 2022. However, it was only ordering what it knew it could sell. CW1 further stated that the missed sales were not going to be made back and that the "money was off the table" regarding those missed sales. Such misses were described as being everywhere, not concentrated in particular products.

82.     CW2, Stanley's director of supply chain operations for Lowe's, confirmed the

decline in demand, the Lowe's pull-ins in Q4 2021, and that Stanley's top executives knew this information. CW2 stated that the instruction to obtain pull-in orders "came from the top." There was a directive from finance to "go get the number," meaning that sales staff along with supply and demand personnel should coordinate to determine the inventory on hand and what could be immediately moved to Lowe's to improve sales numbers. CW2 stated that Stanley senior level executives began talking with Home Depot and Lowe's in November 2021 to determine whether Stanley could move forward with early order fulfillment, i.e., a pull-in. CW2 stated that sales and demand personnel at Stanley and their counterparts at Lowe's were not in favor of the pull-in because it took expected sales away from a later period but were overridden by senior executives. CW2 stated that McChesney participated in monthly meetings in which sales shortfalls and the pull-in strategy were discussed. Pull-ins were discussed at meetings CW2 attended and were up for review and approval at meetings Allan and Loree attended with McChesney. CW2 believed Allan approved the Lowe's Q4 2021 pull-in and quoted him as stating: "Yes, we gotta hit this number. Go get it."

83.    CW3, Vice-President of the supply chain for the Americas region and then globally during the Class Period, also confirmed that demand at Stanley was declining during the second half of 2021 and that it executed the Lowe's pull-in during Q4 2021. CW3 stated that pull-ins were done at Stanley to meet targets that leadership set, but that the 2021 pull-in was large and out of the ordinary and done at the direction of senior leadership. CW3 emphasized that "the unnatural actions started because we had a lot of inventory" on hand, explaining that the Q4 2021 pull-in was driven by excess inventory that had accumulated as demand weakened. CW3 further stated that Stanley wanted to move the inventory that was shipped to Lowe's in December 2021 as part of the early order fulfillment exercise because "cash was tied up" in products for which there was

clearly declining demand. According to CW3, the reason behind the Q4 2021 Lowe's pull-in was "to get cash out," not just to "hit a number," but "to facilitate numbers and to get rid of inventory." CW3 believed that 3 months or more of inventory was pulled into 2021, which was described as "unnatural." CW3 stated that Stanley had about 100 products that were big ticket items, such as table saws, miter saws, hand tools, power tools and stationary tools, and those were the ones that were primarily pulled-in and shipped to Lowe's in Q4 2021, some in excess of six months of the typical inventory shipped to Lowe's. CW3 stated that some pull-ins were also done with Amazon during Q4 2021 but Lowe's was the big pull-in.

84.    CW3 also stated that discussions about the 2021 pull-ins went all the way to the top-level executives. Meetings and emails centered on discussions about pull-in opportunities and "let's try to execute this." According to CW3, Allan was involved in the discussions on this topic, more so than McChesney or Loree. Nonetheless, CW3 stated that the pull-ins were well-known in Stanley and they could not have been executed without Loree knowing about it. The amount and size of the Q4 2021 pull-in got the senior executives' attention and were sanctioned by them. All knew the objective was to drive to hit the Q4 2021 target.

85.    CW5 also stated that the directive to pull-in orders for Q4 2021 was "coming from the top" executives at Stanley. CW5 stated that the policies in place at Stanley dictated "dollar thresholds" for authority for transactions, meaning that different levels of management and executives could authorize transactions by a certain dollar amount. The CEO or CFO was required to sign off on transactions that were beyond a vice president's level of authority, which, according to CW5, was the Q4 2021 Lowe's pull-in. CW5 stated that it was "common knowledge and practice" at Stanley that authorizations occurred in this manner. CW1 described the process by which Lowe's agreed to take additional inventory in Q4 2021 as a negotiation, and that because it

was such a large amount of extra inventory that Lowe's took, it seemed that the terms of that pull-in needed to be negotiated by the two companies' top executives.

86.    CW3 stated that all the executives had the same incentive plan predicated on performance. All were incentivized to hit the targets.

87.    The pull-ins into Q4 2021 and the approximate amount were also confirmed by another Stanley former employee. Jarred Rahn, a former director of supply chain analytics at the Company, who stated on his Linked-In page that he was responsible for "closing" a "regional gap" for Q4 2021 by moving $300 million of additional inventory to customers.

88.    CW1 prepared Excel-based reports that specifically spelled out the demand forecast shortfalls. The demand plan was updated on a four-week business planning cycle. During 2022, Stremmel began requesting that CW1 provide these reports weekly rather than monthly.

89.    CW2 attended meetings among 80-100 other employees (likely the MAP Meetings) where, month after month, during the Class Period, they discussed and acknowledged that the Company was not meeting its sales targets.

90.    CW4 called into the monthly MAP meetings. At those meetings, CW4 focused on sales to Amazon. CW4 stated that the decline in demand was discussed at those MAP meetings, with the sales decline stated to be about 30% overall across all categories.

91.    CW1, the global demand planning manager, confirmed that the explanation Stanley provided to shareholders in July 2022 about the decline in demand was not complete or accurate – the decline was evident much earlier than May or June 2022 as Stanley claimed. CW1 emphasized, "absolutely the bubble had burst and the consumption number had dropped off." The Company knew that consumption had declined and it had consecutively missed the demand forecast every month in 2022. It was evident that the trend of increased demand from 2021 "was

gone" and demand was "not panning out" to the Company's forecast.

### III.    **Defendants' Material Misrepresentations and Omissions**

#### A.    **October 2021–January 2022: False Claims of Robust Demand**

92.    While the CWs stated that demand was beginning to decline in the second half of 2021, and that the decline was known throughout the Company, Defendants not only refused to acknowledge the slowing of demand, they doubled-down by repeatedly insisting that demand was continuing to remain strong. The Class Period begins on October 28, 2021, when Stanley reported its financial results for the third fiscal quarter ending October 2, 2021. On that date, Stanley filed a Form 8-K with the SEC, attaching a press release regarding its third fiscal quarter results as well as a summary of third quarter financials and an investor presentation. Defendants largely expressed excitement over the extraordinarily high consumer demand environment that the COVID-19 pandemic had brought for Stanley's products. Despite it being at the end of the first month of Q4, when four of the CWs stated demand was already declining,[8] Defendants reassured investors that the booming demand would remain heightened and that Defendants were carefully monitoring consumer demand.

93.    The October 28, 2021 press release issued by Stanley reported topline financial and operating results for the Company's third fiscal quarter of 2021. In the release, Defendant Loree informed investors enthusiastically that "[w]e are pleased to deliver 10% organic growth and record third quarter revenues *as customer demand remains robust* across the majority of our end markets", and added that Stanley's "multi-year growth story remains compelling given the *positive secular demand trends and unique opportunities ahead*". Rather than disclose the Company's

---

[8] The fifth CW acknowledged demand was declining during Q4 2021.

slowing demand, Defendant Loree in the press release falsely blamed a "universally difficult supply chain environment" and "inflationary trends" as the primary headwinds for Stanley's growth.

94.    The Company stated in the October 28, 2021 press release that "[w]orking capital turns for the quarter were 5.7, down 1.3 turns versus prior year *due to inventory investments to support the strong demand outlook and longer lead times related to the dynamic global supply chain.*" Allan stated that: "We remain well-positioned to deliver *above-market organic growth* with operating leverage, resulting in *strong free cash flow* generation that will drive top-quartile shareholder returns over the long-term." The Company also guided 2021 free cash flow to "approximate $1.1–$1.3 billion *due to an expectation for higher levels of inventory to support the strong demand* and to serve our customers." In reality, year-to-date cash flow at that time was only $31.3 million, making it highly unlikely that the Company would come anywhere close to achieving $1 billion in free cash flow in the remaining two months of 2021, given the declining demand.

95.    While describing demand as "robust", Stanley simultaneously reduced its 2021 earnings guidance in the same October 28, 2021 press release, cutting its *adjusted earnings per share forecast from $11.35–$11.65 to $10.90–$11.10*, which it attributed to commodity, transit and labor inflation, and an impact from currency.

96.    Defendants were engaging in misdirection with respect to the third quarter 2021 results because there were a number of troubling signs that were emerging. While they announced that net sales were up 11% from the prior year's third quarter, that number was far below the 29% and 31% increases for the first and second quarters, respectively, and were a strong signal that demand was declining. Moreover, income from operations declined in the third quarter, going from $520.3 million in 2020 to $447.4 million in 2021. Net cash provided by operating activities

decreased from $677.2 million in 2020 to $4.6 million in 2021, and free cash flow (before dividends) decreased from $615.1 million in 2020 to a negative $124.5 million. Profits within its Tools & Storage segment, by far the Company's largest, also decreased going from $597.1 million in 2020 to $485.8 million in 2021, and its profit rate, excluding charges, decreased to 15.7% from 21.5% in the third quarter of 2020.

97.    Included at the end of the October 28, 2021 press release was a generic, boilerplate paragraph explaining how the Company's actual results may differ, including because of "the impact from demand changes within world-wide markets associated with homebuilding and remodeling."

98.    On the same morning as the October 28, 2021 press release, Stanley held a pre-market conference call with investors to discuss the Company's financial and operating results for the third fiscal quarter of 2021. Loree added that "***several positive secular demand trends…are benefiting our businesses***, and we remain bullish on the resi[dential] and nonresi[dential] construction markets as well as the industrial recovery." He continued to frame the "unusually complex supply chain environment" as the primary headwind.

99.    Defendant Loree further tied rising inventory levels directly to this supposed strength in demand, stating that "we are ***continuing to invest in*** innovation, manufacturing, automation, ***inventory and our supply chain to meet the strong demand in the near term***."

100.    On the October 28, 2021 earnings call, Defendant Allan, who at the time of the call was Stanley's President and CFO, stated that "[w]e continue to see a range of ***powerful secular business drivers*** that are creating a path for strong multiyear growth for our businesses." Defendant Allan continued by stating that Stanley was positioned for "significant growth in 2022 and beyond" and then chimed in to suggest that Stanley had accurately forecast the changing demand

environment across 2021 into 2022, stating that "*[o]ur thesis on demand is playing out* as underlying construction activity remains strong and the Pro is driving growth[.]"

101.    Later during the October 28, 2021 earnings call, Defendant McChesney echoed the false reassurance Defendant Loree had provided regarding continued growth in Stanley's Tools & Outdoor business, stating that Stanley had "*invested in inventory* to serve the *robust demand environment here in 2021 and in '22 and beyond*."

102.    Further, during the October 28, 2021 earnings call, Defendant Allan explained that Stanley's deteriorating free cash flow was the result of the Company's decision to buildup inventory to meet what he described as a strong demand environment:

> Lastly, the company expects free cash flow to be approximately $1.1 billion to $1.3 billion, which contemplates CapEx investment levels to be between 3% to 3.5% of revenue. ***This updated guidance reflects our desire to maintain temporarily higher levels of inventory to serve the strong demand and improve customer fill rates.***

103.    Defendant Allan on the October 28, 2021 earnings call also set guidance predicting 2022 earnings growth based on what he described as the current demand environment, stating:

> So to summarize, ***with the current inflation and demand environment***, ***we are programming the business to deliver $1 of EPS growth versus our 2021 guidance.*** Tools & Security global markets continue to demonstrate strong demand and our customers have an optimistic view for 2022. Industrial will begin to see a cyclical recovery in 2022, most likely at a moderate pace. ***We have a clear plan for 2022 growth assuming that conditions we are experiencing today continue.***

104.    On the October 28, 2021 earnings call, Defendant Loree misleadingly misstated that Stanley was "enjoying positive *secular trends*, vibrant markets and a strong array of growth catalysts, ***and we expect this to continue*.**" Moreover, Defendant Allan reassured that:

> [T]he ***market demand environment remains very strong and supportive***. We have a phenomenal set of growth catalysts across the businesses, and ***we are actively addressing the supply and inflation environment***, ***which has not worsened*** from what we have experienced in Q3. ***We remain well positioned to deliver above-market organic growth*** with operating leverage, resulting in strong free cash flow generation that will drive top quartile shareholder returns over the long term.

105.    Defendant Loree summarized the prepared remarks for the call by reiterating to investors that "***we continue to execute on the strong demand trends and deliver exceptional organic growth despite the temporarily challenging supply chain environment***."

106.    An analyst on the same earnings call asked: "Maybe just on the volume growth for '22, the mid-single digits that you're kind of highlighting. Just curious kind of your confidence behind that and maybe how much of that is driven by just end market sell-out growth?" In response, Defendant Loree reaffirmed that:

> ***The demand is strong. The conditions are supportive.*** So serving the demand, I think, is the challenge. And I think we – ***we're confident we've created the demand*** and the environment is supportive, and we need to serve the demand. That is challenging. But you can see we delivered on our third quarter organic growth commitment, 10% despite the challenges that we faced. And so we have a resilient organization and we have all the growth programs in place, and ***we have a high level of confidence that we can deliver that sort of growth.***

107.    On November 12, 2021, Stanley filed with the SEC a Form 10-Q for its 2021 third fiscal quarter ended October 2, 2021 ("2021 Q3 10-Q"), which repeated many of the above statements from the October 28, 2021 press release regarding strong or robust demand, and explained net sales decreases as being caused by "accelerating transit costs to meet strong demand, commodity inflation and new growth investments." It also further revised its earnings per share outlook for 2021, lowering adjusted non-GAAP earnings per share to $10.70 to $10.90 from $10.90 to $11.10.[9] Its expected free cash flow amounts were the same as in the October 28, 2021 press release. In the 2021 Q3 10-Q, Stanley reported ***total inventory of $4.1 billion as of October 2, 2021, including $2.8***

---

[9] Also on November 12, 2021, Stanley filed a Form 8-K with the SEC in which it, among other things, explained that in response to a comment letter from the SEC, it was correcting an error in how it calculated diluted earnings per share with respect to its outstanding Equity Units. After making that correction and giving effect to the change, it lowered its earnings per share outlook for 2021 on a GAAP and adjusted non-GAAP basis.

***billion in finished goods***—an increase from $2.7 billion in total inventory, including $1.9 billion in finished goods, as of January 2, 2021. This sharp rise underscored the Company's substantial inventory buildup over 2021. Regarding free cash flow, which went from an inflow of $615.1 million in the third quarter of 2020 to an outflow of $124.5 million in the third quarter of 2021, the Company stated: "Free cash flow decreased in both periods [including year-to-date] due to higher inventory balances to support strong demand in the Tools and Storage segment and higher capital expenditures."[10]

108.    In Stanley's 2021 Q-3 10-Q, the Company identified a number of factors that "could cause" its actual results to differ from projections, stating, inter alia:

> Important factors that could cause the Company's actual results, performance and achievements, or industry results to differ materially from estimates or projections contained in its forward-looking statements include, among others, the following: … (xv) maintaining or improving production rates in the Company's manufacturing facilities, responding to significant changes in customer preferences, product demand and fulfilling demand for new and existing products, and learning, adapting and integrating new technologies into products, services and processes; . . . [and] (xviii) ***the impact from demand changes within world-wide markets associated with homebuilding and remodeling*** … .

At the same time, when identifying risk factors, the Company stated: "There have been no material changes to the risk factors as disclosed in the Company's Form 10-K for the year ended January 2, 2021 filed with the Securities and Exchange Commission on February 18, 2021."

109.    The statements in paragraphs ¶¶92-108 above were materially false and misleading because they misrepresented facts, and failed to disclose adverse facts, about the Company's

---

[10] On January 31, 2022, Stanley filed an amended Form 10-Q for the period ended October 2, 2021 because it needed to restate certain information regarding its accounting for Equity Units as errors were made. Management "concluded that the Company had material weaknesses in its internal control over financial reporting as of October 2, 2021, related to its accounting for the Equity Units." *See* Form 10-Q/A dated January 31, 2022. This amended filing did not materially change any of the substantive allegations herein.

business, operations, and prospects that were known to Defendants or recklessly disregarded by them. Specifically, Defendants:

(i)     Knew demand for Stanley's products had already begun to decline from COVID-19–fueled highs and continued falling throughout the Class Period;

(ii)     Issued 2021 free cash flow and 2022 earnings per share guidance with actual knowledge that the projections were false and/or misleading when made, knowing free cash flow was collapsing as Stanley built up inventory that it could not sell, and that demand was continuing to decline;

(iii)     Simultaneously characterized deteriorating free cash flow and ballooning inventory as both a strategic investment to meet "strong demand" and as an unintended consequence of supply chain congestion, obscuring the fact that a substantial portion of the inventory build consisted of finished goods that were unsold because of weakening demand;

(iv)     Attributed missed earnings and lower sales volumes to supply chain issues and inflation even as finished goods inventory soared;

(v)     Touted "strong demand" despite contemporaneous internal indicators—including rising finished goods inventory, collapsing free cash flow, and increased inventory levels at some (or all) of its major customers—showing weakening demand;

(vi)     Issued risk disclosures that warned only that demand *could decline* if demand changed, when demand had already declined and was materially impacting results; and

(vii)     Failed to disclose that demand was declining, that inventory growth reflected weakening demand rather than investments to support a strong demand outlook, and that free cash flow deterioration was likewise attributable to declining demand.

**B.    February 2022: Continued Misrepresentations Despite Mounting Inventory and Declining Demand**

110.    On February 1, 2022, Stanley issued a press release that began with the title "***Robust Customer Demand*** Drove Record 2021 Full Year ***Organic Revenue Growth*** of 17% and 30% Adjusted Diluted EPS Expansion . . . ", held an earnings call with investors to report its financial results for the fourth quarter and fiscal year 2021 ended January 1, 2022, released a summary of Stanley's financials for fiscal year 2021, and provided an earnings presentation to investors. The press release, which was attached to a Form 8-K filed with the SEC, announced 2021 adjusted earnings per share of $10.48 — below the Company's adjusted earnings per share guidance of $10.90 to $11.10, ***which it had already reduced only three months earlier***.[11] Moreover, according to Zacks Equity Research, Stanley's adjusted earnings of $10.48 per share was lower than Zacks consensus estimate of $10.86 per share.

111.    The February 1, 2022 press release also provided ***2022 guidance of*** "[f]ull Year Diluted GAAP EPS Of $10.10 To $10.70 And ***Adjusted EPS[] Of $12.00 To $12.50***; Free Cash Flow[] Expected To Approximate $2.0 Billion." Defendant Loree was quoted as stating that the Company "delivered record revenue and earnings growth in 2021 supported by robust customer demand and our growing portfolio of product innovations . . . [and] we are leveraging key investments in product innovation, strategic growth initiatives as well as capacity expansions to better serve our customers who are ***experiencing unprecedented demand***."

---

[11] On January 26, 2022, Stanley responded to an SEC objection that challenged Stanley's claim that it had not materially misstated certain information in its financial statements, by filing a Form 8-K, stating that those previously issued financial statements needed to be restated because of its accounting for equity units. Among other things, the effect of the restatements was to reduce Stanley's earnings per share, including for a portion of 2021. Even accounting for those adjustments, Stanley still missed its 2021 guidance. In addition, in the Form 8-K, the Company stated that "management has concluded that there were material weaknesses in internal control over financial reporting relating to each of the errors described." *See also* footnotes 2 & 9, *supra*.

112.    Despite this characterization, the press release reported that "[n]et sales for the quarter were $4.1 billion, up 2% versus prior year as price (+5%) and acquisitions (+6%) **were partially offset by lower volume (-8%)** and currency (-1%). Volume was impacted by a series of logistical and other supply chain challenges."

113.    The February 1, 2022 press release also addressed the Company's free cash flow miss of approximately $1 billion for 2021, explaining:

> **Full year free cash was $144 million primarily due to a $1.8 billion increase in inventory**, excluding acquisitions, **to support the strong demand outlook** and longer lead times related to the challenged global supply chain. This included a substantial increase in inventory in transit of $600 million as well as higher unit costs associated with the inflation. **At least $500 million of this inventory increase is anticipated to reverse in 2022.**

114.    Defendant Allan was quoted in the February 1, 2022 press release as stating: "[i]n 2021, we delivered 17% organic revenue growth with operating profit expansion and 30% adjusted EPS growth. . . . We exit the year having implemented price increases to mitigate inflationary impacts while improving efficiencies and investing in expanded capacity to support the continued growth we project in 2022 and beyond."

115.    Despite Defendants' claims of strong and unprecedented demand and record 2021 organic revenue growth, Defendants did not disclose the massive Lowe's Q4 2021 pull-in or admit that without that pull-in, net sales in Q4 2021 would have been below net sales in Q4 2020. Moreover, it was incorrect to call the revenue reported from the massive Lowe's Q4 2021 pull-in as "organic" revenue, as such revenue is **not** regarded as "organic."

116.    Included at the end of the February 1, 2022 press release was a generic, boilerplate paragraph explaining how the Company's actual results may differ, including because of the following: "maintaining or improving production rates in the Company's manufacturing facilities, responding to significant changes in customer preferences, product demand and fulfilling demand

37

for new and existing products, and learning, adapting and integrating new technologies into products, services and processes" and "the impact from demand changes within world-wide markets associated with homebuilding and remodeling."

117.    During the February 1, 2022 earnings call, Defendant Loree repeatedly reassured investors that demand would remain high. Defendant Loree assured that the demand environment of 2021 was continuing, stating "*[w]e benefited from extraordinarily strong customer demand, which continues for our innovative products and portfolio of brands*," and that such demand would be buoyed by "*several positive secular demand trends that are benefiting our businesses.*" Defendant Loree again attributed the Company's deteriorating free cash flow to a strategic decision to build inventory in order to serve this purportedly strong demand, explaining:

> *We strategically prioritized building additional inventory in 2021 to capture the strong demand*. And in addition, we experienced the impacts from the clogged supply chain, which intensified as the year progressed as component shortages, shipping delays and inflation drove inventory levels even higher. Accordingly, free cash flow for the year was $144 million, which reflects a $1.8 billion increase in inventory. Suffice it to say this working capital increase was higher than anticipated, *necessary but partially temporary investment which will reverse by at least $500 million this year*, converting working capital back to a cash generator during the year.

118.    Defendant Loree further stated during the February 1, 2022 earnings call that "*as we think about some of the causal factors in North America, many of the traditional drivers of housing and repair/remodel activity are trending in a positive direction*." Defendant Allan likewise attributed the poor free cash flow results to supply chain congestion, even as he described an intentional buildup of inventory:

> *Last year, we also made significant investments in inventory to help meet the outsized demand in the tools business.* Excluding the consolidation impact from acquisitions, we increased our core inventory position by $1.8 billion as compared to year-end 2020. 2/3 of this increase is composed of inputs, work in progress or goods in transit that will work their way through our supply chain to support growth and improve fill rates with our customers. *As a result, fourth quarter free cash flow was $175 million, which brings our year-to-date result to $144 million, significantly below our prior expectation for 2021.* The main

driver of the deviation was related to the congestion of the global supply chain on working capital. Let me unpack this to provide some additional color.

119.    Defendant Allan continued to describe the inventory build up as both strategic and an unintended consequence of supply chain issues during the February 1, 2022 earnings call, explaining:

> First, we ended up building more inventory and tools versus our expectation. This was primarily related to a combination of goods in transit expanding in the quarter as we experience port and other logistical delays. ***The increased tools inventory is needed to serve existing and projected demand, and therefore, we believe we will sell through this incremental inventory during 2022.*** Secondly, we are holding on to inventory longer than we have historically due to longer shipping and lead times, which has changed the relationship between inventory and payables. This dynamic also led to a deviation versus our October expectations.

120.    Defendant Loree reiterated on the February 1, 2022 earnings call that Stanley was "***focused on continuing to serve the robust demand in our markets***" and Defendant Allan added during the earnings call that "***[e]nd-user demand strength remains persistent across all markets***."

121.    Further, during the February 1, 2022 earnings call, Defendant Loree reassured investors that management was actively monitoring for potential changes in demand, adding "we will carefully watch for any impacts from a higher interest rate environment or changes in the elasticity of demand following price increases and react accordingly if things change" and that management was "confident in our ability to execute in today's dynamic, volatile environment."

122.    When asked by an analyst how exactly Stanley was prepared to mitigate changes in demand, Defendant Loree further stated "we just need to continue to monitor price elasticity, competitive dynamics, all those different things that one does when one manages in an environment like this." Specifically as to the effect of product price increases on demand, Defendant Allan told another analyst that management "***[had] not seen an impact to demand related to that in any of the channels***" referenced, and would "watch this very closely, and it's why we're taking this

approach on the volume side where we're not being overly aggressive in forecasting where the volume might go." Allan continued:

> But we're prepared, as Jim and I both mentioned, to really pursue higher volume. But we have to watch the pricing impact very closely and see the elasticity impact. But it's different. It's a different cycle. This is not the typical cycle where you're looking at maybe putting 3% to 4% price increase in the market to offset your inflationary pressures. You're talking about something that's more above 10% in many cases. And if you look at our peers and other players in both the building products and industrial space, you're seeing the magnitude of those types of increases across the board. And we believe that's the right approach at this stage. However, we also have to maintain the flexibility and watch this very closely day-to-day and week-to-week and respond accordingly.

123.    In its accompanying February 1, 2022 investor presentation, Stanley continued to characterize demand as strong and sustainable, highlighting in a slide titled "***Demand Remains Strong As We Enter 2022***" that "demand in Tools remains strong" and citing "positive housing & repair/remodel fundamentals," including millennial household formation, low existing housing inventory, home value appreciation, and continued focus on the home and remote work. The presentation also emphasized a ***"$1.8B core inventory investment in 2021 to support the strong demand environment***" and stated that the Company "***expect[ed] at least $500 million of inventory reduction in 2022***."

124.    Stanley provided 2022 earnings guidance during the earnings call and its investor presentation on February 1, 2022. For the year 2022, Stanley was providing guidance of GAAP earnings per share of $10.10-10.70 and adjusted earnings per share of $12.00-12.50.

125.    On February 22, 2022, Stanley filed with the SEC its Form 10-K for its 2021 fiscal year ended January 1, 2022 (the "2021 10-K"), which included, among other things, its 2021 financial results reported in the February 1, 2022 press release. In its 2021 Form 10-K, Stanley reported ***total inventory of $5.4 billion as of January 1, 2022, including $3.5 billion in finished goods***—up from $4.1 billion in total inventory and $2.8 billion in finished goods just three months

earlier. This sharp increase further underscored the Company's mounting inventory levels heading into 2022. The Company stated in the 2021 10-K that "[w]orking capital turns were 5.1 at the end of 2021, down 6.0 turns from 2020, due to inventory investments ***to support the sustained strong demand outlook*** and longer lead times related to the challenged global supply chain which has substantially increased inventory in transit." The Company elsewhere referred to "the increasing demand from customers" when referencing suppliers and regarding Tools & Storage net sales in 2021, stated that "[t]he 20% organic growth was driven by stronger volumes due to the consumer reconnection with the home and garden, eCommerce and ***strong professional demand*** as well as price."

126.    The 2021 10-K also disclosed that cash flows provided by operations were $663.1 million in 2021, down from $2.022 billion in 2020, and that free cash flow decreased to $144.0 million in 2021 from $1.674 billion in 2020 and $1.081 billion in 2019, citing a $1.8 billion increase in inventory, excluding acquisitions, "***to support the strong demand outlook and longer lead times related to the challenged global supply chain***."

127.    The filing further included risk disclosures identifying factors that "could cause" actual results to differ from projections, including "maintaining or improving production rates in the Company's manufacturing facilities, responding to significant changes in customer preferences, product demand and fulfilling demand for new and existing products, and learning, adapting and integrating new technologies into products, services and processes" and "the impact from demand changes within world-wide markets associated with homebuilding and remodeling." The Company noted that demand for its products "***may decrease***" as the economy continued to reopen and consumers shifted their focus to activities outside the home. It also warned that "depressed consumer and business confidence may decrease demand for products and services."

128.    The 2021 10-K did not disclose the trend of slowing demand, the pulling of sales forward from 2022 into Q4 2021 to increase 2021 results, or the risks that demand was already slowing and would continue to decline. The 2021 10-K included certain quarterly information, including net sales, which showed that in Q4 2020, net sales were $4.0 billion and that in Q4 2021, net sales were $4.1 billion. Undisclosed in the 2021 10-K was that the only reason net sales in Q4 2021 were slightly higher than net sales in Q4 2020 was because of the massive, extraordinary Lowe's pull-in, which added more than $200 million to Q4 2021 net sales.

129.    The statements in paragraphs ¶¶110-128 above were materially false and misleading because they misrepresented and failed to disclose adverse facts about the Company's business, operations, and prospects that were known to Defendants or recklessly disregarded by them. Specifically, Defendants:

(i)    Knew demand for Stanley's products had already begun to decline from COVID-19–fueled highs and continued falling throughout the Class Period;

(ii)    Executed an undisclosed massive pull-in of customer orders in Q4 2021 in an effort to boost results and mask weakening demand, surging inventory, and collapsing free cash flow, which made demand appear stronger than it was, and was the reason Stanley was able to report that net sales in Q4 2021 were higher than in Q4 2020;

(iii)    Missed 2021 earnings guidance despite the Q4 2021 pull-in as finished goods inventory expanded sharply, revealing that underlying demand was deteriorating;

(iv)    Maintained 2022 earnings per share guidance with actual knowledge that the projections were false and/or misleading when made knowing that products that would have been ordered in 2022 had already been pulled forward into 2021;

(v)    Simultaneously characterized deteriorating free cash flow and ballooning inventory as both a strategic investment to meet "strong demand" and as an unintended consequence of supply chain congestion, obscuring that a substantial portion of the inventory build consisted of finished goods that were unsold because of weakening demand;

(vi)    Attributed missed earnings and lower sales volumes to supply chain issues and inflation rather than slowing demand even as finished goods inventory soared;

(viii)    Induced at least one major customer to carry excess product from the Q4 2021 pull-in, which suppressed its 2022 orders;

(ix)    Touted "robust demand" despite contemporaneous internal indicators—including rising finished goods inventory, collapsing free cash flow, and the Q4 2021 pull-in—showing weakening demand;

(x)    Issued risk disclosures that warned only that demand *could* decline if post-pandemic spending patterns changed, when demand had already declined and was materially impacting results;

(xi)    Claimed that organic sales had increased in 2021 when sales had only increased because of the massive Q4 2021 pull-in, which is not regarded as organic sales; and

(xii)    Failed to disclose that demand was declining, that inventory growth reflected weakening demand rather than investments to support a strong demand outlook, and that free cash flow deterioration was likewise attributable to declining demand.

## IV.    <u>The Truth Begins To Emerge With A Partially Corrective Disclosure</u>

### A.    April 2022: The Truth Is Partially Disclosed

130.    On the morning of April 28, 2022, Stanley issued a press release reporting first quarter earnings for 2022 that in its title attributed the 20% year-over-year increase in total revenue growth as being "Driven By Strategic Outdoor Power Equipment Acquisitions And A ***Sustained***

***Strong Demand Environment***." On that date, Stanley also filed a Form 8-K with the SEC that attached a copy of the press release. Defendant Loree was quoted as stating in the press release that Stanley, among other things, "capitalized on ***the strong demand environment***, our recent strategic acquisitions in the fast-growing outdoor power equipment market and a 5% contribution from pricing to drive 20% quarterly revenue growth as well as higher sequential margins[.]" That press release also provided that "[n]et sales for the quarter were … partially offset by lower volume (-6%)[.]" Volume was stated to have been "constrained by temporary electronic component supply challenges."

131.    Despite this purported "sustained strong demand environment," the Company revised its 2022 earnings per share outlook downward to $7.20 - $8.30 on a diluted GAAP basis from $10.10 to $10.70, and on an adjusted basis to $9.50 to $10.50 from $12.00 to $12.50. It attributed most of the change to commodity and transit inflation causing a $3.50 per share reduction, which was offset somewhat by an addition of $1.70 per share due to "[i]ncremental pricing actions, first quarter performance and other."

132.    The Company's revenue growth was not being driven by strong demand for its products at the time but instead, Stanley's acquisitions accounted for most of any revenue growth as volume had actually decreased by 6%. Moreover, despite the reported increase in revenue growth, the Company reduced its earnings guidance for 2022 significantly, which it had provided only three months earlier. *See* ¶111, *supra*.

133.    The April 28, 2022 press release attributed the decline in working capital turns to what it characterized as inventory investments made "to support the strong demand," while simultaneously pledging to reduce inventory later in the year. The Company stated:

> Working capital turns for the quarter were 3.7 turns down 1.5 turns sequentially, ***due to inventory investments to support the strong demand***, as well as the historical seasonal

upturn in sales related to Father's Day and the 2022 outdoor and construction seasons. ***Inventory is planned to decline sequentially beginning in the back half supporting an expected inventory reduction in 2022 versus year end 2021.***

134.    The April 28, 2022 press release included the same generic factors the Company had previously identified as ones that could cause results to differ from estimates or projections, as it stated, inter alia:

> Important factors that could cause the Company's actual results, performance and achievements, or industry results to differ materially from estimates or projections contained in its forward-looking statements include, among others, the following: … (xv) maintaining or improving production rates in the Company's manufacturing facilities, responding to significant changes in customer preferences, product demand and fulfilling demand for new and existing products, and learning, adapting and integrating new technologies into products, services and processes; [and] . . . (xviii) ***the impact from demand changes within world-wide markets associated with homebuilding and remodeling*** … .

135.    Also on April 28, 2022, Stanley filed a Form 10-Q with the SEC detailing the Company's financial and operating results for the first fiscal quarter ended April 2, 2022 (the "2022 Q1 10-Q"). Stanley disclosed in the 2022 Q1 10-Q that net sales for the Company's first quarter were "***partially offset by a 6% … decrease from volume***", furtively indicating that demand was slowing. Regarding its main segments, it stated:

> Tools & Outdoor net sales increased 24% compared to the first three months of 2021 due to a 27% increase from the MTD and Excel acquisitions and a 5% increase in price, partially offset by a 6% decline in volume and a 2% decrease from foreign currency. Industrial net sales declined 2% compared to the first three months of 2021 as a 5% increase in price was more than offset by a 5% decline in volume and a 2% impact from foreign currency.

Stanley also reported that its Tools & Outdoors segment profit declined from $644.7 million for the first fiscal quarter of 2021 to $378.5 million for the first fiscal quarter of 2022.

136.    In its 2022 Q1 10-Q, Stanley reported ***total inventory of approximately $6.3 billion as of April 2, 2022, including $4.0 billion in finished goods***—a substantial increase from the $5.4 billion in total inventory (including $3.5 billion in finished goods) the Company reported as of

year-end 2021 and the $4.1 billion total inventory reported as of October 2, 2021. Stanley also disclosed that "Free cash flow . . . was an outflow of $1.381 billion in the first quarter of 2022 compared to $246.1 million in the corresponding period of 2021." The filing attributed the sharp deterioration in free cash flow as being "***primarily due to increased inventory investments to support the strong demand outlook,***" continuing to frame rising inventory as a function of purported demand strength rather than weakening demand conditions.

137.    The 2022 Q1 10-Q included the same revised outlook for 2022 as contained in the April 28, 2022 press release, which provided the same reasons for the reduced outlook.

138.    In the same filing, Stanley stated that "[t]here has been no significant change in the Company's exposure to market risk during the first quarter of 2022," and referred investors back to the discussion in its 2021 Form 10-K. This representation omitted that internal indicators—including reduced volumes and rising finished goods inventory—already reflected a softening demand environment that materially increased the Company's exposure to demand-related risk.

139.    The 2022 Q1 10-Q repeated the same generic risk-factor language the Company had used in earlier filings, warning only that certain factors "could cause" results to differ from projections, including: "(xv) maintaining or improving production rates in the Company's manufacturing facilities, responding to significant changes in customer preferences, product demand and fulfilling demand for new and existing products, and learning, adapting and integrating new technologies into products, services and processes; [and] . . . (xviii) the impact from demand changes within world-wide markets associated with homebuilding and remodeling."

140.    The 2022 Q1 10-Q further stated that "[t]here have been no material changes to the risk factors as disclosed in the Company's Form 10-K for the year ended January 1, 2022 filed with the Securities and Exchange Commission on February 22, 2022." Those previously disclosed

risk factors included statements that demand for Stanley's products may decrease as the economy reopened and consumers shifted spending away from the home. By affirmatively standing by that same language in April 2022, Defendants continued to frame declining demand as merely a potential future risk rather than a present reality, even as internal indicators—including lower volumes and ballooning finished goods inventory—reflected that the slowdown was already underway.

141.    Defendant Allan confirmed on the April 28, 2022 earnings call that Defendants were "updating … adjusted earnings per share to a range of $9.50 up to $10.50", representing a cut of nearly 16 to 21% from the adjusted earnings per share range of $12 up to $12.50 Stanley had announced for its fiscal year 2022.

142.    On this news, Stanley's stock declined from a closing price of $139.14 per share on April 27, 2022 to close at $127.13 per share on the day of the report and call. This represented a drop of $12.01 per share, or around 8.6% in one day.

143.    However, Defendants continued to falsely misrepresent the nature and extent of Stanley's deteriorating demand and sales. For example, the April 28, 2022 press release falsely portrayed the drop in sales volume as "in line with expectations", blaming "temporary electronic component supply challenges, which have continued to improve." Further, Defendant Loree stated in the press release that "[w]hile inflationary pressures remain a macro headwind" on demand, "*we have demonstrated our ability to offset those pressures*."

144.    During the April 28, 2022 earnings call, Defendant Allan stated that "our focus remains on ensuring we serve the *continued healthy demand*." He described the financial results for the quarter, by stating "*[t]he headline for the first quarter is that demand for our products*

*remains healthy*" and that "*we have not seen evidence of broad demand destruction* related to price elasticity.*"

145.    Defendant Allan likewise characterized demand as exceeding supply, continuing to portray strength in end markets and framing any constraints as supply-driven rather than demand, stating that "[d]emand continues to outpace availability for our hottest products amid this constrained supply chain environment."

146.    Defendant Allan further attributed the sharp deterioration in free cash flow to seasonal inventory build, continuing to frame rising inventory as a function of expected demand rather than any underlying weakness in demand, stating:

> *Our inventory at the end of Q1 was up approximately $850 million versus the year-end '21 balance.* The increase in our first quarter inventory was primarily due to working capital seasonality to support the peak outdoor buying season, spring merchandising and the Father's Day selling season. This investment in working capital, coupled with the earlier timing of certain tax payments, contributed to a free cash outflow of $1.4 billion in the first quarter. *This Q1 performance will reverse as we execute on the remaining 2022 working capital initiatives.*

147.    Defendant Allan further stated during the earnings call: "So in summary, we are actively managing a very dynamic supply chain and responding with agility to position ourselves *to meet the continued strong demand we are experiencing*, especially within the professional power tool portion of our business." Defendant Allan additionally made materially false and misleading statements during the question-and-answer portion of the earnings call. In response to an analyst who noted that Defendants had revised sales volumes for Stanley's fiscal year 2022 down from single-digit growth to "kind of flat," Defendant Allan countered repeatedly that demand was not a driver: "*[i]t's not necessarily a view that we think demand is slowing*. … *[I]t is not an assumption that there's some significant slowdown related to overall demand.*"

148.    Defendant Loree also continued to make false and misleading statements during the April 28, 2022 earnings call. For example, Defendant Loree stated that first quarter results "benefited from *a sustained strong demand environment*" and reassured that while "[o]rganic revenue was down 1% … *customer demand remained strong* across many of our global markets and price realization accelerated sequentially from the fourth quarter." Defendant Loree again blamed the downturn on supply chain and procurement issues rather than consumer demand, stating that "volume could have been higher, but for the supply-constrained environment that we continue to make progress on resolving, with added supply of semiconductors and electronic components during this quarter."

149.    On the same call, Defendant Loree specifically reassured investors that Stanley would adapt to the end of the pandemic demand boom accordingly, stating "while the boom global conditions of 2020 and 2021 have leveled off, *the fundamentals and secular drivers remain healthy and are still very much intact*. As we look out over the balance of the year, the combination of repair/remodel, new residential construction and commercial construction have *plenty of runway to continue to drive enduring demand* in many of our markets around the world." While Defendant Loree pointedly acknowledged that the days of a pandemic demand boom were coming to a close, he reassured investors that "we see *continued momentum within our core markets*". Defendant Loree further reassured investors that Stanley management was prepared for any change in the demand environment, stating that "we will monitor and respond accordingly if and when we observe any adverse impact from a higher interest rate environment and/or significant elasticity of demand effects following our pricing actions."

150.    The statements in paragraphs ¶¶130-149 above were materially false and misleading because they misrepresented and failed to disclose adverse facts about the Company's

business, operations, and prospects that were known to Defendants or recklessly disregarded by them. Specifically, Defendants:

(i)      Knew demand for Stanley's products had already begun to decline from COVID-19–fueled highs and continued falling throughout the Class Period;

(ii)     Issued 2022 earnings per share guidance with actual knowledge or recklessly disregarding that the projections were false and/or misleading when made, knowing that products that would have been ordered in 2022 had already been pulled forward into 2021, and that demand was declining;

(iii)    Simultaneously characterized deteriorating free cash flow and ballooning inventory as both a strategic investment to meet "strong demand" and as an unintended consequence of supply chain congestion, obscuring that a substantial portion of the inventory build consisted of finished goods that were unsold because of weakening demand;

(iv)     Attributed lowered earnings guidance and lower sales volumes to supply chain issues and inflation even as finished goods inventory available for sale soared;

(v)      Induced at least one major customer to carry excess product from the 2021 pull-in, which suppressed its 2022 orders;

(vi)     Touted "strong demand" despite contemporaneous internal indicators—including rising finished goods inventory, collapsing free cash flow, and the Q4 2021 pull-in—showing weakening demand;

(vii)    Issued risk disclosures that warned only that demand *could* decline if post-pandemic spending patterns changed, when demand had already declined and was materially impacting results; and

(viii)   Failed to disclose that demand was declining, that inventory growth reflected weakening demand rather than investments to support a strong demand outlook, and that free cash flow deterioration was likewise attributable to declining demand.

151.    In addition, throughout the Class Period, Stanley's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Stanley] speculative or risky" and an explanation of "how [the] risk affecte[d] [Stanley]." Defendants' failure to disclose that demand was slowing at Stanley violated Item 303 because the decline in demand represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because the slowing of demand created a significant risk that was not disclosed even though that was one of the most significant facts that made an investment in Stanley speculative or risky. Defendants also violated Items 303 and 105 by failing to disclose that Stanley pulled-in a significant amount of sales into Q4 2021, which made its 2022 sales uncertain and made an investment in Stanley speculative or risky.

### B.    July 2022: The Full Truth Emerges

152.    On July 28, 2022, before the market opened, Stanley issued a press release reporting the Company's financial and operational results for the fiscal second quarter of 2022 ended July 2, 2022. On that date, Stanley also filed a Form 8-K with the SEC that attached a copy of the press

release. Notably, unlike its prior three press releases reporting on earnings, this press release did not mention robust or strong demand in its title. The press release stated, in pertinent part, that "the macroeconomic environment—including inflation, rising interest rates and significantly slower demand in late May and June—drove the majority of the challenges we faced this quarter", "the softening of the demand environment accelerated rapidly during the last portion of the quarter", and that "[n]et sales for the quarter were … partially offset by lower volume (-13%).".

153.    Also on July 28, 2022, Stanley filed a Form 10-Q with the SEC detailing the Company's financial and operating results for the second fiscal quarter ended July 2, 2022 (the "2022 Q2 10-Q").  Stanley reported in the 2022 Q2 10-Q that its Tools & Outdoors segment profit declined from $627 million for the second fiscal quarter of 2021 to $361.6 million for the second fiscal quarter of 2022.

154.    The 2022 Q2 10-Q also revealed that Stanley's inventory levels had continued to swell. The Company **reported total inventory of approximately $6.6 billion as of July 2, 2022, including $4.1 billion in finished goods**. This represented a significant increase from the $4.1 billion in total inventory (including $2.8 billion in finished goods) the Company had reported as of October 2, 2021—just before the Class Period began. The accumulation of finished goods inventory further confirmed that sell-through to end customers had slowed substantially, contrary to Defendants' prior representations that inventory growth reflected "strong demand."

155.    Additionally, that same day, Defendants held an earnings call for investors where they had admitted demand had seen a sharp drop-off. Defendants could not hide that demand for Stanley's Tools & Outdoor segment had nosedived, with Defendant Allan, who become CEO on July 1, 2022, stating on the call that Stanley "saw a swift deterioration in consumer Tools & Outdoor demand" and that "the changes from this new demand environment… caused us to revise

our 2022 adjusted diluted EPS range down to $5 up to $6", representing an approximately 50% cut to the earnings per share from the guidance Stanley had previously provided.

156.    On this news, Stanley's stock price declined $18.87 per share, *or more than 16%*, from a close of $117.45 per share on July 27, 2022 to a close of $98.58 per share on July 28, 2022.

157.    The financial media and analysts were quick to react to the news, with analysts from Mizuho Financial Group stating that the massive guidance cut "***truncates anything that occurred in the quarter***", adding "***this is significantly worse than we could have imagined***." MarketWatch, a Dow Jones company, reported that July 28, 2022 was the "stock's biggest percentage decline since … March 18, 2020." Analysts from Raymond James and CGS-CIMB co-authored a July 29, 2022 report about Stanley titled "***Bordering on 'Un-Investible'…***", emphasizing "Stanley's sharply deteriorating volumes and bloated inventories[.]"

158.    Analysts at Wolfe Research also downgraded Stanley's stock on July 28, 2022, citing the depth of the Company's earnings reset and persistent operational issues. It stated: "a disappointing 2Q22 performance, a much deeper FY22 EPS guidance reset (to $5–6 vs. prior $10) and continued cash burn ($0.5bn as inventory continued to build) has led us once again to reappraise our rating."

159.    Wolfe Research further underscored the Company's deteriorating free cash flow and mounting inventory, noting that "[i]nventories are heavily bloated, and the plan is to reduce working capital by $1–1.5bn during 2H22. However, management has struggled to manage inventory over the past 3 quarters." This external analysis highlighted the growing disconnect between Defendants' earlier claims of sustained demand strength and inventory build-up to serve that demand, and the worsening operational reality.

160.    In its July 28, 2022 disclosures, Stanley itself acknowledged this shift, stating: "Against that backdrop, the entire organization is focused on taking the necessary steps to reduce our inventory to generate cash flow, and to resize our cost base through corporate simplification, operational optimization and supply chain transformation." This marked a stark contrast from the Company's prior representations that inventory build reflected a strategic investment to meet "strong demand."

161.    Ultimately, Stanley's true performance confirmed the depth of the underlying demand deterioration. For full-year 2022, the Company reported adjusted earnings per share of $4.62, missing even the drastically reduced guidance it had issued in July 2022, and far below the guidance it gave earlier in 2022. Similarly, inventory increased from $5.42 billion on January 1, 2022 to $5.86 billion on December 31, 2022, a rise of approximately 8%, rather than the projected reduction of at least $500 million in inventory. These results demonstrated that the demand slowdown was not a sudden or unforeseeable development, but a continuation of trends that had begun well before Defendants publicly acknowledged them.

## IV.    Stanley's Executive Compensation Provided Defendants With An Incentive To Approve Undisclosed Pull-ins

162.    Stanley's executive compensation system provided an incentive for Defendants to meet sales targets in any manner possible, including by using pull-ins.

163.    For 2021, the corporate performance goals used to determine Stanley's executive annual incentive compensation were: adjusted diluted earnings per share, cash flow multiple, organic sales growth and adjusted gross margin rate. This incentive compensation was in addition to the executive's base salary. Executives also received Long-Term Incentive Compensation, Stock Options and Restricted Stock Units and Performance Units.

164.    For 2021, Stanley was able to exceed target amounts of adjusted earnings per share

and purported organic sales growth, in part, by conducting pull-ins.

165. Stanley's 2021 Proxy Statement, filed with the SEC on or about March 9, 2022, contained the following statement under a sub-heading titled Our Pay for Performance Philosophy:

> Our compensation programs are ***designed to incentivize our employees to achieve or exceed pre-established, objective financial goals for the Company*** and deliver superior returns to our shareholders. As depicted in the charts below, 79-89% of our executives' target compensation opportunity for 2021 was variable and tied directly to the achievement of financial goals or share price performance. . . . The ***incentive compensation earned by our executives in 2021, and historically, reflects our financial performance*** and achievement relative to our pre-established goals, and is aligned with our pay for performance philosophy. (emphasis added)

166. As Stanley further stated in the 2021 Proxy Statement about how it compensates executives:

> **Pay for Performance.** A significant portion of annual and long-term compensation is variable, dependent on and directly linked to Company financial performance, including achievement relative to our Compensation Peer Group. The annual incentive plan goals align with our earnings guidance while the three-year performance plan goals are linked to our strategic framework and long-term financial objectives.

167. The 2021 Proxy Statement further provided regarding 2021 executive compensation:

> The Compensation Committee believes that a significant portion of each executive officer's compensation opportunity should be variable in order to ensure that median or above median compensation is delivered only when business results are strong and we have created value for our shareholders.

168. According to Stanley's 2021 Proxy Statement, Defendant Loree's total compensation in 2021 was $13,167,893 and Defendant Allan's total compensation in 2021 was $5,522,007.

## V.    Additional Class Period or Relevant Corporate Events

### A.    Stanley Completes a Notes Offering During the Class Period

169. On February 24, 2022, Stanley completed a public offering (the "Offering") of $500,000,000 aggregate principal amount of the Company's 2.300% Notes due 2025 (the "2025 Notes") and $500,000,000 aggregate principal amount of the Company's 3.000% Notes due 2032

(the "2032 Notes" and, together with the 2025 Notes, the "Notes").

170.     Stanley stated that it intended to use the net proceeds from the Offering for general corporate purposes, including repayment of indebtedness.

171.     From the Offering, Stanley received net proceeds of approximately $991.9 million, after deducting expenses and underwriting discounts.

**B.     Allan Is Appointed CEO and Ramirez Departs**

172.     On May 31, 2022, Stanley announced that its Board appointed Defendant Allan as its next CEO effective July 1, 2022. Allan joined the Board and retained the title of President.

173.     The Company also announced that it entered into a letter agreement with Allan, providing compensation and benefits, including a base salary of $1.25 million, an annual cash bonus based on certain metrics multiplied by his earned base salary, a long-term incentive grant with an aggregate grant date value of $3.6 million, annual grants of equity awards that result in a total fiscal year 2022 grant date value of $6.75 million, and with respect to fiscal year 2023 a target long-term incentive award of no less than $9.25 million, and employee benefits and perquisites provided to other senior executives of the Company.

174.     On July 12, 2022, Stanley announced that "Jaime Ramirez, Executive Vice President and President, Tools & Storage, will be stepping down from his role to pursue opportunities outside of the Company, effective July 22, 2022."

**ADDITIONAL SCIENTER
ALLEGATIONS**

175.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Stanley, their control over, and/or receipt and/or modification of Stanley's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Stanley, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

176.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Stanley's common stock and operated as a fraud or deceit on Class Period purchasers of Stanley common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Stanley's common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Stanley common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

177.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and the other members of the Class purchased or acquired Stanley common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

178.    At all relevant times, the market for Stanley's common stock was an efficient market for the following reasons, among others:

(a)    Stanley common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    Stanley filed periodic public reports with the SEC and the NYSE;

(c)    Stanley regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Stanley was followed by numerous securities analysts employed by major brokerage firms.

179.    As a result of the foregoing, the market for Stanley common stock promptly digested current information regarding Stanley from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Stanley common stock during the Class Period suffered similar injury through their purchase of Stanley common stock at artificially inflated prices and a presumption of reliance applies.

180.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiff is entitled to a presumption

of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## NO SAFE HARBOR

181.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Stanley who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

182.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Stanley common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

183.    The members of the Class are so numerous that joinder of all members is

impracticable, since Stanley, as of July 22, 2022, had more than 147.8 million shares of stock outstanding and because the Company's shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

184.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)    whether the price of Stanley common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages as a result of the decline in value of Stanley's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

185.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

186.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

187.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5(a),
### (b), and (c) (Against All Defendants)

188.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

189.    This Count is asserted by Plaintiff on behalf of itself and the other members of the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c), 17 C.F.R. C 240.10b-5(a)-(c), promulgated thereunder.

190.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Stanley's common stock; and (iii) cause Plaintiff and the other members of the Class to purchase or otherwise acquire Stanley's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

191. Defendants, by the use of means and instrumentalities of interstate commerce:(i)

employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Stanley's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

192.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

193.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

194.    As a result of Defendants' fraudulent activity, the market price of Stanley was artificially inflated during the Class Period.

195.    In ignorance of the true financial condition of Stanley, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Stanley containing the misleading information, purchased or otherwise acquired Stanley's common stock

at artificially inflated prices during the Class Period.

196.    Plaintiff and the other members of the Class's losses were proximately caused by Defendants' active and primary participation in Stanley's scheme, acts, practices, and course of business to defraud or operate as a fraud upon the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Stanley's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Stanley's common stock through their misconduct as described herein. Plaintiff's and the other members of the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Stanley.

197.    Throughout the Class Period, Defendants were aware of material non-public information concerning Stanley's fraudulent conduct (including the false and misleading statements and omissions described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the other members of the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

198.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Stanley common stock during the Class Period.

### COUNT II
### Violation of Section 20(a) of the Exchange
### Act (Against the Individual Defendants)

199.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

200.    During the Class Period, the Individual Defendants were privy to non-public

information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had been mitigated and not disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains, solely under the control of the Defendants.

201.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

202.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Stanley's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to

material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Stanley's corporate releases detailed herein and are therefore responsible and liable for the misrepresentations and omissions contained herein.

203.    The Individual Defendants acted as controlling persons of Stanley within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Stanley to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Stanley and all of its employees. As alleged above, Stanley is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

204.    As a direct and proximate result of the wrongful conduct of Stanley and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Abraham, Fruchter & Twersky, LLP as Class Counsel;

(B)    Awarding Plaintiff and the other members of the Class damages against all

Defendants, jointly and severally, including interest thereon;

(C)    Awarding Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(D)    Awarding such other or further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 14, 2025

**ABRAHAM, FRUCHTER
& TWERSKY, LLP**

*/s/* Lawrence D. Levit
Mitchell M.Z. Twersky (*pro hac vice*)
Atara Twersky (*pro hac vice*)
Lawrence D. Levit (*pro hac vice*)
Dylan A. Berger (*pro hac vice*)
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
mtwersky@aftlaw.com
atwersky@aftlaw.com
llevit@aftlaw.com
dberger@aftlaw.com

**Counsel for General Retirement System of the
City of Detroit and Lead Counsel for the Class**

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Erin Green Comite (CT 24886)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
ecomite@scott-scott.com

**Local Counsel for the Class**

66

**VANOVERBEKE, MICHAUD**
**& TIMMONY, P.C.**
Michael Vanoverbeke
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
mvanoverbeke@vmtlaw.com

**Additional Counsel for Plaintiff**