**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NARESH VISSA RAMMOHAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>      v.<br><br>STANLEY BLACK & DECKER, INC., DONALD ALLAN, JR., JAMES M. LOREE, AND LEE MCCHESNEY,<br><br>              Defendants. | Civil Case No. 3:23-cv-00369 (KAD) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED**
**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS COMPLAINT**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................4

        A.      Information and Discussions About Demand Were Prevalent at Stanley ............... 4

                1.      The CWs Were Well-Positioned to Be Knowledgeable Regarding Demand ............................................................................................... 4

                2.      The Company's MAP Meetings Detail Sales, Supply and Demand ........... 5

                3.      The Company's Executive Meetings Summarize the MAP Meetings ........ 7

        B.      The Deterioration of Consumer Demand for the Tools & Outdoor Segment ......... 7

        C.      A Massive Pull-in From Lowe's Allowed Defendants to Claim Demand Remained Strong ................................................................................................ 8

                1.      The Lowe's Pull-in ............................................................................. 8

                2.      Defendants Knew and Approved of the Lowe's Pull-in ......................... 10

                3.      The Q4 Pull-In Hides Declining Demand ............................................. 11

                4.      As 2022 Progresses, Defendants Continue to Insist Demand is Strong ... 12

III.    ARGUMENT .......................................................................................................13

        A.      Legal Standards ................................................................................................. 13

        B.      Defendants Made Materially False and Misleading Class Period Statements ...... 14

                1.      The Fourth Quarter of 2021 ................................................................. 15

                2.      The First Quarter of 2022 .................................................................... 17

                3.      The Second Quarter of 2022 ................................................................ 21

                4.      Statements Defendants Claimed to be About Risks ................................ 25

                5.      Vendors' Disclosures Support Plaintiff's Allegations ............................ 27

                6.      Defendants' Statements Are Not Subject to Forward Looking, Opinion, or Puffery Defenses .......................................................................... 28

                        a.      Defendants' Statements Were Not Forward-Looking ................... 28

i

b.      Defendants' Statements Were Not Opinion ................................. 30

c.      Defendants' Statements Are Not Puffery ..................................... 32

C.      Plaintiff Pleads a Strong Inference of Scienter ....................................... 34

D.      The SAC States a Valid Rule 10b-5(a) and (c) Scheme Claim ............................ 38

E.      Plaintiff's Section 20(a) Control-Person Claim is Properly Pled ........................ 40

F.      Leave to Amend is Appropriate if Any Part of the Motion is Granted ................. 40

IV.     CONCLUSION ................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020) .................................................................................. 32

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ................................................................................... 34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 13

*Backe v. Novatel Wireless, Inc.*,
    642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................................. 22

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (D. Conn. 2021) .................................................................. 37

*City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*,
    153 F.4th 288 (2d Cir. 2025) ........................................................................ *passim*

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
    2016 WL 6075540 (W.D. Tex. Sept. 16, 2016)................................................... 19

*Doller v. Hertz Glob. Holdings, Inc.*,
    2025 WL 2896919 (M.D. Fla. Oct. 10, 2025).................................................... 38

*Emp.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ........................................................................ 14, 36

*Fisher v. Kanas*,
    487 F. Supp. 2d 270 (E.D.N.Y. 2007) ................................................................ 38

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................ 18

*Gimpel v. The Hain Celestial Grp., Inc.*,
    156 F.4th 121 (2d Cir. 2025) ....................................................................... *passim*

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
    2014 WL 6982233 (N.D. Ohio Dec. 9, 2014)................................................... 30

*In re Bristol-Myers Squibb Sec. Litig.*,
    2005 WL 2007004 (D.N.J. Aug. 17, 2005)....................................................... 31

*In re Dentsply Sirona, Inc. Sec. Litig.,,*
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) ............................................................. 31

*In re Eletrobras Sec. Litig.,*
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) .............................................................. 40

*In re Facebook, Inc. IPO Sec. & Derivative Litig.,*
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) .............................................................. 26

*In re Mylan N.V. Sec. Litig.,*
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................... 24

*In re Parmalat Sec. Litig.,*
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) .............................................................. 40

*In re Philip Serv. Corp. Sec. Litig.,*
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) .............................................................. 14

*In re Quality Sys., Inc. Sec. Litig.,*
    865 F.3d 1130 (9th Cir. 2017) ......................................................................... 31

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ................................................... 33

*In re SolarEdge Techs., Inc. Sec. Litig.,*
    2025 WL 1031154 (S.D.N.Y. Apr. 6, 2025) .............................................. *passim*

*In re STMicroelectronics N.V. Sec. Litig.,*
    2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025) ................................... 14, 26, 36

*In re Sturm, Ruger & Co., Inc. Sec. Litig.,*
    2011 WL 494753 (D. Conn. Feb. 7, 2011) ....................................................... 36

*In re Supercom Inc. Sec. Litig.,*
    2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ................................................... 37

*In re Synchrony Fin. Sec. Litig.,*
    988 F.3d 157 (2d Cir. 2021) ............................................................................ 14

*In re Urban Outfitters, Inc. Sec. Litig.,*
    103 F. Supp. 3d 635 (E.D. Pa. 2015) .............................................................. 22

*In re Van der Moolen Holding N.V. Sec. Litig.,*
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) .............................................................. 18

*In re Vivendi, S.A. Sec. Litig.,*
    838 F.3d 223 (2d Cir. 2016) ............................................................... 28, 29, 30

*In re Wells Fargo & Co. Sec. Litig.*,
　2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ................................................................ 30

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
　761 F.3d 245 (2d Cir. 2014) ......................................................................................... 24

*Murphy v. Precision Castparts Corporation*,
　2017 WL 3084274 (D. Or. June 27, 2017)...................................................................... 17

*New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*,
　455 F. Appx. 10 (2d Cir. 2011)...................................................................................... 29

*Noto v. 22nd Century Grp., Inc.*,
　35 F.4th 95 (2d Cir. 2022) ............................................................................................ 40

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000) ................................................................................... *passim*

*Odeh v. Immunomedics, Inc.*,
　2020 WL 4381924 (D.N.J. July 31, 2020)...................................................................... 26

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
　367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................ 31, 32, 37, 38

*Oklahoma Firefighters Pension & Ret. Sys. v. Musk*,
　779 F. Supp. 3d 396 (S.D.N.Y. 2025) ...................................................................... 38, 39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015)................................................................................................ 30, 32

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
　432 F. Supp. 3d 131 (D. Conn. 2019) ............................................................................ 40

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
　11 F.4th 90 (2d Cir. 2021) ............................................................................................ 38

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
　792 F. Supp. 2d 328 (D. Conn. 2011) ............................................................................ 40

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004) .................................................................................... 15, 30

*Roofer's Pension Fund v. Papa*,
　2018 WL 3601229 (D.N.J. July 27, 2018)...................................................................... 32

*SEC v. Rio Tinto PLC*,
　41 F.4th 47 (2d Cir. 2022)............................................................................................. 39

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
    2018 WL 1587457 (D. Conn. Mar. 31, 2018) .................................................... 30

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ....................................................................... 15

*Stadium Capital LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ....................................................... 37

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ............................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................................... 34

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ...................................................................... 32

**Statutes**

15 U.S.C. § 78j ................................................................................ 13, 15, 40

15 U.S.C. § 78u .................................................................................... 34

15 U.S.C. §78t .................................................................................... 40

**Rules**

Federal Rule of Civil Procedure 12 ................................................................. 42

Federal Rule of Civil Procedure 8 .................................................................. 41

Federal Rule of Civil Procedure 9 .............................................................. 13, 41

**Regulations**

17 C.F.R. § 240.10b-5 .............................................................................. 38

Lead Plaintiff General Retirement System of the City of Detroit ("Plaintiff") hereby respectfully opposes Defendants' Motion to Dismiss (the "Motion") Plaintiff's Second Amended Complaint (the "SAC") filed against Defendant Stanley Black & Decker, Inc. ("Stanley" or the "Company") and certain of its executives during the Class Period.[1]

## I.    INTRODUCTION

This is a securities fraud class action alleging that, throughout the Class Period, Defendants repeatedly issued materially false and misleading statements claiming that demand for Stanley's products was "strong" and that rising inventory would be needed to meet that demand, while concealing that demand was in fact declining and consequently inventory was ballooning and going unsold, leading to deteriorating free cash flow and increased debt. Knowing Stanley's products were facing deteriorating consumer demand and the Company had increasing finished-goods inventory, Defendants authorized a massive, undisclosed Q4 2021 pull-in of future sales (the "Pull-In") to inflate that quarter and the year-end's reported results. Throughout the Class Period, Defendants continued to materially mislead investors regarding the declining demand for the Company's products and the overall resulting effect on its financials. When the truth was finally revealed, Stanley's stock price dropped over 16% day-over-day, causing substantial damage to Plaintiff and the Class.  ¶¶17, 156.

For most of 2020 and early 2021, the COVID-19 pandemic fueled high consumer demand for Stanley's home improvement products. ¶¶3, 40, 64, 69, 72, 92. By the fall of 2021, that demand was in significant decline, volume was slumping, inventory was ballooning, and free cash was

---

[1] The "Class Period" is October 28, 2021, through July 28, 2022. The "Individual Defendants" are current Stanley Executive Chair Donald Allan, Jr. who served, at different times during the Class Period, as the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"); former CEO James M. Loree; and former Vice President ("VP") of Corporate Finance and CFO of the Tools & Storage business Lee McChesney. See ¶¶26-29. The Individual Defendants and Stanley are referred to herein as "Defendants." Unless otherwise specified, all "¶__" are to the SAC. ECF 80. Defendants' Memorandum in Support of the Motion (ECF 81-1) is referred to as the "MTD."

collapsing. *See*, *e.g.*, ¶¶64-65, 69-72, 82-83, 88, 91.

Despite these realities, Defendants, throughout the Class Period, repeatedly claimed, *inter alia*, that existing demand for Stanley's products was "robust", "extraordinary", and "strong", and that they were increasing the Company's inventory levels to support that strong demand. *See* ¶¶3-4, 93-94, 98-99, 101-02, 104-06; *see also* ¶¶9-10, 54, 107, 110-11, 113-14, 116-20, 122-23, 125-26, 130, 133, 136, 146-49.

However, according to one Company executive and four managers – confidential witnesses (each, a "CW") herein – by Q4 2021 it was evident, through internal reports, spreadsheets, presentations, and customer data, that demand for Stanley's Tools & Outdoor products was in decline. *See*, *e.g.*, ¶¶64-65, 69-72, 76, 82-83, 88-91. According to the CWs, this deteriorating demand was discussed not only at meetings attended by the Individual Defendants and several of the CWs, but also throughout the Company. *See, e.g.*, ¶¶33-37, 56-57, 78, 92, 99-100.

To hide the deteriorating demand, related inventory buildup, and falling free cash, Defendants authorized the massive Pull-In of $200-$300 million of future sales. ¶¶2, 5, 58, 66, 73, 79, 87. To achieve the Pull-In, the Company induced, through an increased discount, one of its three largest customers – Lowe's – to purchase extra product that it did not intend to then purchase. ¶¶62, 115, 126. According to the CWs, the Pull-In was "unprecedented" in size and a "historic high," consisting of three to six months of typical inventory shipped to Lowe's. ¶¶58-59. Only by executing the Pull-In of future sales from subsequent quarters was Stanley able to report that its Q4 2021 sales exceeded its Q4 2020 sales. ¶60. Defendants, however, did not disclose those facts to investors, nor did they revise the Company's demand or sales estimates for 2022, even though the Pull-In robbed sales from future quarters. *See, e.g.*, ¶¶61, 80-81. Moreover, despite inflating Stanley's 2021 results with the massive Pull-In, the Company still missed its 2021 earnings

2

guidance which Defendants had reduced just three months earlier. ¶¶2, 6,

When Stanley reduced the range of its expected full-year 2022 earnings on April 28, 2022, Defendants falsely blamed the deteriorating sales on "temporary electronic component supply challenges, which have continued to improve" – thereby intimating that but for their inability to manufacture and deliver more goods, Stanley earnings would otherwise have been on-track, as demand continued to remain "robust", and Defendants saw no slowdown in demand. ¶¶12, 130-31, 143. Meanwhile, *inter alia*, Defendants stated that any change in demand was only something that "could" occur even though it was already occurring, and that "[t]here has been no significant change in the Company's exposure to market risk during the first quarter of 2022." ¶¶13, 144.

Despite these claims, three months later, on July 28, 2022, Stanley announced that the Company's net income fell to $87.6 million from $459.5 million a year earlier. ¶15. The Company also drastically cut its full-year adjusted 2022 earnings per share guidance from $9.50-$10.50 per share to $5.00-$6.00 per share. ¶¶15, 155. Meanwhile, inventory continued to increase because products were not selling and as a result free cash flow did not recover. ¶154.[2]

Two recent Second Circuit decisions – *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288 (2d Cir. 2025), ("*Peloton*"), and *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121 (2d Cir. 2025) ("*Hain*") – confirm the viability of Plaintiff's claims. As *Peloton* explains, whether a statement is false or misleading turns on its "context and manner of presentation," including whether defendants described business conditions one way when internal facts or contemporaneous conduct showed the opposite, or framed already-materialized risks as hypothetical. 153 F.4th at 295, 300-02. That is what the SAC alleges here: Defendants assured

---

[2] While Defendants waived arguments regarding their scheme liability, as detailed in the SAC, this conduct was part of a scheme to conceal the Company's true financials that included the false and misleading statements, Pull-In, failure to comply with financial reporting obligations, and the Notes Offering conducted during the Class Period to pay for rising debt. *See, e.g.*, ¶¶ 94, 118, 126, 136, 169-71.

3

investors that demand was strong and inventory growth intentional to meet it, while internal data showed demand was declining and unsold inventory was consequentially accumulating.

This case aligns even more closely with *Hain*, which held that statements attributing performance to strong demand were actionable where executives approved pulling future sales forward to meet current targets. 156 F.4th at 140-43. The SAC alleges a similar arrangement here: an undisclosed pull-in used to mask weakening demand. Under *Hain* and *Peloton*, and consistent with other controlling Second Circuit authority, the SAC plausibly alleges actionable misconduct, and Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Information and Discussions About Demand Were Prevalent at Stanley

#### 1.    The CWs Were Well-Positioned to Be Knowledgeable Regarding Demand

The SAC details information provided by five former Stanley employees with specific knowledge regarding Stanley's business practices and the demand for its products during the Class Period. ¶¶33-37. They include two demand planning managers, a supply chain director, a supply chain VP, and a sales manager, each working in Stanley's Tools & Outdoors division. *Id.* That division, which distributed its products through retailers, comprised approximately 82% and 85% of Stanley's total revenues in 2021 and 2022, respectively. ¶¶38, 40-41, 83.

CW1 was Stanley's global demand planning manager from July 2021 to June 2022. ¶33.[3] CW1 led the coordination and consolidation aspects of demand planning for all the Tools & Outdoors business globally, which included three main responsibilities: (i) coordinating demand planning among different teams in the Americas, Asia & Europe; (ii) "pulling together all the

---

[3] CW1 worked closely with VP, Global Demand Planning, Global Tools & Storage, who reported to VP, Supply Chain Jason Stremmel ("Stremmel"), who reported to Nick DeSimone, Chief Supply Chain Officer, who reported to Defendant Loree. ¶¶33-34. All CWs are referred to in the masculine to protect their identities.

numbers"; and (iii) integrating a new software tool for demand planning. ¶33.

CW2, who worked for Stanley for more than two decades, was Director of Supply Chain Operations for Stanley's Lowe's account from 2013 until early 2022. ¶34. CW2 worked out of Stanley's Towson, Maryland office and reported to, among others, Stremmel. *Id.* CW2 interacted directly with Lowe's personnel on forecasting and order fulfillment. *Id.* Lowe's, along with Home Depot and Amazon, were Stanley's three largest customers. *Id.*

CW3 was employed by Stanley for 8 years until October 2022. ¶35. Among other positions, CW3 was VP of supply chain for the Americas region from December 2019 to January 2022 and VP of Global Planning from January 2022 to October 2022. *Id.* CW3 reported to the chief supply chain officer who reported to President and CEO Allan. *Id.*

CW4 became a Stanley employee from December 2021 until July 2022 after Stanley acquired a 20% stake of his then-employer MTD Holdings in 2018 and then the remainder of MTD Holdings in 2021. ¶36. CW4 was a national e-commerce sales manager at Stanley, servicing Amazon, and handled outdoor products. CW4 reported to Mike Axline, VP of the outdoor e-commerce segment. *Id.*

CW5 began working at Stanley in September 2013. ¶37. He was Stanley's North American supply chain manager from July 2020 to July 2021 and then a demand planning manager from July 2021 to August 2022, assigned to the Lowe's account. *Id.* CW5 most recently reported to VP of Supply Chain John Weetenkamp, who worked in Stremmel's Global Planning organization. *Id.*

### 2.    The Company's MAP Meetings Detail Sales, Supply and Demand

Stanley conducted monthly meetings known as MAP meetings, which were part of planning with a focus on reviewing major accounts. ¶48. They were held on a Monday, usually in a conference room in Towson, Maryland, in preparation for Thursday meetings among Stanley's top executives (the "Executive Meetings"). ¶¶48, 53-54. About 80-100 employees attended these

meetings, including finance, sales, supply and demand personnel. ¶48.[4]

MAP meetings were typically four-six hours long, during which sales leaders for each account reviewed performance (including demand and results compared to targets), projections, opportunities (including pull-ins used to drive demand), and risks. ¶49.

Notably, Stanley had access to portals providing Lowe's, Ace Hardware and Home Depot's inventories and sell-through data, allowing Stanley to see what was selling and not selling through with each of these customers. ¶77. Ben Dunn from Stanley was assigned to Lowe's and ran and circulated reports every Monday on Lowe's sell-through of products, using the portal known as Lowe's Link. ¶¶43, 77. The distribution list for these reports was described as massive. ¶77.

Each MAP meeting included a fifteen-to-twenty-page PowerPoint presentation which used the same format for every customer and covered each division. ¶49. Prior to the MAP meetings, the sales leaders emailed the PowerPoint decks to numerous recipients, including Defendant McChesney. ¶50. If changes were made to the PowerPoint decks during the meetings, they were recirculated by email afterwards. *Id.* McChesney regularly asked questions at the meetings and brought a binder with him which included all the PowerPoint decks and his notes. ¶¶50-51.

Among other things, the MAP presentations used information from Company reports that showed the month-by-month gap that existed between actual and forecasted sales. ¶51. From July 2021 to August 2022, CW5 prepared slides for the MAP meetings regarding demand planning for Lowe's. ¶¶37, 51. Until early 2022, CW2 used those reports to perform his job functions as Director of Supply Chain for Lowe's. ¶¶34, 51.

---

[4] About 50 employees attended in-person, including Defendant McChesney, Brendan McNulty (the CFO for North American Tools & Outdoor who reported to McChesney), CW2, CW3 and CW5. ¶¶48, 51, 54. Another 30-50 employees participated by phone, including CW4. ¶¶48, 90.

### 3.    The Company's Executive Meetings Summarize the MAP Meetings

At the Executive Meetings McChesney typically met with Defendants Allan and Loree, and other top executives (including CW3), and provided a summary of the MAP meeting. ¶¶53-54. These meetings had an executive roll-up that summarized business, including demand and actual results, across all regions. ¶54. Executives received summarized versions of the MAP PowerPoint presentations, and feedback was provided to the sales and operations teams. ¶53.[5]

Executives and other employees, including, but not limited to, CW1, CW4, Axline, and Stremmel, created and/or had access to Excel reports which showed the demand decline in the fall of 2021. ¶¶44, 71, 88. At the start of January 2022, CW1 provided reports to Stremmel that spelled out the demand forecast shortfalls. ¶76. Originally, the demand plan was updated on a four-week business planning cycle. ¶88. However, during 2022, Stremmel requested that CW1 provide these reports weekly rather than monthly. *Id*.

### B.    The Deterioration of Consumer Demand for the Tools & Outdoor Segment

In the beginning of 2021, Stanley saw increased consumer demand for its Tools & Outdoor products as COVID-19 pandemic stay-at-home orders spurred increased home remodeling and do-it-yourself projects. ¶¶3, 92. However, as the world reopened in the second half of 2021 and rising inflation ate away at consumer spending power, consumer demand for Stanley's Tools & Outdoor products began to deteriorate. *See* ¶¶64-65, 69-72, 82-83, 88, 91.

According to CW2, the then-Director of Supply Chain Operations for Lowe's, and CW3, the then-VP of supply chain for the Americas region, it was evident that demand was slowing in the second half of 2021. ¶¶64-65. Per CW4, the "rampant decline" in demand began in fall 2021, with that decline either remaining consistent or getting worse until CW4 left Stanley in July 2022.

---

[5] Stanley essentially acknowledged the MAP and Thursday meetings in a December 21, 2021 letter to the Securities and Exchange Commission ("SEC"). ¶55.

¶69. CW4 knew first-hand about the decline in demand in the outdoor segment because of CW4's responsibilities for e-commerce channel in that space and CW4 understood from conversations with Stanley colleagues that the decline in demand was "across all brands and categories." ¶70.

By early October 2021, it was evident that Stanley was facing sell-through weakness and had excess inventory. Indeed, total inventory had risen to approximately $4.1 billion, including $2.8 billion in finished goods, and year-to-date free cash flow had collapsed to just $31.3 million, down dramatically from the prior year. ¶¶7, 107. The CWs stated that the declining demand gave rise to discussions about executing pull-ins to make up for falling demand. ¶¶79-80, 82-83.

According to CW4, the Excel reports which Axline and other executives had access to showed a "major decline in demand" in the fall of 2021 and included "top-down" goals to try to figure out how to increase sales. ¶71. As a result, to get cash for its inventory, Stanley needed to try to execute a pull-in from 2022 to increase Q4 2021 sales and to hide the decline in demand. *See*, *e.g.* ¶¶8, 72-73, 83.

### C. A Massive Pull-in From Lowe's Allowed Defendants to Claim Demand Remained Strong

At times when it needed to increase sales, Stanley sought to convince certain of its customers to agree to take more inventory earlier than contemplated. ¶57. This practice, known herein as a pull-in, consists of pulling sales forward into an earlier period of time and was done to try to increase revenues during a financial reporting period. ¶57.

#### 1. The Lowe's Pull-in

During Q4 2021, Stanley induced Lowe's to take on a massive amount of additional inventory that Lowe's otherwise would have purchased during 2022. By shipping out this inventory early, Stanley was attempting to enhance its Q4 2021 and entire year 2021 results. ¶¶63, 66. Indeed, if not for this Pull-In, Stanley's Q4 2021 sales would have been lower than its Q4 2020

8

sales and Defendants would have had to admit that demand, rather than remaining strong, was declining. Without the Pull-In, the $4.068 billion in net sales that Stanley reported for Q4 2021 would have been between $3.868 billion and $3.768 billion, lower than the $4.003 billion reported for Q4 of 2020.[6] This undisclosed Q4 2021 massive Pull-In also created, unless demand substantially increased, a substantial risk of lowered future demand as it robbed from future periods in 2022. ¶¶63, 93. Notably, despite this massive Pull-In to bolster results, Stanley still missed its yearly 2021 guidance of $10.90-$11.10 per share, which it had just reduced three months earlier, and instead reported earnings of $10.48 per share. ¶110. Despite missing its already reduced guidance, Stanley did not revise its demand estimates for 2022, although Defendants knew that the Pull-In had already robbed sales from 2022. ¶¶67, 69.

According to CW2, Stanley senior level executives began talking with Lowe's in November 2021 to determine whether Stanley could move forward with the Pull-In. ¶92. To induce Lowe's to take extra inventory, Stanley increased the payout amount (or discount) to about 12-15%, higher than the usual 10% payout. ¶64. For the Pull-In, CW2 met with Lowe's personnel regarding the extra inventory that Lowe's might take and had to determine what inventory Stanley could ship immediately, and Lowe's agreed to take certain of those products. ¶64.

The CWs stated that Stanley's top executives were informed about declining demand and authorized the $200-$300 million Pull-In (¶¶87, 89, 92, 94-95) but did not revise the 2022 demand forecast. ¶¶73, 87, 97. According to CW5, the amount of the Lowe's Q4 2021 Pull-In stood out as a "historic high." ¶¶63, 93. CW2 described frustration among the Lowe's team that Stanley would get stuck with millions of dollars of unsold product because the rest of the Company was not hitting the plan and Lowe's would have to "carry Stanley" in covering the shortfall. ¶¶54-55.

---

[6] See Declaration of Lawrence D. Levit in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint ("Levit Decl.") filed concurrently herewith, Ex. C.

9

CW1 stated that the biggest problem with the Pull-In was that it robbed money from future periods and that while December 2021 was not that great, demand (or sales) would be at least that much lower in 2022 because of the Pull-In. ¶61. However, according to CW3 and CW5, Lowe's continued to order from Stanley in Q1 2022 even though it still had a great deal of inventory. ¶¶67-68. CW5 attributed these Lowe's orders to the fact that Lowe's sent the Pull-In products to be stored in a warehouse in Chicago and initially did not effectively distribute those products to regional centers. Accordingly, Lowe's regional centers did not have the products they needed to supply their stores and continued to order directly from Stanley even though Lowe's had the products in a warehouse. ¶68. Because Lowe's continued ordering in Q1 2022, that quarter ended up being better for Stanley than it should have been (although the Company still reported lower volume) but also caused more of a decline to occur in Q2 2022. ¶74. According to CW5, it was apparent to Stanley that Lowe's did not need the inventory it was ordering in 2022 because Stanley had access to Lowe's existing, real-time inventory and knew that inventory was increasing. ¶75.

### 2.    Defendants Knew and Approved of the Lowe's Pull-in

According to CW2, the instruction for the Pull-In "came from the top." ¶82. There was a directive from finance to "go get the number," meaning that sales staff along with supply and demand personnel should coordinate to determine the inventory on hand and what could be immediately moved to Lowe's to improve sales numbers. *Id.*

CW2 stated that personnel at Stanley and their counterparts at Lowe's were not in favor of pull-ins because it took expected sales away from a later period but were overridden by senior executives. Pull-ins were discussed at meetings CW2 attended in which McChesney participated (although CW2 did not specifically identify it as such, the meetings likely included MAP meetings) and were up for review and approval at the Executive Meetings. CW2 believed Allan approved the Lowe's Pull-In and quoted him as stating: "Yes, we gotta hit this number. Go get it." ¶82.

10

CW3, who attended the monthly Executive Meetings, also stated that discussions about the 2021 Pull-In went all the way to the top-level executives. ¶¶54, 84. Meetings and emails centered on discussions about pull-in opportunities and "let's try to execute this." ¶84. According to CW3, Defendant Allan was involved in the discussions on this topic and the Pull-In could not have been executed without Loree knowing about it. *Id.*

CW5 also stated that the directive to pull-in orders for Q4 2021 was "coming from the top" executives at Stanley. CW5 stated that the policies in place at Stanley dictated "dollar thresholds" for authority for transactions, meaning that different levels of management and executives could authorize transactions by a certain dollar amount. ¶85. The CEO or CFO was required to sign off on transactions that were beyond a vice president's level of authority, which, according to CW5, was the Q4 2021 Lowe's Pull-In transaction. *Id.* CW1 stated that given the size of the Pull-In, the terms were believed to have been negotiated by the top executives at Stanley and Lowe's. ¶85.

### 3.      The Q4 Pull-In Hides Declining Demand

Although Stanley pulled-in sales from 2022 into 2021, the Company did not change its demand forecast for 2022 or the public statements about strong demand and needing more inventory to meet that strong demand. *See, e.g.*, ¶¶79-80. CW5 stated that the Q4 2021 Pull-In had "ripped out" the inventory from the 2022 demand plan and that the Pull-In was "very disruptive" to Stanley, but that Stanley was more focused on the dollar than on how the Pull-In would impact planning in the future. ¶73. Consequently, the Company began the year with a demand shortfall.

CW1 described Stanley's demand forecast for 2022 as being "aggressive" and "delusional." ¶75. CW1 stated that, by the end of Q1 2022, it was "pretty clear to a lot of people that it was going to be an ugly year." ¶78. In conversations with sales staff, CW1 stated that they "seemed very miserable" as a result of Stanley's poor performance and that the sales team members were just getting the "thumb screws on them," with pressure to "go get more" business. *Id.*

11

According to CW1, there was no data showing demand was still strong in 2022. When doing a forecast, there were actuals, which were the sales results and they showed slowing demand, and there was no reliable reason to expect a turnaround. ¶¶75-76. CW1 provided reports to Stremmel from the start of January 2022, which captured the continuing demand decline. *Id.*

CW5 stated that because of the Q4 2021 Pull-In, CW5 believed that the 2022 demand plan for Lowe's should have been revised downward. ¶63. In early 2022, however, CW5 stated that "leadership" declined and provided no justification for the then-existing Lowe's demand plan. *Id.*

### 4. As 2022 Progresses, Defendants Continue to Insist Demand is Strong

On February 1, 2022, while still insisting demand was strong and inventory needed to be increased to meet it, Defendants announced results for Q4 2021 and full year 2021. Those results showed that without the undisclosed Q4 Pull-In, sales for that quarter would have been below Q4 2020 sales. In addition, Defendants reported that volume for the quarter decreased by 8% from the prior year, that it missed its guidance for free cash flow for 2021 by approximately $1 billion, and that the Company missed the earnings guidance that it had just reduced on October 28, 2021. ¶120.

By April 2, 2022, total inventory had risen further to approximately $6.3 billion, including $4.0 billion in finished goods. ¶136. Moreover, free cash flow for Q1 2022 was a staggering negative $1.38 billion, compared to a positive $246 million the year before. *Id.*

In the face of this increasing inventory, plummeting free cash flow, and continued lower volume, on April 28, 2022, Stanley reduced the range of its expected full-year 2022 earnings to $9.50-$10.50, down from the $12.00-$12.50 adjusted EPS issued only three months prior. ¶¶12, 131. Defendants falsely blamed the deteriorating sales on "temporary electronic component supply challenges, which have continued to improve" – thereby intimating that but for their inability to manufacture and deliver more goods, demand remained robust. ¶¶12, 14, 130-31, 143, 148. Meanwhile, *inter alia*, Stanley stated that "[t]here has been no significant change in the Company's

12

exposure to market risk during the first quarter of 2022," and Defendant Allan claimed that "demand for our products remains healthy". ¶¶13, 144.

Despite these claims, three months later, on July 28, 2022, Stanley announced that the Company's net income fell to $87.6 million from $459.5 million a year earlier. ¶15. The Company also drastically cut its full-year adjusted 2022 earnings per share guidance from $9.50-$10.50 per share to $5.00-$6.00 per share. ¶¶15, 155. The July 28, 2022 disclosures erased billions in shareholder value as the Company's stock price dropped 16% day-over-day. ¶¶17, 156.

## III.    ARGUMENT

### A.    Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To succeed on a Section 10(b) claim, 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Hain*, 156 F.4th at 136, *quoting Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Hain*, 156 F.4th at 135 (cleaned up). The "sufficient particularity" standard is satisfied when information from CWs is described in a manner supporting the inference that individuals in their positions would possess the alleged information, rather than on whether particular documents are identified. *See Hain*, 156 F.4th at 129 ("We generally consider and take as true allegations by CWs at the pleadings stage so long as the

13

CWs are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); [7] *Emp.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (particularity satisfied where CWs were described by job title, responsibilities, and temporal proximity to the events at issue, without requiring identification of specific internal documents).[8] As a recent court stated in quoting the Second Circuit: "courts 'must be careful not to mistake heightened pleading standards for impossible ones.'" *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *2 (S.D.N.Y. Sept. 15, 2025), *quoting In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021).

**B.    Defendants Made Materially False and Misleading Class Period Statements**[9]

On October 28, 2021, the start of the Class Period, Stanley already had declining demand, ballooning inventory, and collapsing free cash flow. ¶¶2, 3, 5. As volume (the number of goods being sold) was going down because of the declining demand, inventory was increasing because sales targets were not being met, and the Company was getting stuck with excessive inventory. Put simply, Stanley had too many finished goods and not enough people that wanted to buy them. Accordingly, Defendants pursued and executed the Pull-In with Lowe's to get rid of some of its accumulating inventory, raise cash, as free cash flow had been depleted by increased inventory caused by failing demand, and try to hit its Q4 2021 sales targets.

However, instead of informing investors regarding the truth of Stanley's business during

---

[7] Unless stated otherwise, all emphasis is added and internal quotations and citations are omitted.

[8] The particularity requirement may be satisfied through the identification of documentary or personal sources, but the statute does not require plaintiffs to identify such sources to plead fraud adequately. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 478 (S.D.N.Y. 2004) ("*Novak* should not be read to require that securities fraud complaints identify documentary or personal sources.").

[9] All of Defendants' materially false and misleading statements are listed in the concurrently filed chart. *See* Levit Decl., Ex. A. All actionable portions of the false and misleading statements alleged in the SAC concern past or present conditions and are highlighted in the third column which is entitled "SAC Alleged False or Misleading Statement."

the Class Period, Defendants doubled down on their deception. Notably, throughout the Class Period, Defendants repeatedly reduced the Company's earnings guidance while touting demand and that elevated inventory levels were necessary to meet that demand, and then conceded they missed their reduced guidance while also attempting to downplay volume decreases.

Importantly, whether a statement is false or misleading is "evaluated not only by literal truth, but by context and manner of presentation." *Peloton*, 153 F.4th at 295, *citing Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). "The test for whether a statement is materially misleading under Section 10(b) ... is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Peloton*, 153 F.4th at 295 (cleaned up), *citing Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004).

### 1.    The Fourth Quarter of 2021

The Class Period begins on October 28, 2021, nearly one month into Stanley's 4Q 2021. On that date, the Company issued a press release reporting its financial and operating results for 3Q 2021 and cut its 2021 full-year adjusted earnings per share forecast from $11.35-$11.65 to $10.90-$11.10. ¶¶93, 95, 105.

On that same day, in an earnings conference call, Defendant Allan reassured investors that, *inter alia*, "***the market demand environment remains very strong and supportive. We have a phenomenal set of growth catalysts across the businesses* . . . . *We remain well positioned to deliver above-market organic growth with operating leverage, resulting in strong free cash flow generation* . . .". ¶¶3, 104. Similarly, in response to a question from an analyst, Defendant Loree reaffirmed, in part, that "***The demand is strong. The conditions are supportive. So serving the demand, I think, is the challenge*. . . . *we're confident we've created the demand and the environment is supportive, and we need to serve the demand*." ¶106.

However, the CWs consistently stated that demand had declined by 4Q 2021. *See*, *e.g.*,

15

¶33-37, 43-55, 64-65, 69-72, 82-83, 89-90;[10] *compare Peloton*, 153 F.4th at 296 (finding CW statements were too inconsistent regarding when demand began to decline to find a February 2021 statement false and misleading.). As a result, free cash flow had dropped precipitously and was only at $31.3 million compared to $390.7 million the prior year. ¶7. Accordingly, when Defendants provided free cash flow guidance for the full year that was "expected to approximate $1.1 - $1.3 billion due to an expectation for higher levels of inventory to support the strong demand and to serve our customers[,]" (¶¶4, 94) there was no reasonable basis for that guidance because of the declining demand and decreasing reported volumes.

Indeed, Stanley's free cash flow situation was so poor at this time that CW3, VP of the supply chain for the Americas region and then globally during the Class Period, specifically identified it as one of the reasons Defendants sought and executed the massive Q4 2021 Pull-In. *See* ¶65. The Company needed cash because it was not in a good position to generate it, and the numbers bear this out. Inventory, including finished goods inventory, was ballooning while free cash flow was falling far short of Defendants' stated expectations.

Furthermore, statements regarding building up inventory to support the strong demand were materially false and misleading because Stanley was failing to meet its targets. *See, e.g.*, ¶¶69-71, 75-76, 78-80, 83, 90. Entering 2022, CW1, Stanley's global demand planning manager, stated that no data supported the claimed demand, and CW4 stated that Stanley seemed to be "hoping" that the artificial increase in demand from 2020 and early 2021 would continue. *See, e.g.*, ¶¶33, 72, 75-76. Defendants' building up of inventory was unsustainable because it was premised on demand that internal data showed did not exist.[11]

---

[10] One of the five CWs relied on in the SAC did not provide a specific date as to when there was declining demand at Stanley but did acknowledge that it was occurring in Q4 2021. ¶69.

[11] Defendants downplay Stanley's missing sales targets and claim that missing aggressive goals does not mean demand is declining. MTD at 14-15. First, the CWs stated that it was demand that was declining, not just that targets were

### 2.    The First Quarter of 2022

On February 1, 2022, Stanley issued a press release reporting its financial and operating results for Q4 2021 and the 2021 fiscal year. ¶110. That press release was entitled "Robust Customer Demand Drove Record 2021 Full Year Organic Revenue Growth of 17% and 30% Adjusted Diluted EPS Expansion[.]" *Id.* The body of that press release quoted Defendant Allan as stating that "[i]n 2021, we delivered 17% organic revenue growth with operating profit expansion and 30% adjusted EPS growth." ¶114.

Those statements were materially false and misleading because it was ***not*** organic growth that bolstered revenues by those amounts in 2021, but the massive Pull-In that cannibalized revenue from 2022. As the CWs stated, Stanley needed to induce Lowe's to take this extra product in Q4 2021 by providing Lowe's with a larger discount. *See, e.g.,* ¶¶58-60. Tellingly, Lowe's warehoused this extra product rather than sending it out to stores. ¶68. Without the Pull-In, organic revenue could not have been stated to grow 17% during 2021. Defendants' "repeated public statements attributing [the company's] strong growth in sales numbers to 'strong consistent consumer demand' and other 'organic' factors . . . fail[ed] to disclose how the channel-stuffing practices [*i.e.*, pull forward or pull-in] artificially inflated sales figures." *Hain*, 156 F.4th at 131.

Defendants fail to address that without the Pull-In, which they do not deny occurred, Q4 2021 sales would have been lower than Q4 2020 sales. Defendants also do not address the issue of the Pull-In not being organic revenue and how it was false to claim that the entire revenue increases in 2021 were organic. Reporting that all Stanley's revenue for Q4 2021 and the year 2021 was organic was materially false and misleading and those statements are actionable. *Murphy v. Precision Castparts Corporation*, 2017 WL 3084274, at *9 (D. Or. June 27, 2017) (representations

---

being missed. Moreover, missing targets was relevant because it resulted in the Q4 2021 massive pull-in without which Defendants could not continue to claim demand was strong.

about organic growth that did not disclose that sales were the results of "pulling-in" was material and actionable); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (once a company puts the topic of the cause of its financial success at issue, it is obligated to disclose information concerning the source of its success); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (same).

In *Hain*, the Second Circuit held that statements attributing performance to strong demand were actionable where executives approved of pulling future sales forward to meet current targets. *Hain,* 156 F.4th at 140-43. The court explained that such practices, described as "[robbing] Peter to pay Paul," rendered statements claiming strong demand as misleading half-truths. *Id*. at 128, 140-43; *see also* ¶61 (CW1 described the Q4 Pull-In as the Company having "robbed money from future periods").

*Hain* is directly on point here. The CWs stated that as demand was declining Stanley built inventory to serve projected demand (which, per CW1, no data supported) that never materialized, resulting in a glut of excess inventory. ¶¶64-83. To address the drastic weakening of demand and convert excess inventory into cash, Defendants approved and executed the Pull-In. ¶¶2, 65-66, 80. The CWs described this practice in the same terms used in *Hain*: pulling forward future sales to meet near-term targets at the expense of future quarters. ¶¶58, 60-61, 73, 80. Yet Defendants continued to assure investors that demand remained strong and inventory growth was intentional and demand-driven, which was contradicted by the facts and data. ¶¶111, 113, 115, 117-20, 123-26, 130, 133, 136, 144, 147-49.[12]

While Defendants attempt to downplay the impact of the Pull-In, they do not deny it

---

[12] Defendants claim that Plaintiff only alleges that demand declined at some indeterminate time. MTD at 13-14. That is incorrect. Four of the CWs uniformly stated that demand was declining by the start of the Class Period with the Fifth CW stating if occurred during Q4 2021, which included the start of the Class Period.

occurred; that it was as much as $200 million; that it was for an unprecedented amount and a historic amount for Stanley; and that the Individual Defendants knew and approved of it. Defendants merely claim that Plaintiff has not shown enough to prove these allegations, while also erroneously claiming the Pull-In was not linked to declining demand even though various CWs explicitly stated that such a link existed. ¶¶ 57-60, 66, 79, 82-85, 87.

As *Hain* makes clear, pull-ins are not themselves unlawful (and Plaintiff does not state they are, as Defendants suggest). Pull-ins become actionable when executives publicly proclaim strong demand while concealing that sales were being pulled forward to mask demand weakness. *Hain,* 156 F.4th at 140-43. Defendants' reliance on the portions of *Peloton* dismissing certain claims regarding demand is misplaced. *See, e.g.*, MTD at 10-11. The unactionable statements in *Peloton* were tied to guidance the company ultimately met, and the CWs therein provided inconsistent accounts regarding when demand began to decline. *Id*. at 297-99. In contrast, the SAC alleges consistent accounts from CWs regarding the timing of declining demand. ¶92. Moreover, Defendants' statements were made in the context of the Company repeatedly reducing guidance and then repeatedly missing guidance that reduced guidance throughout the Class Period. ¶¶95, 107, 110-11, 113, 124, 131-32, 136, 141, 155. These factual differences are in stark contrast and, instead, place the SAC's alleged false and misleading statements squarely within the type and context of statements *Peloton* and *Hain* found to be actionable.

Defendants' statements about Stanley's inventory levels and the reasons they were increasing are also actionable under the securities laws. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2016 WL 6075540, at *3-4 (W.D. Tex. Sept. 16, 2016) (actionable to tout revenue where defendant's "growth was stagnant, shipments were stalling and inventories were stockpiling, all of which resulted in far too much product and not enough demand"); *Novak*, 216 F.3d at 311-

19

12 ("despite knowledge of the true reasons for rising inventory levels," defendants gave "false reassurances that inventory was under control or giving false explanations for its growth"). *In re SolarEdge Techs., Inc. Sec. Litig.*, 2025 WL 1031154, at *7 (S.D.N.Y. Apr. 6, 2025) (materially misleading to omit part of reason for inventory increases).

The February 1, 2022 press release also reported that free cash at $144 million was far short of the guidance given three months earlier and attributed it to using cash to increase inventory to support the strong demand. ¶113. Notably, Defendant Allan specifically claimed the Company made "***significant investments in inventory to help meet the outsized demand in the tools business.***" ¶118. Allan further claimed that "***[t]he increased tools inventory is needed to serve existing and projected demand***, and therefore, we believe we will sell through this incremental inventory during 2022." ¶119. Defendants' explanation that inventory investments were made to serve strong demand failed to account for why inventory was not converted into cash. In reality, cash was tied up because finished goods were not being sold as demonstrated by the continued decrease in volume. Tellingly, by January 1, 2022, total inventory had ballooned to $5.4 billion, including $3.5 billion in finished goods  –  a roughly 25% increase in finished goods in a single quarter. ¶125. Meanwhile, free cash flow missed guidance by approximately $1 billion and was far below the year before. ¶113.

In an earnings conference call on that day, Defendant Loree again assured investors that the Company "***benefited from extraordinarily strong customer demand, which continues for our innovative products and portfolio of brands*** . . . . " ¶117. Defendant Allan similarly claimed that "***[e]nd user demand strength remains persistent across all markets***." ¶120. Further, Allan, in response to a question regarding price increases on demand, stated that management "***[had] not seen an impact to demand related to that in any of the channels***" referenced. ¶122.

Defendants' February 1, 2022 statements were materially false and misleading for reasons similar to why the October 28, 2021 statements were materially false and misleading. *See, e.g.*, ¶¶9, 120 (Defendants continued to claim that demand remained strong entering 2022 "***across all markets[.]***"). This is in direct contrast to the undisclosed information provided by the CWs as detailed in the SAC and *supra*. *See, e.g.*, ¶¶44, 53, 76, 58, 60, 65-66, 69-71, 75-76, 78-80, 89-90. Moreover, the demand slowdown was also evident from the Q4 Pull-In. ¶58 (CWs stated that Q4 Pull-In with Lowe's was executed to meet targets, sell off accumulating inventory, and raise free cash flow); ¶60 (CW5 stated that overall demand had declined and Pull-In was done to make up for that decline); ¶65 (CW3 stated that Q4 Pull-In was done because inventory had been built up and cash was tied up in inventory for which demand was declining).

Notably, the February 1, 2022 press release also reported that net sales for the 4Q 2021 declined by 8% as "***[v]olume was impacted by a series of logistical and other supply chain challenges***." ¶112. This statement was false and misleading. The 8% decline in volume was substantially caused by declining demand, as the CWs stated. Moreover, even that 8% decrease in volume was misleading because volume had been boosted by the undisclosed Pull-In. Without the Pull-In, the volume decline would have been even greater.

Tellingly, the February 1, 2022 press release also announced that the Company had 2021 adjusted earnings per share of $10.48, below its already 2021 full-year adjusted earnings per share October forecast of $10.90-$11.10. ¶¶110.

### 3.    The Second Quarter of 2022

On April 28, 2022, Stanley issued a press release lowering its 2022 full year adjusted earnings per share to $9.50 to $10.50 from its February guidance of $12.00-12.50 per share. ¶¶111, 131. Despite this reduction, Defendant Loree again claimed that first quarter results "***benefited from a sustained strong demand environment***" and while "[o]rganic revenue was down 1% . . .

*customer demand remained strong* across many of our global markets . . . ." ¶148. Defendant Loree blamed the downturn on supply chain and procurement issues rather than consumer demand, stating that "*volume could have been higher, but for the "supply-constrained environment*". *Id.*

Defendant Allan similarly claimed that the demand "continued" and "remain[ed] healthy." ¶144. Furthermore, Allan claimed that the Company had "*not seen evidence of broad demand destruction related to price elasticity*." ¶144.

Notably, Defendants claimed that as of Q2 2022 demand was not slowing even though it had already been slowing for months. *See*, *e.g.*, ¶69 (rampant demand decline began in fall 2021 and did not improve in 2022). Statements about strong demand that are not true are actionable under the federal securities laws. *See*, *e.g.*, *Hain*, 156 F.4th at 131 (Defendants attributed sales growth to "strong consistent consumer demand"); *SolarEdge*, 2025 WL 1031154, at *8 (statements regarding "strong" demand were actionable based on CW statements); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) ("strong demand" statement was actionable); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 644, 651 (E.D. Pa. 2015) (statements about strong demand are actionable where sales propped up by discounts). Moreover, as the Second Circuit stated, while getting a customer to take more product than it wanted is "not necessarily illegal, [ ] it may give rise to liability under the Exchange Act when a company engages in the practice to deceive investors." *Hain*, 156 F.4th at 128.

Regarding inventory and free cash flow, the April 28, 2022 press provided, in part, that "*[w]orking capital turns for the quarter were 3.7 turns down 1.5 turns sequentially, due to inventory investments to support the strong demand* . . . ." ¶133. The concurrently filed 10-Q further disclosed that free cash flow for Q1 2022 was a staggering negative $1.38 billion, compared to a positive $246 million the year before. ¶136. However, Defendants misleadingly reported a

22

year-over-year decrease in free cash flow as being "***primarily due to increased inventory investments to support the strong demand outlook***." *Id.*

Defendants continued to claim the Company was investing in inventory to support the strong demand. Those statements were false and misleading because Defendants hid the reasons why inventory was building up. Inventory was growing because the Company could not meet its sales targets and product was piling up. *See, e.g.*, ¶¶52, 58, 65, 60, 69-70, 76, 88, 89, 90.

Defendants attributed the increase in Stanley's inventory levels, and corresponding decrease in free cash flow, to supply chain constraints and logistical issues. *See* ¶¶112-13, 119. Similarly, they stated that volume had decreased because of supply challenges and electronic components. *See* ¶¶14, 112, 130, 143, 148. Those statements were false because inventory was increasing and volume and free cash flow were declining as a result of Stanley's products not selling at pre-Class Period levels and the Company failing to adjust its sales targets. *See, e.g.*, ¶76.

Moreover, Defendants' attempts to blame decreasing volume on electronic component supply challenges were false as its finished goods inventory increased by $500 million from year-end 2021 to April 2, 2022 (¶¶9, 12), demonstrating that lower demand rather than a lack of supply was the cause of the volume drop. This was just one more attempt by Defendants to obscure that weakening demand was causing an inventory build-up and corresponding free cash flow collapse.

In any event, none of the CWs gave these proffered excuses as reasons for Stanley's problems during the Class Period, but each of the CWs stated that it was declining demand. As further support that it was not supply chain issues holding Stanley back, the Company had no problem with the supply chain when it was providing $200-$300 million in extra product to Lowe's as part of the Pull-In.

By failing to disclose that declining demand was the primary reason that Stanley's

23

inventory was increasing, its free cash flow was far below guidance, and its sales volume was down, the above-identified statements were materially false and misleading and are actionable. *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (once defendants made statements about certain sales factors, they had an obligation to "tell the whole truth", even for statements that were literally correct, because the omitted information made the statements materially misleading); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018) ("[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading.").

Defendants' attempt to distinguish *Peloton* misstates the SAC. Defendants argue that, here, unlike in *Peloton*, there are "no similar allegations of a Company action that a Defendant wrongly characterized one way instead of its exact opposite." MTD at 10. That is incorrect. As alleged, Defendants repeatedly told investors that Stanley was intentionally building inventory and reducing free cash to support a "strong" demand environment. ¶¶94, 99, 101-07, 111, 113, 117-20, 123, 125-26, 130, 133, 136, 144, 146-49. At the same time, the CWs describe excess inventory accumulating because demand for Stanley's products was weakening. ¶¶64-66, 69-72, 75-76, 78-83, 89-90. In other words, Defendants characterized inventory growth as demand-driven when, as alleged, it reflected the opposite – inventory buildup and free cash decline caused by softening demand. That inversion of reality is precisely what the Second Circuit held actionable in *Peloton*. *Peloton*, 153 F.4th at 300-01.

On July 28, 2022, Stanley issued a press release finally acknowledging Plaintiff's allegations. *See* ¶152. Notably, unlike its prior three press releases reporting on earnings, this press release did not mention robust or strong demand in its title. *Id.* Instead, Stanley reported that its Tools & Outdoors segment profit declined from $627 million for the second fiscal quarter of 2021

to $361.6 million for the second fiscal quarter of 2022. ¶153. The Company also reported total inventory of approximately $6.6 billion as of July 2, 2022, including $4.1 billion in finished goods. ¶154. This represented a significant increase from the $4.1 billion in total inventory (including $2.8 billion in finished goods) the Company had reported as of October 2, 2021, just before the start of the Class Period. *Id.* Moreover, Defendant Allan, the Company's then-CEO admitted "a swift deterioration in consumer Tools & Outdoor demand[.]" ¶155. Defendants rely on these belated disclosures to claim that Defendants informed investors that demand had "leveled off." MTD at 7. But Defendants were nine months too late. The CWs stated that demand was going down by October 2021 while Defendants were touting strong demand through the end of July. On this news, Stanley's per share stock price declined more than 16%, causing significant losses to Plaintiff and the Class. ¶156.

### 4.    Statements Defendants Claimed to be About Risks

During the Class Period, Defendants identified factors that ***could*** materially impact Stanley's performance, including "the impact from demand changes within world-wide markets associated with homebuilding and remodeling" and "as different geographical areas anticipate moving into a recovery era, demand for the Company's products may decrease as focus shifts to activities outside the home." These factors, which were included among a list of other factors and were repeated in the Company's Class Period SEC filings, were false and misleading because they were not hypothetical risks, as Defendants claimed, but were risks that had already materialized in the form of declining demand as COVID-era stay at home orders were lifted and home improvement demand declined as a result.[13]

---

[13] Defendants repeat this purported warning and use the same or similar language in other documents during the Class Period, all of which are set forth as part of Exhibits B-E to the Levit Decl. Because of the similarities of the statements and because they were materially false and misleading for the same reasons, they are not repeated in the above text. ¶¶ 108, 127, 138-40.

Defendants' statements purportedly setting forth a hypothetical possible change in demand as a risk to Stanley's business were materially false and misleading because a change in demand for its products had already materialized and was already impacting Stanley's results. As detailed *supra*, various CWs stated that demand was declining at the time Defendants were making contrary statements.

If, as alleged, demand was already declining at the time Defendants were claiming that declining demand was still only a possibility, then those risk statements were materially false and misleading and are actionable. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) (risk warnings are present statements as they hide events "that 'had' already occurred"); *STMicroelectronics*, 2025 WL 2644241, at *4 (risk disclosures misleading where company warns of a risk that has already materialized); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (warnings were inadequate and actionable where they warned of "potential risk[s] when such a risk had already materialized.").

*Peloton* also confirms that Defendants' statements are actionable to the extent they framed known problems as hypothetical risks. There, the Second Circuit held that risk disclosure warnings that excess inventory may disrupt Peloton's business were misleading where confidential witnesses alleged those risks had already materialized. *Peloton*, 153 F.4th at 301-02. The court explained that risk disclosures are misleading when they speak of risks that are already present. *Id*.

The SAC alleges the same type of defect here. Defendants warned investors that demand *could* weaken, while CWs and contemporaneous metrics show that demand was already declining and, as a result, excess inventory was accumulating, free cash flow was deteriorating, and earnings guidance was missed. ¶¶108, 127, 134, 138-40. As in *Peloton*, Defendants' risk disclosures plausibly misled investors by describing existing conditions as hypothetical future risks.

26

### 5.    Vendors' Disclosures Support Plaintiff's Allegations

Defendants' reliance on Lowe's public statements (*see* MTD at 12), does not undermine the SAC's allegations and is contradicted by contemporaneous customer-level data. Home Depot and Lowe's were two of Stanley's three largest customers, but Stanley's products represented only a portion of those retailers' overall sales, such that retailer-level performance does not necessarily reflect demand for Stanley's products. ¶34. At the same time, publicly reported transaction and comparable sales data from both retailers during the Class Period reflects declining or flattening demand trends that are consistent with the CWs' accounts of weakening demand for Stanley's products.[14]

At Home Depot, customer transaction volumes declined throughout the relevant period, year-over-year, including a 3.4% decrease in Q4 2021, an 8.2% decrease in Q1 2022, and a 3.0% decrease in Q2 2022. Levit Decl., Ex. F-H. Those sustained declines are consistent with weakening home improvement demand and align with the SAC's allegations that demand for Stanley's products was already deteriorating by late 2021 and continued to worsen into 2022.

Lowe's data likewise supports the SAC. On December 15, 2021, Lowe's publicly forecast that comparable sales for full-year 2022 would range from a decline of 3% to flat, reflecting expectations of slowing or flattening demand rather than continued growth. Levit Decl., Ex. I. That forecast materialized, as Lowe's comparable sales declined by approximately 4% in Q1 2022 and remained essentially flat in Q2 2022. Levit Decl., Ex. J-K. While Lowe's made generalized statements to its own investors about overall market conditions, the contemporaneous sales data from both Lowe's and Home Depot is consistent with the SAC's allegations that demand for

---

[14] Plaintiff relies on publicly reported sales and transaction data from Lowe's and Home Depot, together with Stanley's access to customer-level point-of-sale information, to show that demand conditions during the Class Period were consistent with the CWs' accounts of declining demand for Stanley's products.

27

Stanley's products was weakening during the Class Period, not strengthening as Defendants claimed.

### 6.    Defendants' Statements Are Not Subject to Forward Looking, Opinion, or Puffery Defenses

Defendants also try to evade liability by claiming their statements were not actionable under the federal securities laws because they were forward-looking, opinions, or puffery. MTD at 17-24. Defendants are wrong.

### a.    Defendants' Statements Were Not Forward-Looking

Defendants contend that "many of the statements Plaintiff challenges are quintessential examples of forward-looking statements about Stanley's future plans and goals." MTD at 18. That framing misstates both the governing law and the nature of the challenged statements. Under controlling Second Circuit precedent, the PSLRA safe harbor does not apply to the non-forward-looking portions of mixed statements that include present or historical factual assertions. Courts must sever forward-looking elements from present-tense representations, and the safe harbor applies only, if at all, to the genuinely predictive components. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016); *SolarEdge*, 2025 WL 1031154, at *12.

Here, Defendants attempt to shield entire statements simply because they include references to future periods. But Plaintiffs challenge Defendants' representations about then-existing or past demand conditions, inventory decisions, and operating performance. Those representations are severable, verifiable when made, and actionable if false.

For example, on the October 28, 2021 earnings call, Defendant McChesney stated that Stanley had "invested in inventory to serve the robust demand environment here in 2021 and in '22 and beyond." ¶101. While Defendants point to the reference to 2022 as forward-looking, the statement unmistakably includes present and historical assertions: that Stanley had already

invested in inventory and to meet a demand that was presently "robust" in 2021. Under *Vivendi*, the safe harbor "does not protect … present representations … embedded within statements that [defendants] deem forward-looking." 838 F.3d at 246. Plaintiffs allege that those present-tense representations were false and misleading when made because demand was already declining and excess inventory was consequently accumulating. ¶109; *see also* Levit Decl., Ex. A (highlighted language in column 3).

The same is true of Defendant Allan's statements on that earnings call. Allan stated that "the market demand environment remains very strong and supportive" and that Stanley had "a phenomenal set of growth catalysts across the businesses." ¶104. These are not predictions; they are statements describing present market conditions and the Company's current operating environment. Although Allan also referenced long-term performance and future shareholder returns, those forward-looking aspirations are severable from his contemporaneous factual assertions about demand and market conditions. *See New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*, 455 F. Appx. 10, 15 (2d Cir. 2011) (statements that inventory and restructuring efforts were on track were present-tense representations not protected by the safe harbor).

Likewise, on the February 1, 2022 earnings call, Defendant Loree stated that Stanley was benefiting from "several positive secular demand trends." ¶117. That statement refers exclusively to present conditions – what trends currently "are benefiting" the business – not future projections. *Id.* Defendants' attempt to recharacterize such statements as forward-looking ignores their plain language and controlling precedent holding that statements describing current demand or operating conditions fall outside the safe harbor. MTD at 17.

Even where a challenged statement contains both present and future elements, the PSLRA safe harbor does not protect present-tense factual representations that are false when made. *See*

29

*Vivendi*, 838 F.3d at 246; *SolarEdge*, 2025 WL 1031154, at *12. Here, Plaintiffs allege that Defendants' statements about strong and robust demand were false when made because Stanley was already experiencing declining demand and excess inventory, and because Defendants were contemporaneously engaging in pull-forward practices to mask that deterioration. ¶2. Those allegations render the present-tense portions of Defendants' statements actionable regardless of whether other portions might be characterized as forward-looking.

Defendants' reliance on cautionary language and risk disclosures fares no better. MTD at 19. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173. Defendants warned that demand "may" weaken as pandemic-related conditions changed, while the SAC alleges that demand was already declining, inventory was accumulating, free cash flow was deteriorating, and earnings guidance would ultimately be missed. ¶¶109, 129, 150. Under settled Second Circuit law, statements describing present adverse conditions as hypothetical future risks are misleading and fall outside the PSLRA safe harbor. *See Vivendi*, 838 F.3d at 246-247; *Peloton*, 153 F.4th at 301; *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *13 (D. Conn. Mar. 31, 2018).

### b.     <u>Defendants' Statements Were Not Opinion</u>

In a desperate attempt to fall under the *Omnicare* analysis, Defendants focus on portions of some of the statements to make them sound like opinions. MTD at 22-23, *citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). But Defendants cannot remove the statements from the context in which they were made in an attempt to hide their factual nature. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *24 (S.D.N.Y. Sept. 30, 2021) ("As the Supreme Court explained, 'some sentences that begin with opinion words like 'I believe' contain embedded statements of fact.'"); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 6982233, at *4 (N.D. Ohio Dec. 9, 2014) ("merely because Defendants couch some of

30

their statements with terms like 'our belief' or 'we believe' or 'our highest priority' or 'in my opinion,' the Court is not swayed.").

Indeed, Defendants, for example, stated that they were not seeing a decline in demand (¶147); that "end-user demand strength remains persistent" (¶120); that management had "not seen an impact to demand" (¶122); and that inventory was increased to support strong demand (¶113). These statements (and others) were not opinions, but of then-existing facts, and Defendants have made no meaningful argument as to how they could be opinions. *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019) (statements about strong end-user demand were not opinions); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (defendants' statements "about the current and past state of [defendant's] pipeline went beyond 'feel good' optimistic statements . . . [r]ather, they provided a concrete description of the past and present state of the pipeline"). Moreover, any statements of opinion or belief were false and misleading because of the omitted material facts available to Defendants about Stanley's declining demand.[15] *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 287-88 (E.D.N.Y. 2023) (if real facts conflict with what a reasonable investor would take from the statement, then an opinion statement will mislead).

Similarly, Defendants' other statements, while couched in the same historical strong confident language about demand for their products, were not opinions. ¶¶3, 94, 98, 100, 103-104, 106, 120-122, 130, 143, 147, 149; *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *24 (D.N.J. Aug. 17, 2005) (even if statement "ha[s] an air of opinion to it, because the statement

---

[15] Defendants also claim that Plaintiff has not alleged that the Defendants did not believe that their statements of opinion were untrue at the time they were made. MTD at 23. This is incorrect. Plaintiff has alleged that Defendants had access to documents showing declining demand and attended meetings where declining demand was discussed and gave their approval to the massive Q4 Pull-In with Lowe's, without which they would have been unable to claim demand remained strong. *See, e.g.*, ¶¶50-51.

as a whole refers to what 'the data indicate,'" it is actionable); *see also Novak*, 216 F.3d at 315 (statements were actionable when defendants made optimistic statements about inventory while they allegedly knew that the contrary was true). But for the Pull-In, Defendants would have been unable to claim that demand remained strong. *SolarEdge*, 2025 WL 1031154, at \*7 (misleading not to disclose that reason for portion of revenue increase was channel stuffing, i.e., pulling-in future sales); *Lexmark*, 367 F. Supp. 3d at 30-31 ("[e]ven if 'literally true,' affirmative statements may be rendered false by what they fail to disclose"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*13 (D.N.J. July 27, 2018) ("By putting the issue of organic growth 'in play,' Defendants 'acquire[d] a duty to disclose information relating to that topic.'").

Even if Defendants' statements are considered opinions, they still are actionable under *Omnicare*. "By increasing the ability of plaintiffs to plead material omissions with respect to statements of opinion . . . *Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020). Opinion statements may be actionable if "[although] sincerely held and otherwise true as a matter of fact . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

### c.        Defendants' Statements Are Not Puffery

Here, Defendants' repeated assurances that demand was "strong" and "robust," that inventory growth was needed because of that strong demand, and that revenue growth was organic were not vague cheerleading untethered to facts. Those statements were offered as explanations for Stanley's reported performance and rising inventory, and as reassurances that performance was sustainable. Qualitative statements are actionable where they do more than express optimism and instead affirmatively explain a company's performance, inventory position, or demand conditions in a manner contradicted by internal facts or contemporaneous conduct. *Peloton*, 153 F.4th at 300-

32

01; *Hain*, 156 F.4th at 140-43.

Moreover, even statements that might otherwise be viewed as optimistic become actionable when paired with undisclosed pull-forward practices that materially alter their meaning. *Hain,* 156 F.4th at 140-43 ("We also conclude that the Defendants made a series of actionable misleading, 'half-true' statements by failing to disclose to investors their reliance on the channel-stuffing practices when discussing Hain's financial success and inventory levels at its distributors."). Herein, CWs state that Defendants approved a massive Q4 2021 Pull-In that pulled forward future sales to address weakening demand and excess inventory, while continuing to assure investors that demand remained strong and inventory growth was to meet strong demand. ¶¶58-83, 94, 99, 101-07, 111, 113, 117-20, 123, 125-26, 130, 133, 136, 144, 146-49.

Puffery defenses where defendants described demand or inventory conditions as "strong" or "robust" while omitting facts that rendered those descriptions misleading are likewise rejected. *See Novak*, 216 F.3d at 315 ("[T]he complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true."); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (describing credit portfolio as "strong" and "robust" was not puffery where defendants failed to disclose facts undermining those claims).

Defendants' puffery argument depends on isolating select words while ignoring the context in which the statements were made and the undisclosed conduct that allegedly rendered them misleading. The Second Circuit has expressly rejected that approach. *Peloton*, 153 F.4th at 300-301 (holding that a statement describing demand as "robust" was not actionable because it was tied to guidance the company ultimately met, and not because it was mere puffery); *Hain*, 156 F.4th at 140-43. Defendants' assurances of "strong" and "robust" demand were not vague optimism

33

untethered to facts; they were affirmative explanations for reported performance while, *inter alia*, demand was declining and inventory was consequently ballooning. ¶¶92-96, 97-108, 110-15, 117-23, 125-26, 128, 130-33, 135-37, 143-49.

### C.    Plaintiff Pleads a Strong Inference of Scienter

Pursuant to the PLSRA, "a plaintiff must allege facts giving rise to a 'strong inference that the defendant acted with scienter.'" *Hain*, 156 F.4th at 143 (cleaned up), *quoting* 15 U.S.C. § 78u-4(b)(2)(A). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Hain*, 156 F.4th at 143 (cleaned up), *quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). The PSLRA's "strong inference" of scienter standard is satisfied when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as strong as an opposing inference. *Tellabs,* 551 U.S. at 308; *see also Hain*, 156 F.4th at 143-44.

The SAC properly pleads scienter by showing "strong circumstantial evidence of conscious misbehavior or recklessness." *Hain,* 156 F.4th at 144; *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,* 28 F.4th 343, 355 (2d Cir. 2022). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak* 216 F.3d at 308. Furthermore, Plaintiff meets its "scienter burden with both motive-and-opportunity and circumstantial allegations, considered collectively." *Hain*, 156 F.4th at 144.

The Individual Defendants had knowledge or access to facts contradicting their statements. Indeed, the SAC is replete with information from one executive and four management level CWs regarding Stanley and the Individual Defendants' knowledge and access to facts demonstrating Stanley's declining demand throughout the Class Period. *See, e.g.*, ¶¶43-54, 67-68, 71, 76-77, 79, 82-85, 88-91. As alleged in the SAC, *inter alia*, "Stanley conducted monthly meetings that were

34

known in the Company as MAP meetings. These meetings were part of the sales and operations planning with a focus on reviewing major accounts." ¶48.[16] The SAC provides the meetings' date (usually Monday), location (including room, city and state), approximate number of attendees and the areas in which they worked (finance, sales, supply and demand), length (4-6 hours), topics of discussions (*inter alia*, results, targets and projections), and type of presentations (PowerPoint decks). The SAC also states that Defendant McChesney attended most of the meetings, with a binder of the PowerPoint decks and his notes and regularly asked questions. ¶¶48-52. CW2, CW3, CW4 and CW5 also attended these meetings. ¶¶51, 54, 82, 89-90. The SAC also provides that if changes were made to the PowerPoint decks during the meetings, the decks were recirculated by email after the meeting. ¶50. Contrary to Defendants' assertion, the Q4 2021 Pull-In was discussed at MAP meetings. ¶52.[17] Furthermore, according to CW3, a Stanley VP of supply chain and global planning during the Class Period, Defendant Allan was involved in discussions regarding the Q4 2021 Pull-In, and that it could not have been executed without Loree knowing about it. ¶¶35, 84. CW5 stated that the Pull-In exceeded dollar limitation amounts such that top executive (i.e., CEO or CFO) approval was needed. ¶85. Moreover, it strains credibility to claim that an unprecedented and historic Pull-In would not need approval from the top executives of Stanley.

After MAP meetings, McChesney typically met with Defendants Allan, Loree, and other top executives (including CW3) for the Executive Meetings. ¶¶53-54. The executives also received summarized versions of the PowerPoint presentations made during the MAP meetings. ¶53. After the Executive Meetings additional feedback was provided to the sales and operations teams. *Id*.

The CWs also detailed how Stanley had access to portals providing, *inter alia*, Lowe's and

---

[16] Defendants do not deny that the MAP meetings occurred as the SAC alleges.

[17] Defendants also claim that the CWs did not interact with the Defendants, which is false. At a minimum, as alleged, CW3 attended MAP meetings that McChesney attended, as did other CWs. ¶¶51, 54, 82, 89-90. CW3 also attended the Thursday meetings after the Monday MAP meetings. ¶54.

Home Depot's inventories and sell-through data, allowing Stanley to see what was selling and not selling with these customers. ¶¶45-46, 77. Notably, every Monday a massive Company distribution list received a report ran from Lowe's Link, regarding Lowe's sell-through of products. ¶¶44, 77.

Most importantly, each of the five CWs provide first-hand knowledge that declining demand was evident at these meetings and through accessible business reports/documentation beginning during the second half of 2021. *See, e.g.*, ¶¶43-54, 67-68, 71, 76-77, 79, 82-85, 88-90. As a result, to make up for the declining demand and meet Company targets, Defendants arranged for the massive Pull-In with Lowe's. *See, e.g.*, ¶¶57-61, 63, 65, 82-83, 85. Such actions have been found to satisfy the scienter requirement. *See*, *e.g.*, *Blanford*, 794 F.3d at 308; *STMicroelectronics*, 2025 WL 2644241, at *3 (scienter found were defendants were providing information to investors that contradicted what was actually occurring at the company); *SolarEdge*, 2025 WL 1031154, at *13 (scienter found where defendants touted data in reports to investors, creating a reasonable inference that executives looked at reports showing inventory and demand).

These allegations show circumstantial evidence of Defendants' conscious misbehavior or recklessness regarding the accuracy of their public statements. *See SolarEdge*, 2025 WL 1031154, at *12-13 (data and reports regarding demand and inventory were sufficient for a reasonable inference of scienter as to corporate executives); *STMicroelectronics*, 2025 WL 2644241, at *3 (circumstantial evidence can support inference of scienter in various ways, including that defendants had access to contrary information or it can be inferred from defendants' concrete statements regarding visibility, such as to inventory); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, 2011 WL 494753, at *9 (D. Conn. Feb. 7, 2011) ("By specifically alleging that the defendants were at Executive Operations Committee meetings, received daily updates about production levels, and had an internal system for tracking inventory, plaintiffs have offered circumstantial evidence of

36

conscious misbehavior or recklessness."); *Stadium Capital LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at \*6 (S.D.N.Y. Feb. 5, 2024) (finding a strong inference of scienter after the complaint specifically alleges the CEO and CFO had access to the company's books and records).[18]

Moreover, as the Second Circuit recently affirmed, the scienter inference is bolstered by the fact "that the alleged fraud touched on large swaths of [Stanley's] U.S. business and areas of critical import to [Stanley] and its executives, who [this Court] may infer 'are likely to know more about things central to their business.'" *Hain*, 156 F.4th at 148; *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 137 (D. Conn. 2021) (an inference of scienter is buttressed by Plaintiff's "core operations" allegations), *citing Lexmark*, 367 F. Supp. 3d at 37. "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *Bos Ret.*, 556 F. Supp. 3d at 137 (cleaned up), *citing In re Supercom Inc. Sec. Litig.,* 2018 WL 4926442, at \*31 (S.D.N.Y. Oct. 10, 2018) ("a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'").

In this instance, besides the reports, data, and meetings mentioned above, Defendants were "likely to know whether demand had fallen substantially" for the segment of their business (Tools & Outdoor) which comprised approximately 82% and 85% of Stanley's total revenues in 2021 and 2022, respectively. ¶41. *See Stadium Capital*, 2024 WL 456745, at \*5 (finding the individual defendants "were likely to know whether demand had fallen substantially for the product that accounted for more than 99% of the company's revenue."); *Oklahoma Firefighters*, 367 F. Supp.

---

[18] Additional allegations that support a finding of scienter include the executives' incentive plan predicated on performance which incentivized them to hit the targets. ¶¶162-68; *see also* ¶¶172-73 (Allan's compensation agreement upon becoming CEO). The Company itself was incentivized to appear financially strong in order for it to complete a $1 billion public Notes offering on February 24, 2022. ¶169-71.

3d at 38 (finding "the importance of a [Europe, Middle East, and Africa segments] channel inventory" from a division that comprised 83% of the company's business "moves the needle in [p]laintiffs' favor."); *see also Doller v. Hertz Glob. Holdings, Inc.*, 2025 WL 2896919, at *6 (M.D. Fla. Oct. 10, 2025) (scienter found based on reports or data showing information contrary to statements even though plaintiffs did not show defendants actually reviewed reports or data).

### D.      The SAC States a Valid Rule 10b-5(a) and (c) Scheme Claim

As an initial matter, Defendants' motion does not address the Rule 10b-5(a) and (c) claims and, accordingly, Defendants' have waived any attempt to dismiss those claims. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (arguments raised for the first time in a reply brief are waived). Consequently, even if Defendants attempt to address these claims in their reply, they have already waived them, and even if Plaintiffs' Rule 10b-5(b) claims are dismissed, this action should go forward.[19]

In any event, scheme liability has been adequately alleged. "Scheme liability claims brought under subsections (a) and (c) of Rule 10b-5 'must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" *Oklahoma Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 418 (S.D.N.Y. 2025), *citing Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

Here, Defendants are liable because they engaged in deceptive conduct concealing declining demand and hiding the fact that inventory was consequently building. They acted to inflate sales data and conceal declining demand by causing Stanley to engage in an unprecedented Pull-In during Q4 of 2021. Without that Pull-In, it would have been revealed that demand was

---

[19] Similarly, Defendants have waived the right to make any arguments regarding materiality. *See, e.g.*, MTD at 8 (recognizing that to state a claim, *inter alia*, Plaintiff must allege materiality).

declining because Q4 sales in 2021 would have been significantly lower than Q4 2020 sales, and Defendants' claim that inventory needed to be increased to meet the strong demand would have been shown to be false and that Stanley's inventory buildup was due to declining demand.

In further support of their scheme, Defendants did not comply with the requirements of Items 105 and 303, failing to reveal the month-after-month trend of declining demand and increasing inventory due to declining demand during the Class Period, and that the declining demand, along with the inventory buildup, were creating a risk that required disclosure. Failing to make those disclosures furthered the scheme. *See SEC v. Rio Tinto PLC*, 41 F.4th 47, 49 (2d Cir. 2022) ("misstatements and omissions can form *part* of a scheme liability claim").

Moreover, the deceptive nature of Defendants' conduct is corroborated by Stanley's increasing liquidity strain during the Class Period. As alleged, on or about February 24, 2022, the Company completed a Notes Offering, without disclosing declining demand, that raised approximately $991.9 million in net proceeds, which Defendants stated would be used, among other things, to repay existing indebtedness. *See* ¶¶ 169-71. During the same period, due to declining demand, the Company's total debt increased from approximately $5.6 billion on October 2, 2021 to approximately $11.8 billion by July 2, 2022.

These developments occurred while free cash flow significantly deteriorated, inventory continued to build, and demand weakened. *See* ¶¶ 94, 118, 126, 136. Viewed alongside the undisclosed pull-forward sales and Defendants' public assurances of strong demand, the Notes Offering further supports the inference that Defendants engaged in a course of conduct designed to mask deteriorating business conditions and preserve the appearance of organic performance.

The above allegations are sufficient to allege scheme liability. *See*, *e.g.*, Musk, 779 F. Supp. 3d at 420 (scheme liability claims upheld where defendants allegedly sought to conceal share

ownership from investors); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 471 (S.D.N.Y. 2017) (scheme claims upheld where plaintiffs alleged deceptive act beyond mere misrepresentations); *see also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (scheme allegations upheld based on deceptive act that tended to create an appearance different from reality).

### E.    Plaintiff's Section 20(a) Control-Person Claim is Properly Pled

Because the SAC adequately pleads violations of §10(b), including scienter, the §20(a) control-person claim is not subject to dismissal for failure to establish predicate liability for each of the Individual Defendants' culpability. *See Hain*, 156 F.4th at 151. With respect to the element of control, "courts in the Second Circuit only require the plaintiff to satisfy the pleading requirements of Rule 8(a), rather than the heightened Rule 9(b) standard. *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 176 (D. Conn. 2019). As a result, "the factual issue of a Section 20(a) defendant's control over a primary violator is ordinarily not resolved summarily at the pleading stage." *Id*.

### F.    Leave to Amend is Appropriate if Any Part of the Motion is Granted

If this Court is inclined to grant any part of the Motion, Plaintiff respectfully requests leave to amend or leave to file a motion to amend after the Court issues any order on the Motion. The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107-08 (2d Cir. 2022). The Court has not previously ruled on any aspect of Plaintiff's claims.

## IV.    CONCLUSION

Plaintiff respectfully requests this Court deny Defendants' Motion.

January 29, 2026                                        **ABRAHAM, FRUCHTER**
                                                        **& TWERSKY, LLP**

                                                        */s/ Lawrence D. Levit*

40

Mitchell M.Z. Twersky (admitted *pro hac vice*)
Atara Twersky (admitted *pro hac vice*)
Lawrence D. Levit (admitted *pro hac vice*)
Dylan A. Berger (admitted *pro hac vice*)
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
mtwersky@aftlaw.com
atwersky@aftlaw.com
llevit@aftlaw.com
dberger@aftlaw.com

**Counsel for General Retirement System of the City of Detroit and Lead Counsel for the Class**

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Erin Green Comite (CT 24886)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
ecomite@scott-scott.com

**Local Counsel for the Class**

**VANOVERBEKE, MICHAUD
    & TIMMONY, P.C.**
Michael Vanoverbeke
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
mvanoverbeke@vmtlaw.com

**Additional Counsel for Plaintiff**

41