# EXHIBIT 1

2026 WL 296451
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

In re e.l.f. Beauty, Inc. Securities Litigation

Case No. 25-cv-02316-EKL
|
Filed 02/04/2026

**ORDER GRANTING MOTION TO DISMISS IN PART**

Eumi K. Lee United States District Judge

**\*1** This is a securities fraud case brought against cosmetics company e.l.f. Beauty, Inc. ("e.l.f."), and its chief executive officer, Tarang Amin, and chief financial officer, Mandy Fields ("Defendants"). Compl. ¶¶ 6, 39, 40, ECF No. 55. The crux of the complaint is that Defendants "falsely told investors that demand" for the company's products "was as strong as ever" despite "knowing that demand and sales growth had slowed to its lowest levels in years." *Id.* ¶ 1. Plaintiffs claim that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the United States Securities and Exchange Commission ("SEC"). *Id.* ¶ 310. Plaintiffs also claim that Amin and Fields are liable as "controlling persons" of the company pursuant to Section 20(a) of the Exchange Act. *Id.* ¶¶ 320-323. Having reviewed the parties' submissions, the Court finds this matter suitable for disposition without oral argument. *See* Civil L.R. 7-1(b). For the following reasons, the Court finds that Plaintiffs sufficiently alleged securities fraud based on statements made by Amin in November 2024. Accordingly, the motion is GRANTED in part and DENIED in part as explained below.[1]

Plaintiffs' theory is that Defendants exploited a gap in investors' knowledge about sales trends to fraudulently overstate consumer demand. Because e.l.f. "largely acts as a retail distributor" to retail stores, the company tracks its sales *to* retailers ("sell-in sales") as well as sales *by* retailers to end consumers ("sell-through sales"). *Id.* ¶¶ 6, 51, 61-64, 67. Sell-through sales are important "because they are the primary indicator of consumer demand." *Id.* ¶ 62. Ulta Beauty is one of e.l.f.'s most significant retailers, accounting for up to 15% of e.l.f.'s net sales. *Id.* ¶ 84. But, critically, Ulta Beauty is one of e.l.f's "untracked channels" – that is, sales channels for which commercial aggregators like Nielsen do **not** track sell-through data. *See id.* ¶¶ 69-72, 102. As a result, investors had "virtually no visibility into" e.l.f.'s actual sell-through sales at Ulta Beauty and in other untracked channels. *Id.* ¶¶ 11, 22. Throughout 2024, e.l.f. was amassing substantial inventory. Without knowing e.l.f.'s sales in untracked channels, investors could not discern whether e.l.f. was ordering "more inventory to meet strong demand," or just the opposite – that inventory was piling up because "demand was slowing, and retailers were not ordering more product ... because they already had existing inventory left at their store." *Id.* ¶ 12.

**\*2** Plaintiffs allege that demand for e.l.f.'s products was in fact weakening. Plaintiffs rely on several confidential witnesses ("CWs") to support this claim, and their statements indicate that e.l.f. experienced unfavorable sales trends and weakening demand throughout the second half of 2024. *See, e.g.*, Compl. ¶¶ 15, 23, 113, 114, 133, 145, 213. For example, CW4 "attended monthly forecast meetings" with Amin and others during which sales data, "contemporaneous negative sale trends," and "excess inventory" were discussed. *Id.* ¶¶ 15, 113. CW4 claims that e.l.f.'s sales "began to decline 'across the board' in Summer 2024" and that the company's "overall sales were ... below the Company's internal projections" at that time. *Id.* ¶¶ 23, 114, 145, 213 (recounting that e.l.f.'s sales slowed and "were roughly 12% below ... internal projections in September and October" 2024). Consistent with these general trends, CW2 recalls that e.l.f.'s sales at Ulta Beauty "significantly declined in June or July 2024 and stayed down throughout the rest of 2024." *Id.*; *cf. id.* ¶ 133 (CW3 recalling that sales at Ulta Beauty "began to decline in August or September 2024"). Yet, despite these trends, Defendants represented that consumer demand for e.l.f. products was "strong." *See, e.g., id.* ¶¶ 1, 13, 115.

For the most part, these allegations fail to establish that the statements challenged in the complaint were false or misleading.

First, many of the challenged statements were made earlier in 2024, before the unfavorable trends emerged. *See id.* ¶¶ 115-118, 164, 172-174, 180-183. Other statements were made in August 2024, *see, e.g., id.* ¶¶ 22, 128, 187, 191, but these statements described e.l.f.'s financial results for "April through June 2024," *id.* ¶ 20. Although certain CW accounts suggest that negative trends began to materialize as early as June 2024, other accounts suggest that the trends did not materialize until August or September 2024. *See id.* ¶¶ 23,

114, 133, 145, 213. Thus, Plaintiffs have not plausibly alleged that the August 2024 statements were false or misleading.

Second, some of the challenged statements were *true* based on the allegations in the complaint. For example, Fields stated in November 2024: "[W]e have the inventory that we need to continue to support the demand that we're seeing." *Id.* ¶¶ 139, 204; *see also id.* ¶ 205 ("[W]e feel quite comfortable with the inventory that we have on hand and believe that it will be enough to help service that demand that we're seeing."). The message conveyed by these statements is that e.l.f. had *enough* inventory, and that it was not concerned about having insufficient inventory to meet demand. Plaintiffs have not alleged that these statements were false or misleading – *i.e.*, that e.l.f. had insufficient inventory. Rather, these statements are consistent with Plaintiffs' allegations that e.l.f. had too much inventory because demand was weakening. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (holding that a statement is false or misleading if it directly contradicts what the speaker knew at the time, or if it creates an impression of a state of affairs that differs materially from the one that actually exists).

Third, many of the challenged statements are inactionable puffery and corporate optimism. *See, e.g.*, Compl. ¶ 131 ("[W]e are pleased with what we're seeing" and "we have increased confidence on the year."), ¶ 137 (touting the company's "strength" in general terms), ¶¶ 117, 180-181 ("There's still plenty of growth to be had."). No reasonable investor would rely on these statements because they do not provide "a concrete description of the past and present" state of affairs. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017).

However, the complaint plausibly alleges all elements of a securities fraud claim based on statements made by Amin during an interview with Jim Cramer on the television program "Mad Money." *See* Compl. ¶¶ 150-152, 221. On November 20, 2024, Muddy Waters – a well-known short seller – issued a 48-page report analyzing e.l.f.'s inventory and sales trends based on historical data and interviews with three of e.l.f's largest suppliers. Weber Decl. Ex. 12, ECF No. 59-12. The report opined that e.l.f.'s "growth narrative was in trouble" because the company's inventory was growing "due to insufficient sales." *Id.* at 4; *see also* Compl. ¶ 148. The next day, Amin appeared on Mad Money to deny the accusations in the report.[2] Amin stated that e.l.f. had "built up inventory to be able to meet the strong demand that [the company was] seeing." Compl. ¶ 150. Moreover, when

Cramer asked directly about e.l.f.'s business with Ulta Beauty, Amin responded: "[O]ur business is strong." *Id.* ¶¶ 152, 221.

**\*3** Amin's November 2024 statements were misleading in context because they conveyed that e.l.f. was building inventory to meet demand when Amin allegedly knew at the time that inventory was building because demand was weakening. The statements were made to alleviate concerns that sales and demand were decreasing. *See Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) (explaining that "[c]ontext matters" when evaluating a statement's potential to mislead). These statements were also material: Investors relied on e.l.f.'s representations because sales data was not publicly available for untracked channels like Ulta Beauty. Plaintiffs also allege a "strong inference" of scienter, *see id.* at 1127, because Amin attended "monthly forecast meetings" during which the "negative sales trends" and "excess inventory" were discussed, Compl. ¶¶ 15, 23, 113. Finally, the complaint identifies losses proximately caused by the fraud. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789-94 (9th Cir. 2020). On February 6, 2025, the company's stock price dropped by 19.6% upon e.l.f. announcing that net sales growth for the fiscal year would be negative, in part due to "softness in Ulta" that contributed to the sales decline.[3] Compl. ¶¶ 5, 26, 154-160, 238, 239, 242.

Defendants' remaining arguments are not persuasive. First, Defendants argue that they disclosed certain demand-related risks and truthfully told the market that, although they expected sales would continue to grow, the growth rate would decrease. Mot. at 1, 4, 8, ECF No. 58. But these general statements never revealed that e.l.f. was *already* experiencing decreased sales, and that its inventory was growing for that reason. *See In re Facebook*, 87 F.4th at 949-51. Second, Defendants argue that the confidential witness allegations are insufficient. Mot. at 10-12. But these allegations are stronger and more reliable than Defendants acknowledge. For example, the complaint alleges that CW4 attended the same meetings as Amin, and data discussed in those meetings revealed that e.l.f.'s sales were declining "across the board." Compl. ¶ 23. Third, Defendants suggest that Plaintiffs' theory of loss causation is implausible because e.l.f. met or exceeded its guidance. Mot. at 2. But the loss causation inquiry focuses on whether investors suffered losses from the disclosure of fraud, not whether the company was profitable. Fourth, Defendants argue that the company simply updated its forecasts on February 6, 2025, which is "not a corrective disclosure of [the] past." Mot. at 25 (quotation omitted). This argument misreads the complaint, which alleges that

e.l.f. revealed on February 6 that it had *already* experienced soft sales at Ulta Beauty, a fact which Defendants allegedly concealed to that point.

\*\*\*

Plaintiffs have plausibly alleged a Section 10(b) claim against Amin and e.l.f. based on the November 2024 statements, and in that respect Defendants' motion to dismiss is DENIED. The motion to dismiss is GRANTED as to all other statements, including all statements made by Fields.[4] Because Defendants challenged the Section 20(a) claim solely on the basis that Plaintiffs fail to allege an underlying Section 10(b) violation, the motion to dismiss this claim is DENIED as to *both* Amin and Fields.[5]

**\*4** Because this is the Court's first ruling on the sufficiency of the complaint, Plaintiffs may file a second amended complaint by **March 4, 2026**. However, Plaintiffs should be mindful that the current complaint is already far too long for a purportedly "clear and straightforward case." Opp. at 1. Defendants' responsive pleading is due 30 days after the second amended complaint is filed, or if Plaintiffs choose not to amend, 30 days after the deadline to amend. An initial case management conference is scheduled for **March 18, 2026**. The parties shall file a joint case management statement by **March 4, 2026**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 296451

Footnotes

1    This order assumes the reader's familiarity with the relevant facts, legal standards, and the parties' arguments. The facts are drawn from the complaint and documents that are incorporated by reference and subject to judicial notice. *See* ECF Nos. 59, 60. The Court considered these documents solely to provide context for the challenged statements, and to understand what the market knew during the relevant period. *Cf.* Opp. at 7, ECF No. 62 (objecting to consideration of these documents "for the truth of the matter[s] asserted therein").

2    The Court refers to the Muddy Waters report to provide context for Amin's statements, not to establish falsity or loss causation.

3    The August 8, 2024 disclosure fails because the only plausibly-alleged fraud occurred later.

4    Plaintiffs do not plausibly allege scienter as to Fields. First, the complaint asserts that e.l.f.'s "C-suite reviewed sales data" "all the time" because the company was "data-driven." Compl. ¶¶ 73, 146, 214; *see also id.* ¶¶ 258-259 (stating that e.l.f. reviews its products "each year"). These allegations are too general to support a strong inference of scienter. Second, Plaintiffs rely on the "core operations" inference, but that inference applies only in limited circumstances. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-86 (9th Cir. 2008). Plaintiffs essentially allege that, because growth was important, Fields must have been aware of any fact that might impact the company's growth. *See id.* ¶¶ 273-284. Such a broad application of the "core operations" inference would make corporate officers liable for mere negligence in failing to discover fraud, which is impermissible. *In re Facebook*, 87 F.4th at 952-53. Finally, the complaint points to stock sales that Fields made between April and June 2024. Compl. ¶¶ 19, 120, 270. But these sales predate the manifestation of the unfavorable sales trends.

5    Defendants did not contest Plaintiffs' "controlling person" allegations as to Fields. *See* Compl. ¶¶ 285-289. Plaintiffs "need not show the controlling person's scienter or that they 'culpably participated' in" the primary violation. *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.