**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NARESH VISSA RAMMOHAN, *individually and on behalf of all others similarly situated*, *Plaintiff*, | ) | CASE NO. 3:23-CV-00369 (KAD) |
| v. | ) | October 2, 2026 |
| STANLEY BLACK & DECKER, INC., DONALD ALLAN, JR., JAMES M. LOREE, and LEE McCHESNEY, *Defendants*. | ) | |

**MEMORANDUM OF DECISION**
**RE: MOTION TO DISMISS [ECF NO. 81]**

Kari A. Dooley, United States District Judge:

Lead Plaintiff General Retirement System of the City of Detroit ("Plaintiff" or "Detroit GRS") brings this securities class action on behalf of all persons or entities who purchased common stock in Defendant Stanley Black & Decker, Inc. ("Stanley") between October 28, 2021, and July 28, 2022. The Second Amended Complaint ("SAC") alleges that Stanley and three of its executives, Defendants Donald Allan, Jr., James M. Loree, and Lee McChesney committed violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and its associated regulations, by misleading investors about consumer demand for its products. Defendants filed a motion to dismiss, which Plaintiff opposes. For the reasons that follow, Defendants' motion is DENIED.

## I. STANDARD OF REVIEW

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

## II. ALLEGATIONS AND PROCEDURAL HISTORY

For purposes of the motion to dismiss, the following allegations are accepted as true. *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). The Court reserves certain details for its later discussion of the issues.

**Parties**

Stanley Black & Decker is a multinational corporation that primarily manufactures and sells hand tools, power tools, and other outdoor products to consumers and commercial customers. SAC, ECF No. 80, ¶ 38. Stanley's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "SWK." *Id.* ¶ 25. Plaintiff, City of Detroit General Retirement System purchased Stanley common stock during the Class Period, October 28, 2021, through July 28, 2022 ("Class Period"). *Id.* ¶ 1, 24. Defendant Donald Allan, Jr. ("Allan") operated as Stanley's President and Chief Financial Officer ("CFO") at the start of the Class Period, and he was Chief Executive Officer ("CEO") and President effective July 1, 2022, through the end of the Class Period. *Id.* at. ¶ 26. Defendant James M. Loreee ("Loree") operated as Stanley's CEO prior to

Allan, serving from August 1, 2016, through June 30, 2022, as well as functioning as a member of Stanley's board of directors during the Class Period. *Id.* ¶ 27. Defendant Lee McChesney ("McChesney") was Stanley's Vice President of Corporate Finance, as well as the CFO of Stanley's Tools & Storage Business segment at all times during the Class Period. *Id.* ¶ 28. The Plaintiff alleges that the individual defendants, through their positions within the company as executive officers, possessed the power and authority to control the contents of Stanley's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. *Id.* ¶ 31.

**Confidential Witnesses**

Plaintiff has identified several Confidential Witnesses ("CWs") through the course of its investigation into the matter. *Id.* ¶ 32. Plaintiff identified CW1, as a former Stanley employee who worked for the Company from July 2021 to June 2022 as the global demand planning manager. *Id.* ¶ 33. CW2 worked for the company for more than two decades in a variety of positions, and, during the relevant period, he held the title of Director of Supply Chain Operations for Lowe's account with Stanley. *Id.* ¶ 34. CW3 worked as Vice President of supply chain for the Americas region from December 2019 to January 2022 and Vice President of Global Planning from January 2022 to October 2022. *Id.* ¶ 35. CW4 initially worked in sales at a company called MTD Holdings, in which Stanley acquired 20% stake in 2018 and the remainer in 2021, at which point CW4 became a Stanley employee as a national e-commerce sales manager, servicing Amazon. *Id.* ¶ 36. Lastly, CW5 worked at Stanley from September 2013 to August 2025 in a variety of roles, most notably as the North American supply chain manager from July 2020 to July 2021 and then a demand planning manager from July 2021 to August 2022, assigned to the Lowe's account. *Id.* ¶ 37.

**Stanley Tracks Demand**

Stanley's business is comprised of two main units: "Tools & Outdoor" and "Industrial." *Id*. In 2021 and 2022, the Tools & Outdoor unit accounted for approximately 82% and 85% respectively of Stanley's total revenue. *Id.* ¶ 41. These revenues in 2021 and 2022 were distributed through retailers, including home centers, mass merchants, hardware stores, and retail lumber yards. *Id.*

Stanley monitors sales volume and point-of-sale ("POS") data from merchants for its products to accurately measure demand. *Id.* ¶ 41. For example, CW5 stated that Stanley had access to customers' POS data, such as the "Lowe's Link" system used by Lowe's, and used this data to determine replenishment values and inventory status, determining the demand for its products. *Id.* ¶ 42. Other data was made available via the company's information system, which updated either nightly or weekly, and included the sales that Stanley made to customers such as Lowe's, Home Depot, or Amazon. *Id.* ¶ 45.

Moreover, Stanley conducted monthly meetings, known as "MAP" meetings, where the discussion of the sales and operations planning regarding major accounts took place. *Id.* ¶ 48. The MAP meetings took place in person, while some joined remotely, and spanned from about four to six hours. *Id.* ¶ 48–49. During the MAP meetings, leaders presented PowerPoint presentations identifying sales targets, opportunities, the month-over-month change in sales, and the month-by-month gap that existed between actual and forecasted sales. *Id.* ¶ 50–51. Defendant McChesney actively participated in these monthly MAP meetings and received a copy of the presented materials prior to the meeting. *Id.*

**Demand Declines**

As a result of the COVID-19 pandemic and stay-at-home orders, Stanley experienced increased demand in 2020 and in the beginning of 2021. *Id.* ¶ 64. By the start of the Class Period,

however, demand had begun to decline. *Id.* ¶ 64–65, 69–72. In the later portions of 2021 and into 2022, Stanley's inventory was on the rise and it was missing sales goals. *Id.* ¶ 65, 71, 83. The first time Stanley openly acknowledged declining demand was in July 2022. *Id.* ¶ 152.

**Stanley Engaged in Pull-Ins**

Occasionally, one or more of Stanley's customers would agree to take more inventory at an earlier time period than the customer otherwise intended to purchase, an operation known as a "pull-in" or "pull-forward." *Id.* ¶ 57. CW2 states that the Lowe's account was generally pursued for pull-ins when Stanley was not going to meet its sales target. *Id.* Several CWs state that during the fourth quarter ("Q4") of 2021, Stanley pursued a pull-in and ultimately induced Lowe's to take on a larger amount of inventory than it otherwise was expected to purchase during 2022. *Id.* ¶ 58. The Plaintiff alleges this was an attempt by Stanley to meet their Q4 2021 and entire year 2021 sales targets, sell off inventory that had been accumulating while demand was declining, and raise its free cash flow. *Id.* ¶ 58. The CWs estimated that Lowe's took in additional inventory in Q4 2021, equaling more than $200 million, with one estimate being $300 million, which Stanley reported as sales for that time period. *Id.* CW5 stated that overall demand had declined, and Stanley relied on Lowe's for the Q4 2021 pull-in because the Company needed to make up for that decline. *Id.* Despite the pull-in, Stanley did not revise its demand or sales estimates for 2022 downward. *Id.* ¶ 61.

**Defendants' Statements**

Throughout the Class Period, Defendants made statements indicating that demand remained high, Stanley was continuing to grow, and inventory levels were healthy. The SAC provides a thorough recitation of the statements which Plaintiff alleges were false, and the Court merely summarize with some demonstrative examples now.

In Stanley's October 28, 2021 press release, Defendant Loree was quoted as saying "[w]e are pleased to deliver 10% organic growth and record third quarter revenues as customer demand remains robust across the majority of our end markets." *Id.* ¶ 93. On an October 2021 earnings call Defendant Allan, who at the time was Stanley's President and CFO, stated that "[w]e continue to see a range of powerful secular business drivers," *id.* ¶ 100, and indicated Stanley's "desire to maintain temporarily higher levels of inventory to serve the strong demand and improve customer fill rates." *Id.* ¶ 102. On November 12, 2021, Stanley filed with the SEC a Form 10-Q for its 2021 third fiscal quarter ended October 2, 2021 ("2021 Q3 10-Q"), which repeated many of the statements from the October 28, 2021 press release regarding strong or robust demand, and explained net sales decreases as being caused by "accelerating transit costs to meet strong demand, commodity inflation and new growth investments." *Id.* ¶ 107.

On February 1, 2022, Stanley issued its next press release, the title of which proclaimed in part, "Robust Customer Demand Drove Record 2021 Full Year Organic Revenue Growth of 17%." *Id.* ¶ 110. During the February earnings call, Defendant Loree stated, "[w]e benefited from extraordinarily strong customer demand, which continues for our innovative products and portfolio of brands," and that such demand would be buoyed by "several positive secular demand trends that are benefiting our businesses." *Id.* ¶ 117.

On April 28, 2022, Stanley issued a press release attributing revenue growth to "Strategic Outdoor Power Equipment Acquisitions And A Sustained Strong Demand Environment." *Id.* ¶ 130. Despite this claim, Stanley revised its 2022 earnings per share outlook downward. *Id.* ¶ 131. The press release stated that Stanley had made "inventory investments to support the strong demand" but that "Inventory is planned to decline sequentially beginning in the back half supporting an expected inventory reduction in 2022 versus year end 2021." *Id.* ¶ 133. Meanwhile,

on April 28, 2022, Stanley filed a Form 10-Q in which it disclosed that net sales for the first quarter were "partially offset by a 6% . . .decrease from volume." *Id.* ¶ 135. On an earnings call that same month, in response to an analyst who noted that Defendants had revised sales volumes down, Allan stated "[i]t's not necessarily a view that we think demand is slowing. . . . [I]t is not an assumption that there's some significant slowdown related to overall demand." *Id.* ¶ 147.

At the end of each press release was a boilerplate paragraph explaining that actual results may differ, including because of "the impact from demand changes within world-wide markets associated with homebuilding and remodeling." *Id.* ¶ 97, 116, 134.

In July 2022, Stanley issued a press release acknowledging "challenges" caused by "the macroeconomic environment — including inflation, rising interest rates and significantly slower demand." *Id.* ¶ 152. The corresponding 10-Q also indicated that Stanley's inventory levels continued to increase, with a reported total inventory of approximately $6.6 billion as of July 2, 2022, including $4.1 billion in finished goods. *Id.* ¶ 154. This represented an increase from the $4.1 billion in total inventory (including $2.8 billion in finished goods) that Stanley had reported as of October 2, 2021. *Id.*

Following this report, Stanley's stock price declined $18.87 per share, or more than 16%, from a close of $117.45 per share on July 27, 2022, to a close of $98.58 per share on July 28, 2022. *Id.* ¶ 156.

**Procedural History**

Plaintiff Naresh Vissa Rammohan filed the Complaint on March 24, 2023. Compl., ECF No. 1. On June 15, 2023, the Court granted Detroit GRS's motion for appointment as lead plaintiff for the prospective class, pursuant to 15 U.S.C. § 78u-4(a)(3)(B). ECF No. 30. On November 14, 2025, Plaintiff filed its Second Amended Complaint. SAC, ECF No. 80. It asserts two causes of

action: violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a), (b), and (c) (Against all Defendants) (Count 1); and violation of Section 20(a) of the Exchange Act (Against the Individual Defendants) (Count II). Defendants moved to dismiss all counts for failure to state a claim as a matter of law. Mot. Dismiss, ECF No. 81.

## III. DISCUSSION

### A. Section 10(b) of the Securities Exchange Act

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 delineates the types of behavior proscribed by the statute, including deeming it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The Private Securities Litigation Reform Act (PSLRA) amended the Exchange Act's private right of action for violations of Section 10(b) and Rule 10b-5. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Thus, "[t]o establish a claim under § 10(b) and Rule 10b-5(b), 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 119 (D. Conn. 2021) (quoting *Amgen Inc. v. Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 460–61 (2013)).

Fraud claims pursued under the PSLRA are also subject to heightened pleading requirements. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184

(2d Cir. 2014). First, a complaint alleging securities fraud must satisfy Federal Rule of Civil Procedure 9(b), *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000), which requires that "the circumstances constituting fraud . . . be stated with particularity," Fed. R. Civ. P. 9(b). This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). A securities fraud complaint based on misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak*, 216 F.3d at 306. Allegations that are conclusory or unsupported by factual assertions are insufficient. *See Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986).

Defendants argue that the Operative Complaint fails to adequately allege the first and second elements of a *prima facie* securities fraud claim: (1) that Stanley made a material misrepresentation or omission; and (2) scienter. The Court addresses each in turn below.

**i. Material Misrepresentation or Omission**

The first element of a securities-fraud claim is "a material misrepresentation or omission by the defendant." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at161. Put another way, there must be a "substantial likelihood" that the statement or omission "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks and citation omitted).

"The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) ("*APERS*") (citation omitted). Ultimately, "whether a statement is 'misleading' depends on the perspective of the reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).[1] "The inquiry (like the one into materiality) is objective," *id.* at 187, and it considers not only a statement's "literal truth," but also the "context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted).

Defendants dissect the SAC almost statement by statement and argue as to each why it fails to support a substantive Section 10(b) violation. In doing so, Defendants obscure the larger picture painted by the entirety of the SAC. While each statement relied upon must be actionable in context, the analysis does not and cannot ignore that context. Upon reviewing each of the statements relied upon, the context in which they were made, and the additional allegations in the SAC, Plaintiff has plausibly alleged a Section 10(b) claim.

Defendants first argue that Plaintiff's allegations regarding the Lowe's pull-in are insufficient to plead that any of the statements made were false or misleading because (a) the allegations do not explain why Lowe's would agree to such a transaction, (b) a more plausible explanation exists, and (c) Plaintiff does not allege why this pull-in was different from other ordinary pull-ins that occurred on occasion. The Court disagrees.

---

[1] Although *Omnicare* involved Section 11 of the Securities Act of 1933, that provision "shares the relevant text concerning false and misleading statements with Rule 10b-5." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). Consequently, the Second Circuit has "applied the holding in *Omnicare* to claims brought under Section 10(b) of the Exchange Act." *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 50 n.16 (2d Cir. 2023).

Plaintiff alleges that Stanley induced Lowe's to take extra inventory by increasing the incentive payout. SAC ¶ 59. According to CW2, the usual incentive rate was 10%, but Stanley increased it to as much as 15% to encourage Lowe's to go through with the sale. SAC ¶ 59. These allegations sufficiently suggest a reason for Lowe's agreement to the transaction.

Further, Defendants' reliance on *Twombly* to argue that there is a more plausible alternative explanation for the pull-in — that Lowe's also expected high demand — is misplaced. Aside from this argument being wholly speculative, this Complaint presents allegations that are far from the "obvious alternative explanation" discussed in *Twombly*, 550 U.S. at 567. Essentially, *Twombly* held that, absent allegations affirmatively supporting malfeasance, allegations merely that companies each acted in the same manner were insufficient to establish conspiracy. *Id.* By contrast, Plaintiff here alleges more than simply that Lowe's participated in a pull-in. Plaintiff alleges that Stanley increased incentives to induce the pull-in, SAC ¶ 59; that Stanley has access to track inventory and sell-through rates at Lowe's, and thus knew Lowe's did not need the inventory it was purchasing, SAC ¶¶ 67–68; that Stanley "relied on" the pull-in to reduce its own inventory and improve free cash flow, SAC ¶¶ 60, 65, 83; that sales and demand personnel at Stanley and their counterparts at Lowe's were not in favor of the pull-in but were overridden by senior executives, SAC ¶ 82; and that the pull-in was orchestrated because Stanley needed to "hit this number," SAC ¶¶ 82, 84. Considering all of these allegations in combination and in the light most favorable to the Plaintiff, it is at least plausible that the pull-in was planned and carried out to artificially inflate Stanley's 2021 sales and thus render Defendants' statements about revenues and demand false or misleading.

Finally, although no doubt pull-ins can be legitimately carried out in the ordinary course of business, Plaintiff alleges facts, which if proven, demonstrate that this pull-in was different. In

addition to the reasons discussed above, Plaintiff further alleges that this pull-in was historically and unusually large, in that it involved three to six months' worth of inventory. SAC ¶¶ 58, 83. Collectively, these allegations support a reasonable inference that this particular pull-in was not merely carried out in the ordinary course of business, thus rendering Defendants' statements and failure to publicly disclose the pull-in as plausible material misrepresentations or omissions.

Defendants next argue that Plaintiff's allegations regarding missed sales goals are insufficient both because they do not satisfy the particularity requirements of Rule 9 and because they improperly conflate missed sales goals with declining demand and thus fail to sufficiently allege declining demand. The Court disagrees.

Regarding the heightened pleading requirement of Rule 9, Defendants argue that the allegations pertaining to missed sales goals do not identify "where and when the statements were made" and "explain why the statements were fraudulent." *See* Fed. R. Civ. P. 9. Defendants misread or mischaracterize Plaintiff's complaint. Plaintiff does not allege that Stanley made false statements about any particular sales goals. Rather, Plaintiff alleges that Stanley's statements about strong demand were false and misleading, because the data, including but not limited to missed sales goals, indicated that demand was not strong or robust but in fact was declining. For the statements about the strength of demand, Plaintiff pleads with specificity the statements it alleges were fraudulent, in which reports or press releases those statements appeared, and when those statements were published.

Plaintiff also plausibly alleges the reason the statements about continued high demand were false or misleading. Plaintiff specifically alleges that throughout the Class Period, demand was, in fact, declining, and that the Defendants were aware that demand was declining. Plaintiff alleges that multiple of its CWs stated that demand was declining at the latest in Q4 2021. CW2 stated

that the decline was evident in the "second half" of 2021, SAC ¶ 64; CW3 stated that there was "clear declining demand" cause inventory to rise in Q4 2021, SAC ¶ 65; CW4 stated that the "rampant decline" in demand began sometime in the fall of 2021, SAC ¶ 69; and CW1 stated that there was "no data showing demand was still strong in 2022," SAC ¶ 76. Although these allegations do not pinpoint an exact timeframe when demand began to decline, they do sufficiently plead that demand had declined by the start of 2022 at the latest, and thus that the statements made in 2022 were false or misleading when made. *Cf. City of Hialeah v. Peloton*, 153 F.4th 288, 296 n.3 (2d Cir. 2025) (statements that demand began to decline sometime between February and June 2021 were insufficient to infer that demand had declined by February 2021).

As for the statements made in 2021, Plaintiff adequately alleges that demand declined by the time of the statements in Stanley's November 2021 Form 10-Q. Plaintiff alleges that Stanley was already discussing a pull-in with Lowe's by the time of this report. SAC ¶ 8, 82. CW5 stated that Stanley relied on the pull-in because overall demand had declined. SAC ¶ 60.

Plaintiff also alleges facts indicating that demand was declining by October 2021, at the start of the Class Period. CW3 confirmed that demand was slowing by the start of the class period, causing inventory to rise. SAC ¶ 65. This statement is further supported by Plaintiff's allegation that at the end of Q3 2021, net sales were up only 11% compared to the same quarter of the previous year, significantly lower than the approximately 30% increases in the prior two quarters. SAC ¶ 96. While these allegations may not be conclusive, even if proven, they are nonetheless sufficient for the Court to draw the reasonable inference that demand was declining by the start of the Class Period.

Relatedly, Defendants argue that Plaintiff's allegations regarding increased inventory and decreased free cash flow are insufficient to establish that any statements relied upon were either

false or misleading statements. This argument is tied to Defendants' argument that Plaintiff has failed to sufficiently allege that demand was declining during the class period. However, as already discussed, Plaintiff's allegations of declining demand are based not on generalizations but on extensive and detailed allegations from multiple confidential witnesses as well as allegations about Defendants' ability to track sales and practices of doing just that. Moreover, while missed sales targets, increased inventory, and reduced free cash flow might not, in isolation, require an inference of declining demand, when considered in combination and alongside the CW reports of known declining demand, they do lend support toward an inference that demand was in decline by the start of the class period. In sum, Defendants might be right. Perhaps the increased inventory and decreased free cash flow were unrelated to a decline in demand. But it is not for this Court to decide the merits of this claim at this stage of the litigation. Indeed, these arguments are better made on summary judgment or to a jury. Plaintiff's allegations allow for the reasonable inference that the rising inventory was caused by declining demand, and, therefore, that Defendants' statements to the contrary were false or misleading.

Defendants further argue that, because Plaintiff has not identified a single document demonstrating that Defendants had access to contrary facts, Plaintiff's more generalized allegations about knowledge are insufficient as a matter of law. Because this argument speaks to Defendants' knowledge and state of mind, not whether the statements were materially false or misleading when made, it is better addressed in the Court's discussion of scienter, *infra* at 18.

Defendants finally argue that none of the challenged statements are actionable under Securities laws because they are forward-looking, opinions, or puffery. The Court disagrees.

Although Defendants highlight that several of the challenged statements include discussion of "multiyear growth" and "expectation" — phrases which could be markers of forward-looking

nonactionable statements — such phrases do not necessarily define a statement as forward looking. Whether a statement is adequately identified as forward-looking depends on "the facts and circumstances of the language used in a particular report." *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2010). Many of the potentially forward-looking phrases that Defendants rely on are accompanied by statements of present conditions. For example, Defendant Allan's statement during the October 28, 2021 earnings call ("We continue to see a range of powerful secular business drivers that are creating a path for strong multiyear growth for our businesses." SAC ¶ 100.), despite also including language about future growth, plainly discusses present conditions that Stanley "continue[s] to see," conditions which Plaintiff alleges no longer existed by the time of the call. Defendants cannot escape the purported false or misleading nature of their statements about *present* market conditions merely because that statement was in some way tied to a long-term business plan. Indeed, the statement about present market conditions was the very basis upon which the anticipated future growth was premised.

Moreover, for a forward-looking statement to be non-actionable, it must be both identified as such *and* "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Plaintiff sufficiently alleges that Stanley's warning language did not change across the reports, and thus consistently warned that demand hypothetically could decline, despite demand having already actually fallen. Boilerplate language used across reports which remains unchanged even as the warnings are no longer hypothetical does not amount to "meaningful cautionary statements." *See Slayton*, 604 F.3d at 772–73; *Peloton*, 153 F.4th at 302.

The statements which Defendants assert are nonactionable opinions fare similarly. Although portions of some statements may reflect opinions — e.g. "we're confident," SAC ¶ 121

— other portions of the same statements speak to present demand conditions — e.g. "we will carefully watch for any . . . changes in the elasticity of demand," SAC ¶ 121, implying changes to demand have not yet manifest but which Plaintiff alleges had come to pass. Such statements are not rendered entirely inactionable merely because a portion of them may reflect an opinion.

To the extent that Defendants take issue with statements that are entirely opinions — e.g. "It's not necessarily a view that we think demand is slowing," SAC ¶ 147 — Plaintiff alleges facts sufficient to demonstrate why the statements are nonetheless actionable. There are at least three primary situations in which opinion statements are actionable: (1) when the speaker did not hold the belief professed, *Omnicare*, 575 U.S. at 184–85; (2) when the supporting facts the speaker supplied were untrue, *id.*, at 186; and (3) when the statement does not "fairly align[] with the information in the [speaker's] possession at the time," *id.*, at 189. While Defendants' argument focused on the first such circumstance, Plaintiff relies on the third. Thus, the appropriate in inquiry is whether the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.*

Plaintiff alleges that Defendants had knowledge of significant facts indicating rapidly declining demand. Plaintiff's allegations support an inference that this was not a situation where the facts were mixed with "some fact cutting the other way" such that the opinions in question rested on "a weighing of competing facts," *id.*, at 189–90, but rather one where material facts did not "fairly align[]" with the stated opinions. Thus, the statements are actionable.

Finally, the Court is not convinced that the challenged statements are nonactionable puffery. The Second Circuit defines puffery as optimistic statements that are so vague, broad, and non-specific that no reasonable investor could possibly consider them significant in making

investment decisions. *ECA, Local 134 1BEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Whether a representation constitutes mere puffery depends, in part, on the context in which it was made. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). "While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *Id.* (quotations and citations omitted). For example, a defendant-company's statements describing its portfolio as "fantastic," "great," "robust," "strong," "really high quality," or "carefully managed" may not be puffery when, viewed in context, the statements are purported descriptions of the health of the business which the defendant has put "at issue." *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728 (CM), 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018); *In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012). Here, the allegations are not so vague, broad, and non-specific such that no reasonable investor could possibly consider them significant in making investment decisions.

First, Defendants were not talking about the health of the business generally. They were talking about a significant and measurable data point — demand for their products. And the repeated statements that demand was "strong," "robust," or "healthy" were offered as a key driver behind company earnings and as a deflection away from rising inventory and declining free cash flow. Moreover, Stanley repeatedly emphasized high demand in the titles of its quarterly press releases. SAC ¶¶ 93–94, 110–11. "[B]y putting the topic of the cause of its financial success at issue, [a company] then [ ] is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would

significantly alter the mix of available information." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278 (S.D.N.Y. 2012) (alterations in original, quotations and citations omitted). Perhaps in isolation, some of the relied upon statements would not be actionable, but "[b]y touting [these general statements] to such a degree, [Defendant] put the topic 'at issue' such that we cannot say that, as a matter of law, investors would not find these representations material." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d at 80 (quoting *Richman*, 868 F. Supp. 2d at 278).

The Court thus concludes that Plaintiff's allegations support a plausible inference of material misrepresentations or omissions by the Defendants which are not otherwise inactionable under securities laws.

**ii. Scienter**

Plaintiff must also allege that Defendants acted with scienter. *See, e.g.*, *Chill v. GE*, 101 F.3d 263, 266 (2d Cir. 1996). "This scienter requirement for a private action under Rule 10b–5 has been firmly established for at least a generation." *Novak*, 216 F.3d at 306. To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 311. That inference "may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (citations omitted). For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007). Because the Court concludes that Plaintiff has sufficiently alleged the third means of alleging scienter, it need not address the others.

Defendants argue that the Complaint is inadequate by comparing this case to multiple cases holding that allegations of defendants' tracking inventory and having access to sales reports were insufficient to plead a strong inference of scienter. *See, e.g.*, *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *Diaz v. Gap, Inc.*, No. 22-cv-07371, 2025 WL 1293308, at *20 (E.D.N.Y. Mar. 31, 2025), *aff'd sub nom.*, *Smith v. Gap, Inc.*, 177 F.4th 405 (2d Cir. 2026). These cases are inapposite.

For example, in *Gap, Inc.*, the Second Circuit observed that the complaint: did not identify who prepared reports about inventory levels; did not identify when the reports were prepared; failed to describe the content of the reports; and merely relied on "a confidential witness's secondhand account that two store managers told [a defendant] that they had too many plus-sizes and not enough medium sizes in stock." *Gap, Inc.*, 177 F.4th at 413. The Court concluded that the allegations "might support the inference that Defendants knew that certain stores were having inventory problems, but not that [the company] was faltering nationwide." *Id.*

Here, by contrast, Plaintiff's allegations are not so lacking. Plaintiff not only alleges that Defendants had access to tracking data through systems like Lowe's Link and other customer inventory reports, SAC ¶¶ 43, 46, 67, but also describes the types of reports made, the regular intervals and days on which they were prepared and circulated, the positions of people tasked with making the reports and the content of them. SAC ¶ 48–52. The SAC lays out the location and frequency of the MAP meetings, that Defendant McChesney attended the meetings, and that the content of the reports presented during those meeting were then circulated after the meetings.

SAC ¶ 48–51. At least three of the CWs are alleged to have attended these meetings, including one who reported on the Lowe's account, and one who stated that declining demand was discussed at the meetings. SAC ¶ 54, 89, 90. Furthermore, the Complaint sets out the means by which the remaining Individual Defendants became apprised of the information from the MAP meeting, describing the follow-up meeting among executives including the Individual Defendants where they were provided with "an executive roll-up that summarized business, including demand and actual results across all regions." SAC ¶ 53. CW3 is alleged to have attended both monthly meetings and to have first-hand knowledge of this information sharing. SAC ¶ 54.

Thus, the allegations are sufficient to support a strong inference that Defendants knew facts or had access to information suggesting that their public statements were not accurate.

**B. Section 20(a) of the Exchange Act**

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (alteration omitted) (quoting 15 U.S.C. § 78t(a)). To prove a violation of § 20(a), Plaintiff must demonstrate (1) a primary violation of the Exchange Act by the controlled person; (2) control of the primary violator by the targeted defendant, and (3) that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated. *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because the Court concludes that Plaintiff has alleged the requisite primary violation and because Defendants do not argue any other basis for dismissal of Plaintiff's § 20(a) claims, Defendants' motion to dismiss these claims is DENIED.

## IV. Conclusion

For the reasons set forth above, Defendants' motion to dismiss is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of October 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE